**No. 2022-2291**

# United States Court of Appeals for the Federal Circuit

IMPACT ENGINE, INC.,
*Plaintiff-Appellant*

v.

GOOGLE LLC,
*Defendant-Appellee*

Appeal from the United States District Court for the Southern District of California, No. 3:19-cv-1301-CAB-DEB, Judge Cathy Ann Bencivengo

## IMPACT ENGINE'S CORRECTED OPENING BRIEF (Non-Confidential Version)

Garret A. Leach, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Sharre Lotfollahi, P.C.
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

Jason M. Wilcox, P.C.
Stephen C. DeSalvo
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Plaintiff-Appellant Impact Engine, Inc.*

February 2, 2023

## U.S. Patent No. 7,870,497 (Appx53)

**1.** A multimedia communication system comprising:

a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and

a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assemble the communication.

**9.** A multimedia communication system in accordance with claim 1, further comprising a project viewer that renders an assembled communication and transmits the rendered communication via the network to the client computer for viewing in the graphical user interface.

## U.S. Patent No. 10,572,898 (Appx215)

**30.** An online advertisement generation system for autonomously generating and broadcasting a communication to a graphical user interface of a recipient device, the communication capable of being rendered, the online advertisement generation system comprising:

a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;

a communications system server coupled to the media repository, the communications system server being connectable to an internet network, the communications system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data, and comprising:

an advertisement generation engine for autonomously generating the communication, the advertisement generation engine for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to generate the communication, the communication including a collection of slides comprising a grouping of design layers, design elements, and content containers;

a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;

a formatting engine for formatting the communication; and

a distribution engine wherein once the communication is generated and formatted, the communications system server autonomously broadcasts the one or more communications via the distribution engine to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

## CERTIFICATE OF INTEREST

Counsel for Impact Engine, Inc. certify the following:

| **1. Represented Entities**<br><br>The full names of all entities represented by undersigned counsel in this case are: | **2. Real Party in Interest**<br><br>The full names of all real parties in interest for the entities are: | **3. Parent Corporations and Stockholders**<br><br>The full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities: |
|---|---|---|
| Impact Engine, Inc. | None/Not Applicable | None |

**4. Legal Representatives.** The law firms, partners, and associates that (a) appeared for the entities in the originating court or (b) are expected to appear in this Court for the entities, but who have not already entered an appearance in this Court, are:

KIRKLAND & ELLIS LLP: Xaviere Giroud, Kyle Kantarek, Nikhil Krishnan, Caroline Lourgos, Megan New, Katherine O'Sullivan, Justin Singh, Benjamin Yaghoubian

RUTTENBERG IP LAW, PC: Guy Ruttenberg

**5. Related Cases.** The titles and numbers of the cases known to be pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are:

None/Not Applicable

**6. Organizational Victims and Bankruptcy Cases.** Information required under Fed. R. App. P. 26.1(b) and 26.1(c): None/Not Applicable

# TABLE OF CONTENTS

**Page**


Statement of Related Cases .......... viii

Jurisdictional Statement .......... ix

Introduction .......... 1

Statement of the Issues .......... 3

Statement of the Case .......... 4

A. Background .......... 4

1. Impact Engine's Patented Technology Revolutionized Making, Editing, and Distributing Media-Rich Online Ads. .......... 4

2. Google's Accused Products .......... 13

B. District Court Proceedings .......... 15

1. Claim Construction .......... 15

2. Motions to Dismiss .......... 18

3. Summary Judgment .......... 20

Summary of the Argument .......... 26

Argument .......... 29

Standard of Review .......... 29

I. The Asserted Claims Recite Patent-Eligible Subject Matter. .......... 30

A. The Claims Are Not Directed to an Abstract Idea. .......... 32

B. The Claims Recite Unconventional Combinations of Components Representing an Inventive Concept. .......... 41

C. Claims Reciting the "Project Viewer" Component Are Patent-Eligible for Additional Reasons .......... 47

II. The District Court Improperly Granted Summary Judgment of Noninfringement Based on an Incorrect Construction of "Project Viewer." .......... 50

A. The District Court Legally Erred by Construing the Claimed "Project Viewer" as Requiring Structures That Do Not Correspond to the Claimed Functions. ..... 51

1. The District Court's "Project Viewer" Construction, Which Does Not Map Structures to Claimed Functions, Is Legally Erroneously. ..... 54

2. This Court Should Correct the District Court's "Project Viewer" Construction to Match Claimed Functions with Only Necessary Structure. ..... 58

B. The District Court Erred by Granting Summary Judgment of Noninfringement Based on Its Erroneous Construction of "Project Viewer." ..... 67

C. Even Under the District Court's Flawed Construction, Material Factual Disputes Preclude Summary Judgment. ..... 72

III. The District Court Erred in Granting Summary Judgment of Invalidity Under §112. ..... 74

A. Google Forfeited Its §112 Invalidity Challenges. ..... 75

B. Genuine Disputes of Material Fact Preclude Summary Judgment of Invalidity Under §112. ..... 76

C. The District Court's Invalidity Analysis Was Legally Improper Under §112. ..... 80

Conclusion ..... 82

**Note Regarding Confidential Material**

Material redacted at pages 70-71 of the non-confidential version of this brief, and highlighted in the confidential version, concerns substantive details of the accused Google products. All of that information was marked confidential in proceedings below under the district court's governing protective order, and was not, to counsel's knowledge, revealed in publicly available filings or in proceedings open to the public.

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
350 F.3d 1365 (Fed. Cir. 2003) .......... 68

*ADASA Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) .......... 38, 41

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
375 F.3d 1367 (Fed. Cir. 2004) .......... 30

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... 31

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
504 F.3d 1236 (Fed. Cir. 2007) .......... 30

*Amdocs (Isreal) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) .......... 34, 45, 50

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... 41, 45, 46, 49

*Bernard Dalsin Mfg. Co. v. RMR Prods., Inc.*,
10 F. App'x 882 (Fed. Cir. 2001) .......... 67

*CardioNet, LLC v. InfoBionic, Inc*,
955 F.3d 1358 (Fed. Cir. 2020) .......... 40

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) .......... 29, 30, 43

*Centrak, Inc. v. Sonitor Techs., Inc.*,
915 F.3d 1360 (Fed. Cir. 2019) .......... 29, 81

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) .......... 29

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) .......... 46

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) .......... 36, 37, 38

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) .......... 34, 38, 39

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 45

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
830 F. App'x 634 (Fed. Cir. 2020) .......... 41

*Edgewell Personal Care Brands, LLC v. Munchkin, Inc.*,
998 F.3d 917 (Fed. Cir. 2021) .......... 68

*Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*,
919 F.3d 1347 (Fed. Cir. 2019) .......... 29

*Enfish v. Microsoft*,
822 F.3d 1327 (Fed. Cir. 2016) .......... 32, 34, 38, 44

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014) .......... 67

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .......... 34

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) .......... 75

*Head v. Wilkie*,
936 F.3d 1007 (9th Cir. 2019) .......... 29

*Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*,
799 F. App'x 847 (Fed. Cir. 2020) .......... 58

*John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*,
437 F. App'x 886 (Fed. Cir. 2010) .......... 55, 58, 67

*In re Kelley*,
305 F.2d 909 (C.C.P.A. 1962) .......... 66

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) .......... 31, 32, 35, 44

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
355 F.3d 1361 (Fed. Cir. 2004) .......... 67, 69

*Lochner Techs., LLC v. Vizio, Inc.*,
567 F. App'x 931 (Fed. Cir. 2014) .......... 79

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......... 34, 36, 40, 41

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
194 F.3d 1250 (Fed. Cir. 1999) .......... 55, 56, 58

*MTD Prods. Inc. v. Iancu*,
933 F.3d 1336 (Fed. Cir. 2019) .......... 56

*Northrop Grumman Corp. v. Intel Corp.*,
325 F.3d 1346 (Fed. Cir. 2003) .......... 55, 58

*Plastipak Packaging, Inc. v. Premium Waters, Inc.*,
55 F.4th 1332 (Fed. Cir. 2022) .......... 80

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) .......... 38, 43

*Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*,
858 F.3d 1383 (Fed. Cir. 2017) .......... 75

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .......... 34

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......... 30

*Thales Visionex Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017) .......... 47

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
675 F. App'x 1001 (Fed. Cir. 2017) .......... 34, 39, 41

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011) .......... 58

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*,
561 F. App'x 934 (Fed. Cir. 2014) .......... 55, 61

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
782 F.3d 671 (Fed. Cir. 2015) .......... *passim*

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) .......... 3, 24, 80

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) .......... 30, 51, 56

*Winbond Elecs. Corp. v. Int'l Trade Comm'n*,
4 F. App'x 832 (Fed. Cir. 2001) .......... 66

**Statutes**

28 U.S.C. §1331 .......... ix

28 U.S.C. §1338 .......... ix

35 U.S.C. §101 .......... *passim*

35 U.S.C. §112 .......... *passim*

35 U.S.C. §112(f) .......... 51, 55, 58

**Rules**

Fed. R. Civ. P. 12(c) .......... 29

Fed. R. Civ. P. 56(a) .......... 29

**Note:** All quoted emphasis is added unless otherwise indicated.

## STATEMENT OF RELATED CASES

No other appeals have been taken from the proceedings below. Counsel for Impact Engine is not aware of any other case that may directly affect or be directly affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338 over this patent infringement action. The district court entered final judgment on August 31, 2022. Appx1. Impact Engine timely filed its notice of appeal on September 27, 2022. Appx11468-11470. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## INTRODUCTION

Impact Engine pioneered a system that allows non-technical, lay users to make and distribute engaging media-rich online advertisements without programming knowledge and in a manner that consumes less bandwidth. It received industry acclaim and numerous patents for its innovative technology. After years of meetings with Impact Engine, Google copied those inventions to make its own products—Google Ads, Display & Video 360, and YouTube Video Builder—without permission from or compensation to Impact Engine. Having run out of options, Impact Engine sued Google for its willful infringement of eight of Impact Engine's patents (seven of which are now on appeal).

But before a jury could hear Impact Engine's case, the district court entered judgment in Google's favor based on a series of legal errors. After *twice* rejecting Google's §101 challenges, the district court reversed course and incorrectly held most of the asserted claims are invalid under 35 U.S.C. §101. The district court had it right the first time. The asserted claims recite more than the abstract idea of tailored online advertisements. Each one claims a concrete improvement in how to create dynamic, media-rich online ads and recites specific steps for

achieving that result. These claims are thus anything but abstract and, in any event, rely on combinations of software elements that improve online advertising platforms in unconventional ways. The district court concluded otherwise by erroneously describing the inventions at such a high level of generality they are barely recognizable.

For two other claims, the district court granted summary judgment of noninfringement based on an erroneous claim construction and despite a genuine dispute of material fact. Those claims recite a "project viewer" performing different functions in different asserted claims. The district court held that term was a means-plus-function term and identified the project viewer's four specified functions across various asserted claims. But then, rather than separately identifying the structure for each of those functions, the district court held every claim reciting a "project viewer" required the same 300-plus lines of corresponding structure regardless of the function it performs. That flawed construction is reason enough to set aside the district court's summary judgment decision. But even under the district court's flawed construction, Impact Engine's expert showed the accused Google products contain *every* structure associated with *every* "project viewer" function. That analysis, which the

district court never addressed in its decision, should have foreclosed summary judgment as well.

The district court's summary judgment decision also found another claim was not enabled and lacked adequate support in the specification based on less than a page of analysis. The court's terse discussion did not consider any *Wands* factor or any of this Court's §112 precedent. Nor did it address Impact Engine's expert evidence explaining why the claimed "compiling engine" is both enabled and supported by the patent's written description. The court instead expressed "frustration" that different patents use slightly different terminology with the "project viewer" in some patents and the "compiling engine" in others performing similar functions. But there is no frustration-based exception permitting courts to short-circuit the normal §112 analysis. When that analysis is properly applied, genuine factual disputes exist and a jury should decide the §112 issues in this case.

## STATEMENT OF THE ISSUES

**I.** Whether the district court erred by holding claim 1 of the '497 patent and all asserted claims of the '8,253, '832, '632, and '618 patents are invalid under 35 U.S.C. §101.

**II.** Whether the district court erred by:

**A.** construing "project viewer"—a means-plus-function claim term—as requiring structures unnecessary to performing the claimed functions;

**B.** granting summary judgment of noninfringement for claim 9 of the '497 patent and claim 1 of the '6,253 patent based on its incorrect construction of "project viewer"; and

**C.** alternatively, granting summary judgment of noninfringement for those claims despite evidence the accused products include all the allegedly required structure of the claimed "project viewer."

**III.** Whether the district court erred by granting summary judgment that claim 30 of the '898 patent is invalid under 35 U.S.C. §112 for lack of written description and enablement.

## STATEMENT OF THE CASE

### A. Background

#### 1. Impact Engine's Patented Technology Revolutionized Making, Editing, and Distributing Media-Rich Online Ads.

Online advertisements are an essential part of almost every company's marketing strategy today. But in 2005, creating media-rich

online ads required sophisticated graphic-design skills and expertise in complex computer programming. *See* Appx29(Abstract); Appx47(2:57-62); Appx49(5:14-17); Appx1264-1265(¶56); Appx8001-8006. Companies were forced to hire professional graphic designers and advertising agencies. Appx47(1:12-20); Appx1263-1264(¶54); Appx11176-11177(¶40); Appx11178-11179(¶¶46-47); Appx8006.

Hiring these professionals and agencies was expensive. They needed "large amounts of resources" to create media-rich communications. Appx47(1:20-23); Appx1250(¶1); Appx1263-1264(¶¶53-54); Appx11318-11319(¶¶1086-1087); Appx11331(¶1119). And unlike today when parts of media-rich ads (such as the text or size) can be modified dynamically, each ad had to be "created from scratch each time for each and every ad version and size variation," which required more time and money for every update. Appx1263(¶53); Appx1264-1265(¶56); Appx11320(¶¶1091-1092). Without such costly updates, outdated communications quickly became irrelevant. Appx1263(¶53). Ad professionals and agencies were considered "unnecessarily costly for larger enterprises" and "usually cost-prohibitive for small enterprises." Appx47(1:16-20); Appx1250(¶1); Appx1263-1264(¶¶53-54).

Online ads were also historically "static" rather than "dynamic," and thus had to be rendered and downloaded in their entirety for every viewer and website visit. Appx1263(¶53); Appx11321(¶1094). This resulted in large file sizes that wasted bandwidth and degraded ad viewers' experiences by slowing down their website visits. *Id.*; Appx7999; Appx8009-8010; Appx11062; Appx11318(¶1086); Appx11331(¶1119). Everyone using the internet in the late 1990s-to-early-2000s remembers the dreaded spinning hourglass and slow, line-by-line download of webpages. Both advertisers and ad viewers needed a better alternative.

Impact Engine recognized this need and invented a new and more efficient way to create, manage, and distribute media-rich online advertisements. Impact Engine's system did not rely on professional graphic designers or custom programming. Appx47(2:57-62); Appx11316-11317(¶1083). Consequently, business owners benefited greatly from the new system's capabilities, which their non-technical lay employees needed little training to use. Appx11186(¶¶82-83); Appx11329-11330(¶¶1115-1116). They gained access to capabilities previously reserved for highly specialized personnel. Appx1264(¶¶56-57); Appx11320(¶1091). Immediately, they were able to create, revise,

distribute, and make derivative versions of their own high-quality, custom-tailored, dynamic advertisements through an intuitive web-based interface. Appx11181-11182(¶¶51-53); Appx51(10:4-10). Software on Impact Engine's servers used ad layers (such as foreground, background, and navigation controls), each of which could be distributed individually to conserve bandwidth and dynamically modified as needed without recreating the entire ad from scratch. Appx11333-Appx11336(¶¶1200-1206); Appx10585; Appx10594; Appx10601-10603; Appx10611-10618. The resulting ads could then be converted to different formats and sizes as needed. Appx11324(¶1105). Industry observers praised Impact Engine's web-based advertising system as must-have technology that should be "an integral part" of any online advertising strategy. Appx10543; Appx11329-11331(¶¶1115-1117). Impact Engine continues to use its invention in its products and services sold today. Appx10845; Appx10851; Appx11435(¶1219); Appx1262(¶44).

Impact Engine obtained patents to protect its invention. This case involves seven of those patents: U.S. Patent Nos. 7,870,497; 8,356,253; 8,930,832; 9,361,632; 10,068,253; 10,565,618; and 10,572,898. These patents are related, share a common specification, and on their face claim

priority to April 2005. Appx29; Appx55; Appx80; Appx107; Appx134; Appx161; Appx188. Citations to the common specification throughout this brief are to the ’497 patent.

Figure 1 depicts some of patented system’s key components:




Appx31(Fig.1). As shown in the figure, users build advertisements through a “communication builder engine” accessed over a network using a browser window or other graphical user interface. The communication

builder, in turn, includes multiple components, such as a "media repository," a "project viewer," a "compiler," and a "distribution program." Appx48(3:9-29); Appx31(Fig.1); *e.g.*, Appx52(12:6-14).

Communications made using this system "can be created in a layered fashion." Appx47(1:33-35). The communication can be a series of "slides," which themselves can be "a grouping of design layers, design elements, and content containers." Appx48(3:30-32, 3:42-43).

<u>**Sliced**</u>




<u>**Assembled**</u>




Appx8026-8027. This unique layered and compartmentalized structure allows media-rich online advertisements made using the patented system to be easily updated and transmitted using less bandwidth than prior-art ads due to smaller file sizes. Appx8031; Appx1264(¶55); Appx11334-11336(¶¶1202-1206); Appx11051-11052; Appx11062.

Making and modifying media-rich online communications with the patented system is easier and more user-friendly than prior-art computer

systems. Appx29(Abstract); Appx47(2:57-62). For example, "a logical step-by-step, start-to-finish process that requires no programming intervention" can be used, such as an interactive "interview" in which a user's communication is auto-determined using questions that elicit the user's preferred communication type, layout, color scheme, animations, text, graphics, audio, video, and more. Appx47(1:41-44, 2:4-22); Appx48(3:36-41); Appx52(11:61-12:9); Appx36-46(Figs.6-16). The graphics and other media assets, as well as media-rich templates, are stored in the media repository alongside completed communication projects. Appx48(3:9-19); Appx52(11:49-60).

Using the project viewer, which is generated by the project builder, users "can view and assemble" media assets into an integrated communication. Appx48(3:9-12). It is an application that can perform many different functions using numerous algorithms described in the patents. Appx48-51(4:27-9:29). For example, the project viewer can render or "serialize[]" a communication. Appx48(4:27-29). It does so by **(1)** receiving as an input a "project object"—a data structure and associated software programs—"contain[ing] the information necessary for the communication project," **(2)** loading and interpreting the project

object, and **(3)** determining the sequence for loading the communication project (*e.g.*, the arrangement of slides and layers, elements, and containers within each slide). Appx48(4:27-42); Appx8352-8354(¶¶250, 253). The patents describe numerous embodiments of the project object structure defining the communication's layout (*e.g.*, how the content is positioned and width/height of assets) and content (*e.g.*, asset paths and data feeds). Appx49-50(5:7-8:59); Appx8352-8353(¶251).

The project viewer can also send the rendered communication to users' computers in a graphical user interface to allow them to preview the communication. Appx50-51(8:60-9:29); Appx8352-8354(¶¶251, 254). The patents describe achieving this function using either standalone software or an interface embedded in the project builder interface that allows users to see how the finalized communication will look as they edit. Appx50-51(8:60-9:29).

When the communication is ready to be finalized, the compiler puts the communication into a format suitable for transmission. Appx52(12:9-11); Appx33(Fig.3). The distribution program then allows users to distribute the compiled communications "in a variety of ways," including

through a website, email, or physical media. Appx51-52(10:61-11:35); Appx34(Fig.4).

The seven patents claim different aspects of these media-rich online communication systems, including systems having an interactive interview program (Appx78(14:38-59)), a project viewer for rendering and transmitting communications (Appx79(16:5-10)), a project viewer for rendering and displaying communications with auto-play modes (Appx78-79(14:52-15:3)), multiple distribution formats for the resulting advertisement such as mobile, text, and video (Appx104-105(14:55-15:21, 16:11-13, 16:22-24)), a distribution program that uses keywords to determine communication dissemination (Appx131-132(14:56-15:14, 15:20-24, 16:20-26, 16:39-42)), a project viewer for allowing users to view templates and media assets (Appx159(15:14-42, 15:60-63, 16:14-47)), a distribution program for targeted broadcasting of communications over the internet (Appx186-187(16:53-17:16, 17:21-24, 17:48-18:31)), and engines for autonomously generating and broadcasting communications (Appx215(19:39-20:27)). Exemplary claims are reproduced on the front cover of the brief.

### 2. Google's Accused Products

While Impact Engine was innovating its easy-to-use media-rich online advertisement systems and experiencing rapid, nationwide adoption of its patent-pending product, Google was seeking ways to improve its nascent online communication offerings. Appx8060; Appx1251(¶3); Appx1256(¶24). Lacking its own product at the time, Google was impressed with Impact Engine's innovations, represented it was interested in potentially partnering, and met with Impact Engine several times at its corporate headquarters. Appx1255-1260(¶¶19-36); Appx1261(¶42). At Google's insistence, Impact Engine provided prototypes and documentation relating to its patented systems, which Google used without permission to make its own products. Appx1251(¶¶3-4). These products helped transform Google into the titan it is today.

Three Google products are particularly relevant here. The first product, Google Display & Video 360, is a collaborative marketing tool that includes a server-side visual editor for making communications using templates and media assets. Appx5289-5302. The second product, YouTube Video Builder, is a system that allows users to create and

distribute media-rich communications such as video advertisements through a graphical user interface. Appx6027-6045; Appx6079-6080. The final product, Google Ads, is an online advertising platform that allows users to create media-rich advertisements displayed on search engines and partner websites. Appx2649; Appx2671-2683; Appx2690.

The resemblance between Impact Engine's patented systems and Google's products is unmistakable. For example, Google's products are server-side systems that lay users can access over the internet to make media-rich communications (such as advertisements) through a graphical user interface. Appx8478-8483(¶¶372-373); Appx8761-8762(¶¶625-626); Appx8854-8870(¶¶720-726). Those products allow users to view communication templates and media assets held in a media repository, select desired content for integration into their communications, and generate, preview, and distribute them to target audiences in the preferred size and format. Appx8409-8410(¶¶316-318); Appx8483-8532(¶¶374-398); Appx8762-8764(¶¶627-633); Appx8863-8889(¶¶721-750); Appx8919-8933(¶¶814-831). The communications made using Google's products have a layered structure

compartmentalizing desired content. Appx8318-8325(¶¶237-239); Appx8669-8673(¶¶522-525); Appx8891(¶755).

**B. District Court Proceedings**

Impact Engine sued Google in July 2019, alleging Google's Display & Video 360, YouTube Video Builder, and Google Ads products infringe multiple Impact Engine patents. Appx280-281; Appx306; Appx1250-1251; Appx1279-1280; Appx6644-6646. After court-ordered claim narrowing, Impact Engine asserted sixteen claims across seven patents: claims 1 and 9 of the '497 patent; claim 1 of the '6,253 patent; claims 14 and 18 of the '832 patent; claims 4, 21, and 25 of the '632 patent; claims 1, 7, and 12 of the '8,253 patent; claims 14, 16, 22, and 23 of the '618 patent; and claim 30 of the '898 patent. The district court entered judgment that each claim was either invalid or not infringed. Appx1; Appx20; Appx28.

**1. Claim Construction**

The district court issued two claim construction orders three months apart. Appx11475-11484; Appx2-7. In its supplemental claim construction order, the district court construed "project viewer"—a term appearing in ten asserted claims—as a means-plus-function term. Appx7. Impact Engine argued this term referred to a known

programming construct and should be given its plain meaning. Appx7561-7562; Appx7611(¶37). The court disagreed because "[t]he claims and the specification describe the patents' Project Viewer limitation as much more than an application to display a file." Appx6-7. The court concluded that a skilled artisan "reading the claim term Project Viewer and its ascribed functions would [not] understand the structure that would perform these functions." Appx7.

The district court, however, did not adopt Google's proposed structure. Google argued the claimed "project viewer" is a means-plus-function term that performs different functions in different claims, including "rendering an assembled communication, transmitting that rendered communication, and allowing the user to view templates and assets on the [graphical user interface]." Appx7396. Google then identified specific structures it thought corresponded to each function. Appx7397; Appx7399-7401. For instance, Google originally identified the corresponding structure for the rendering function the project viewer

performs in claim 9 of the '497 patent and claim 1 of the '6,253 patent as columns 4:27-46 and 8:61-9:5. Appx2552-2553.[1]

After rejecting both parties' proposed constructions, the district court gave "project viewer" an omnibus construction that did not identify different structure for different functions. The court first identified four "functions performed by the Project Viewer" across the ten claims where that term appears: (1) "rendering [serializing] the communication [i.e., collection of slides]"; (2) "displaying slides in auto-play on or auto-play off modes"; (3) "sending the communication to the client computer"; and (4) "allowing the user to view templates and media assets." Appx7. No claim recites a project viewer that performs all those functions. The district court nonetheless held "[t]he structures disclosed to perform the functions of the Project Viewer are described at Col. 4:27 through Col. 9:19" without identifying the corresponding structure for any individually claimed function. *Id.*

---

[1] Google later pivoted to asserting that rendering a communication requires all the structure at columns 4:27-9:9 based on an off-hand remark the district court made when construing a different term. Appx7400; *see* Appx11483. But it maintained the other functions it identified required different structure described in other portions of the specification. Appx7400.

### 2. Motions to Dismiss

Google moved to dismiss the asserted claims as invalid under §101 three separate times. In its first motion, before claim construction, Google focused on claim 1 of the ’497 patent and argued every asserted claim is directed to the abstract idea of creating customized communications using generic computer hardware and software. The district court disagreed, holding Google had not shown claim 1 of the ’497 patent is representative of all asserted claims and Impact Engine plausibly alleged that claim “sets forth technical elements functioning in a non-conventional or non-routine manner.” Appx11473.

After the first claim construction order issued, Google again moved to dismiss every asserted claim as invalid under §101. Appx11485. Google identified four claims of the ’6,253 patent as representative, all of which included a “project viewer.” *Id.* The district court denied Google’s motion because it determined the claimed “project viewer” was not “a known generic program construct,” but rather was a limited means for achieving claimed functions using the specific structures disclosed in the specification. Appx11485-11486.

In its third bite of the motion-to-dismiss apple, Google targeted claim 1 of the ’497 patent, claims 14, 16, and 23 of the ’618 patent, and claim 30 of the ’898 patent (none of which recite a “project viewer”). Appx8-9. The district court this time granted-in-part and denied-in-part Google’s motion. Appx20. With respect to the challenged claims of the ’497 and ’618 patents, the district court found “the claims are directed at the abstract idea of a system for generating customized or tailored computer communications based on user information.” Appx14. The court found making and distributing such communications “was traditionally performed by professional advertisement agencies,” and the claimed invention merely automates those “conventional activities” using “generic computer components functioning in their known conventional manner.” Appx17-18; *see* Appx15-16. It concluded that, while the claimed combination of elements “may improve the experience of the user” over prior art methods, it “does not improve the functions of the computer.” Appx16-18.

But the district court held claim 30 of the ’898 patent is patent-eligible. That claim expressly requires “grouping the design layers, design elements, and content containers into the collection of slides” that

make up the media-rich online advertisement. Appx215(20:11-18). The district court held these layered slides supply an "inventive concept" by requiring a system that "create[s] th[e] communication using a particular format." Appx19. These "restrictions on how the result [of creating and distributing advertisement content] is accomplished" and the "great detail in the specification" and "how these layered slides … are created," in the district court's view, meaningfully distinguished this claim from the others challenged under §101. Appx18-19.

### 3. Summary Judgment

After exhausting its §101 arguments, Google moved for summary judgment that its products did not infringe certain claims and that others were invalid. Other issues Google raised in its summary judgment motions, which are not at issue here, were denied as moot. Appx28.

**Non-Infringement.** Google first argued no reasonable jury could find the accused products infringe claim 9 of the '497 patent and claim 1 of the '6,253 patent. Those claims require a project viewer that renders the assembled communication. Appx51(9:6-10); Appx78-79(14:64-15:3). Google argued the opinions of Impact Engine's expert, Dr. Wicker, did

not apply the district court's construction of "project viewer" and failed to account for most of the court's required structure. Appx7881.

Dr. Wicker offered two different infringement opinions for the "project viewer" term. His primary opinion correlated the nine structures (or algorithms) in columns 4:27-9:29 identified by the district court with the four claimed functions. Appx8351-8354(¶¶249-254); Appx8392-8393(¶¶293-296); Appx8483-8486(¶¶375-379). Dr. Wicker concluded the algorithms associated with rendering a communication appear in column 4:27-42 and labeled the algorithms in that portion of the specification structures 1-3. That portion of the specification describes "a project object" that "contains the information necessary for the communication project to render." Appx73(4:30-33). "Slides are represented in the project object as elements in an array," *id.*(4:34-35), and the project viewer "interprets" the project object to "determine[] a load sequence for the communication project content" in outputted files. *Id.*(4:35-38). Dr. Wicker explained the accused products include each of those structures. Appx8357-8388(¶¶259-282); Appx8658-8666(¶¶509-516); Appx8885-8889(¶¶741-750).

Dr. Wicker alternatively identified where the accused products contain *every structure* (or its equivalent) from columns 4:27-9:29 regardless of the specific functions each claim reciting the project viewer performed. Appx8354(¶255); Appx8388-8391(¶¶283-287); Appx8666-8669(¶¶517-521); Appx8721-8723(¶¶594-596); Appx8889-8890(¶¶751-754); Appx11456-11457(¶1213). Google contended the district court's construction required Impact Engine to show the accused products had every structure disclosed in the five columns cited by the court so that is what Dr. Wicker did. Like his primary opinion, Dr. Wicker supported this opinion with Google documents, testimony from Google engineers, screenshots of the accused systems, and testimony from Impact Engine's source code expert. *See, e.g.*, Appx8389-8391(¶¶284, 286-287); Appx8667-8668(¶520); Appx8888-8889(¶¶748-749); Appx10190-10192(¶¶63-65); Appx10202-10220(¶¶126-158). Impact Engine raised both of Dr. Wicker's opinions in its summary judgment opposition.

The district court granted Google's motion. The court held the claimed project viewer requires all the structure "identified [in] a significant portion of the specification" from "Col. 4:27 through Col. 9:19 of the '497 patent," regardless of the claimed function. Appx24. "Within

these columns," the district court concluded columns 5:7-8:59 "disclose[] in detail how the project viewer loads the content and design elements selected by the user into containers at various layers to render a communication." *Id.* It concluded Dr. Wicker's primary opinion based on the structures in column 4:27-42 "did not apply any of this detailed description," so "Impact Engine cannot sustain its burden to prove infringement" of the relevant claims. Appx24-25.

The district court did not mention, much less address, Dr. Wicker's alternative opinion that every structure in 4:27-9:29 of the '497 patent is present in each accused product. At the summary judgment hearing, the court remarked that a proper infringement analysis requires examining "columns and columns of information," but "it's not there. It is not here. It is not what [Dr. Wicker] did." Appx11371-11372. When Impact Engine tried to direct the court to where Dr. Wicker performed that analysis, the court responded "I'm ready to move on." Appx11373-11374.

**Enablement and Written Description**. Turning to invalidity, the court held the '898 patent did not enable or adequately describe the "compiling engine" in claim 30. Appx27-28. The court found the patent did "not disclose any information or mechanism that would inform a

person of skill in the art how a compiler as construed in this patent would group the claimed design layers, design elements and content containers into a collection of slides to generate a communication." Appx27. It noted "[t]he patent discloses at length how the project viewer" performs those tasks, but not "a compiling program." *Id.*

Dr. Wicker addressed that concern in his report. He explained a skilled artisan would have understood "the functionality attributed to the project viewer in certain embodiments may similarly be incorporated into other modules, such as the compiler or compiling engine." Appx10493-10494(¶1191). In his opinion, skilled artisans would have known how to compile the project object described in the specification without undue experimentation using "well-understood" and "popular" programming techniques. Appx10494-10495(¶1192).

The district court did not discuss Dr. Wicker's opinions in its two-paragraph analysis or how his opinions failed to raise genuine factual disputes. Appx27-28. The court did not cite any precedent or discuss the *Wands* factors that typically guide the enablement inquiry either. *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Nor did the court mention Google's burden to prove invalidity by clear-and-convincing evidence or

explain how the evidence Google offered met that burden. The district court likewise left unaddressed Impact Engine's argument that Google waived its invalidity challenge by not raising it in its invalidity contentions. *See* Appx9876-9877.

**Patent Eligibility.** Although Google did not move on it, the district court raised §101 *sua sponte* at the summary judgment hearing. Appx11348-11349; Appx11377-11379. After stating "I don't care what [Google] moved on," the court ordered both parties to brief whether claim 1 of the '832 and '632 patents were patent-eligible. Appx11374-11375; Appx11378. The district court found both claims patent-ineligible in its summary judgment order. Appx26. The district court then went even further and, without asking for briefing, also held claims 1, 7, and 12 of the '8,253 patent are patent-ineligible. Appx25-26.

All the claims the district court found patent-ineligible at summary judgment include a "project viewer." Appx25. Although it had previously recognized the "project viewer" was a means-plus-function term that conferred patent eligibility, Appx16(n.6), the district court's summary judgment order did not acknowledge its prior findings or apply its claim construction. Appx25-26. Instead, the district court held the "project

viewer" of the '832, '632, and '8,253 patents is "a known programming construct" that "operate[s] in its known and familiar capacity," and thus could not supply an inventive concept. Appx25-26. As the district court candidly acknowledged, this reasoning relied on a construction of "project viewer" the district court previously rejected. *Id.*

## SUMMARY OF THE ARGUMENT

The district court's judgment should be reversed. Every asserted claim is patent-eligible, Impact Engine put forth evidence showing those claims are infringed, and each claim is adequately described and enabled.

**I.** The district court's conclusion that certain asserted claims are patent-ineligible under §101 is inconsistent with this Court's precedents and should be reversed. The asserted claims are not directed to an abstract idea, as the district court erroneously concluded, but instead recite a first-of-its-kind system allowing lay users to make media-rich online advertisements without hiring expensive professionals. Moreover, that system makes media-rich advertisements with a layered structure that improves computer functionality by consuming less internet bandwidth than prior-art ads. The court also overlooked that the claims recite unconventional elements, both individually and collectively, that

imbue them with an inventive concept. Indeed, the novel use of the "project viewer" in certain claims—which the district court recognized is limited to specific structures described in the specification—gives those claims narrow scope that was neither conventional nor well known.

**II.** The district court's grant of summary judgment that claim 9 of the '497 patent and claim 1 of the '6,253 patent are not infringed should also be reversed. That holding is based on an erroneous construction of "project viewer." After determining "project viewer" was a means-plus-function term and identifying its four different functions across different asserted claims, the district court demanded Impact Engine show for every claimed "project viewer" the same 300-plus lines of structure in the shared specification are present in the accused Google products even though no claim requires every structure or function. This mismatch between claimed "project viewer" functions and corresponding structure should be set aside in favor of constructions that tailor structure to specified functions, as required by this Court's precedents.

Applying the correct "project viewer" construction, genuine disputes of material fact preclude summary judgment of noninfringement. Impact Engine's expert showed, with citations to

copious evidence, where the structures (or their equivalents) described in the specification necessary to perform each claimed function are found in the accused Google products. Regardless, even under the district court's erroneous "project viewer" construction, summary judgment was still inappropriate because Impact Engine's expert showed where *every* structure described in columns 4:27-9:29 of the '497 patent (or its equivalent) is found in the accused products. The district court's noninfringement determination therefore cannot stand under any "project viewer" construction.

**III.** The district court's determination that claim 30 of the '898 patent reciting a "compiling engine" is invalid for lack of adequate written description and enablement similarly should be reversed. Google forfeited this defense by failing to raise it in its invalidity contentions and the district court did not address that forfeiture, warranting at least vacatur. But the Court need not remand because reversal is appropriate. The district court failed to apply the legal framework dictated by this Court's precedents in its analysis and expert testimony creates genuine factual disputes precluding summary judgment under §112.

# ARGUMENT

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a motion to dismiss or for summary judgment under the law of the applicable regional circuit. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1314 (Fed. Cir. 2019); *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019). The Ninth Circuit reviews such decisions *de novo*. *Cellspin*, 927 F.3d at 1314; *Head v. Wilkie*, 936 F.3d 1007, 1010 (9th Cir. 2019). A motion to dismiss may not be granted unless, taking all factual allegations in the complaint as true, "there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012); Fed. R. Civ. P. 12(c). Similarly, summary judgment may not be granted unless, "drawing all reasonable inferences supported by the evidence in favor of the nonmoving party, no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Head*, 936 F.3d at 1010; Fed. R. Civ. P. 56(a).

A district court's patent eligibility determination "under §101 is an issue of law" that this Court "review[s] *de novo*, and may contain underlying issues of fact" that preclude dismissal or summary judgment. *Endo*

*Pharms. Inc. v. Teva Pharms. USA, Inc.*, 919 F.3d 1347, 1352 (Fed. Cir. 2019); *Cellspin*, 927 F.3d at 1314-15. A district court's claim construction, including identification of corresponding structure for a means-plus-function claim, is a legal question also reviewed *de novo* when it is based solely on "evidence intrinsic to the patent." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015); *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236 (Fed. Cir. 2007).

Infringement is a factual question reviewed "for genuine disputes of material facts that would preclude" summary judgment. *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004). Invalidity under §112 is a factual question with respect to written description and a legal question with subsidiary factual questions as to enablement. *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682, 684 (Fed. Cir. 2015).

## I. The Asserted Claims Recite Patent-Eligible Subject Matter.

The district court erred first and foremost by holding over a dozen claims across five different patents were invalid under 35 U.S.C. §101. The asserted claims are directed to new systems that allow users to

create and distribute dynamic, media-rich online advertisements that use less internet bandwidth without needing graphic design or computer programming skills. This technology did not exist before Impact Engine and is patent-eligible as a matter of law. This innovative system allowing non-professionals to create, modify, and distribute media-rich online communications (in a layered fashion) that use less bandwidth than prior-art communications is not "an abstract idea." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 218-19 (2014). Even if it were, "the elements of the claim[s]," individually and together, "contain[] an 'inventive concept' sufficient to 'transform' [any] claimed abstract idea into a patent-eligible application." *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019).

After twice correctly rejecting Google's argument that the asserted claims are invalid under §101, the district court improperly dismissed claim 1 of the '497 patent and claims 14, 16, 22, and 23 of the '618 patent as patent-ineligible (Appx13-18) and later entered summary judgment that claims 1, 7, and 12 of the '8,253 patent, claims 14 and 18 of the '832 patent, and claims 4, 21, and 25 of the '632 patent claim abstract ideas (Appx25-26). The district court's reasoning largely ignores the claim

language and describes the inventions so generally they are barely recognizable. This Court frequently warns courts not to take similar shortcuts and has held similar claims patent-eligible. *See Enfish v. Microsoft*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). It should here too.

### A. The Claims Are Not Directed to an Abstract Idea.

The claimed inventions are "non-abstract improvements to existing technological processes and computer technology" and "patent-eligible." *Koninklijke*, 942 F.3d at 1150. Before Impact Engine's inventions, systems for creating online advertisements using a computer existed, but they required expensive graphic designers and computer programmers to develop, update, and manually post—one-at-a-time—advertisements. Appx47(1:12-26, 1:65-2:5); Appx1263-1265(¶¶ 53-54, 56); Appx7997-8008; Appx11062; Appx11176-11177(¶40); Appx11178-11179(¶¶46-47); Appx11180-11181(¶¶49-50); Appx11186(¶82); Appx11318-11319(¶¶1086-1087); Appx11320(¶¶1091-1092). The resulting ads consumed significant bandwidth. Appx11062; Appx11331(¶1119); Appx7999. Moreover, to update these ads, they had to be taken down, edited, and then re-uploaded in a weeks-long process. Appx1259(¶33). Using the claimed architecture, in contrast, lay users for the first time

could select templates and media assets to create, edit live, and distribute media-rich, non-static advertisements that use less internet bandwidth. *See* Appx29(Abstract); Appx36-46(Figs.6-16); Appx47(1:30-2:22); Appx1264-1265(¶¶55-57); Appx11062-11063; Appx11181(¶52); Appx11186(¶¶82-83); Appx11333-11334(¶¶1200-1202). The claimed systems improved what would become antiquated computer technology.

Claim 1 of the ’497 patent, for example, is directed to more than the idea of generating “tailored computer communications based on user information.” Appx14; Appx17-18. That claim requires a “project builder” with a “graphical user interface” for selecting a “communication project template” and “one or more media assets” to include in an advertisement. Appx53-54(14:38-59). As part of that interface, the project builder conducts “an interactive interview” to elicit “user preferences” about the design, layout, and display of the project template and media assets. *Id.* Based on those responses, the layers (including the template and media assets) are automatically assembled into a “communication” containing one or more slides. *Id.*; Appx11478-11479 (construing “communication” and “slide”). Each slide can include

multiple "layers" (such as a foreground and background) with their own layout and audiovisual content. Appx48(3:30-56); Appx50(7:1-8:59).

This claim language recites more than a mere result or the abstract idea of tailored communications. Claim 1 of the '497 patent instead offers "specific steps … that accomplish the desired result" in a "concrete" way. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir. 2018); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293-96 (Fed. Cir. 2020). Those specific steps, moreover, require "particular information" and specific data structures accessed over a network to put together the user-generated advertisement in a layered format that uses less bandwidth. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *Amdocs (Isreal) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1310 (Fed. Cir. 2016). Indeed, the "specific, structured graphical user interface paired with a prescribed functionality" renders the claim elements patent-eligible. *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1004 (Fed. Cir. 2017); *see Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008-11 (Fed. Cir. 2018); *Enfish*, 822 F.3d at 1337; Appx53(14:44-59). Taken together, the claim elements "recite a sufficiently specific implementation" for "improv[ing] the functioning of

the overall technological process." *Koninklijke*, 942 F.3d at 1151-52. That is all this Court's cases require.

The claims of the '618 patent are similar. They also include a "project builder," which permits access to a "specific database" and "media repository" to allow users to integrate media assets into an "advertisement template," and further provides for "targeted broadcasting of the online advertisement over the Internet." Appx186-187(16:53-17:16, 17:48-18:17). Rather than the ad creator selecting a single media asset in advance, the media asset is dynamically chosen based on "qualitative or quantitative data" about the computer where the advertisement will be displayed, such as the website a user is currently viewing, a user's keyword search, or the computer's geographic location. Appx187(17:1-6, 17:21-24). These claims once again recite a specific way of achieving a desired result, not the result itself. Nothing about this dynamic process is abstract.

The claims of the '8,253, '832, and '632 patents again recite similar structures directed to achieving similar functionality. Appx159(15:14-42, 15:60-63, 16:14-47); Appx104-105(14:55-15:21); Appx131-132(14:56-14, 15:20-24, 16:23-26, 16:39-42). Those patents provide tools for a user

to integrate media assets into an advertising template, but add multiple distribution formats for the resulting advertisement (such as mobile, text, and video). Appx159(15:14-18, 15:25-42, 16:28-42); Appx104-105(14:62-15:17); Appx132(15:3-10). The claims of the ’832 patent further specify the advertisement must be a “communication” with the same layered slides as the ’497 patent and that “when to display” the “communication” is dictated by “keywords provided by a search engine.” Appx104-105(14:62-15:2, 16:1-4, 16:10-12, 16:22-24). These claimed “ordered combination[s]” “allow for the improvement realized by the invention” and are patent-eligible. *McRO*, 837 F.3d at 1313.

The district court erred by overlooking the improvements of the claimed inventions over the prior art. This Court has held claims directed to “a specific improvement over prior systems” that “result[s] in an improved user interface for electronic devices” are not directed to an abstract idea and are thus patentable. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018). In *Core Wireless*, the challenged claims were directed to “computing devices” with “improved display interfaces” that “allow[ed] a user to more quickly access desired data … and functions of applications” in such devices. *Id.*

at 1359. This Court held those claims were patent-eligible because their "improved user interface" was a "specific improvement over prior systems" that made it easier for users to efficiently and quickly navigate data and functions on a small computing device. *Id.* at 1363. The same logic applies to the asserted claims here.

Just like the claims in *Core Wireless*, Impact Engine's patent claims used an improved user interface to make user interaction with a computer system much easier and more efficient. Impact Engine's claimed inventions allowed lay users, for the first time, to easily and cost-effectively make and modify media-rich online advertisements through an improved user interface (*e.g.*, a system including a "project builder" and/or "project viewer") without programming skills. *See, e.g.*, Appx53(14:38-59); Appx186-187(16:53-17:16); *see also* Appx29(Abstract); Appx36-46(Figs.6-16); Appx47(1:30-2:22); Appx1264-1265(¶¶55-57); Appx11062-11063; Appx11333-11334(¶¶1200-1202). Although the district court concluded the patents do "not claim to have created or improved graphical user interfaces," Appx17, that finding ignores the ordered combination of the claimed elements and those systems'

purported advance over the prior art. Appx11337(¶1208); Appx47(1:30-33); Appx36-46(Figs.6-16).

Additionally, contrary to the district court's determination, the inventions of the asserted claims "improve the functions of the computer." Appx16-18. This Court has repeatedly recognized claims directed to an improvement in technological processes, such as computer functionality, are not directed to an abstract idea and are patent-eligible. *See ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 909 (Fed. Cir. 2022) (claim improving "the technological process" for encoding data was patent-eligible); *Core Wireless*, 880 F.3d at 1363 (claims reciting user interface improving computer functionality were patent-eligible); *Data Engine*, 906 F.3d at 1007-11 (claims reciting methods for navigating three-dimensional electronic spreadsheets were patent-eligible because they improved computer functionality); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016) (claims to "new and improved technique" for preserving hepatocytes were patent-eligible); *Enfish*, 822 F.3d at 1338 (claims reciting system involving self-referential tables were patent-eligible because they improved computer functionality).

Similar to the claims at issue in all those cases, the asserted claims here are directed to an improved technological process for making high-quality, dynamic advertisements without the need for knowledge of complex computer code and makes layered ads that require less internet bandwidth. *See* Appx1265(¶57) ("[T]he claims of the Patents-in-Suit embody an improvement to the claimed computer-implemented process that is both palpable and functional."); Appx1264(¶55). The asserted claims require specific structures involving a graphical user interface, which enables non-technical users to make and modify media-rich online communications having a layered structure that can be easily modified without recreating the ad from scratch and that consumes less internet bandwidth. Appx1264(¶55); Appx11479; Appx8031; *see Trading Techs.*, 675 F. App'x at 1004 (claims patent-eligible because they "require[d] a specific, structured graphical user interface paired with a prescribed functionality directly related to the graphical user interface's structure" that resolved prior-art problem). The district court "fail[ed] to appreciate the functional improvement achieved by the specifically recited [system components] in the" claims. *Data Engine*, 906 F.3d at 1011; Appx14-15.

The district court further mischaracterized the inventions as merely "automat[ing] functions previously performed by professional graphic designers." Appx26; *see* Appx16-17. That argument fails here as it did in *McRO*. In *McRO*, animators conventionally had to "manually fix" problematic sequences of animated speech. 837 F.3d at 1307. Although the claims "aim[ed] to automate a 3-D animator's tasks," they were patent-eligible because the "computer [was] employed to perform a *distinct* process to automate a task previously performed by humans." *Id.* at 1307, 1314. So too here. Graphic designers previously created media-rich online ads in a labor-intensive process unique to each ad, Appx1263-1265(¶¶53-54, 56), whereas Impact Engine's claimed inventions replace those manual methods with an entirely *different*, *better* approach using a revolutionary server-side system in which non-technical, lay users can make and distribute media-rich advertisements over a network by integrating media assets into templates having a layered structure, which lessens the burden on internet bandwidth. Appx1264-1265(¶¶55, 57); Appx11333-11334(¶¶1200-1202); Appx8020-8031; *see CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1370-71 (Fed. Cir. 2020) (criticizing district court's "incorrect assumption that the claims are

directed to automating known techniques"); *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 642-43 (Fed. Cir. 2020) (upholding "specific solution" for improving "human-operated washing systems"). The claimed inventions further allow ad content to be updated almost instantaneously even while media-rich online ads are live. Appx1254(¶17); *see* Appx51(9:17-29). Because Impact Engine's patent "claims are not directed to an abstract idea," the §101 "inquiry ends" at step one and the claims should be held patent-eligible. *McRO*, 837 F.3d at 1312; *see ADASA*, 55 F.4th at 909.

### B. The Claims Recite Unconventional Combinations of Components Representing an Inventive Concept.

Even if directed to an abstract idea, the relevant claims recite "inventive concept[s]" that are "significantly more than the abstract idea itself." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016). "Precedent has recognized that specific technologic modifications to solve a problem or improve the functioning of a known system generally produce patent-eligible subject matter." *Trading Techs.*, 675 F. App'x at 1004-05. Impact Engine's claims advanced the art in two important ways.

*First*, creating media-rich online advertisements through an intuitive graphical interface based on project templates and media assets in a network-connected media repository was unprecedented. Appx29(Abstract); Appx36-46(Figs.6-16); Appx1264-1265(¶¶55-57); *see* Appx53(14:38-59); Appx104-105(14:55-15:21); Appx131-132(14:56-15:14, 16:39-42); Appx159(15:14-42, 15:60-63, 16:14-47); Appx186-187(16:53-17:16, 17:48-18:25); Appx11181(¶¶51-52); Appx11321(¶1094); Appx11331(¶1119); Appx11334-11336(¶¶1203-1206). Because of that unconventional combination, companies no longer need professional artists, high-end design software, or their own media assets to create compelling online advertisements. Appx47(1:16-23, 2:57-62); Appx49(5:14-17); Appx1265(¶57); Appx11062-11063; Appx11181-11182(¶53); Appx11186(¶¶82-83); Appx11325(¶1106); Appx11331(¶1119). The combination of a "project builder" with other "discrete processing elements," such as project viewers, compilers, formatters, and distribution programs instead allowed users to generate and modify "display advertisements" for the first time without "extensive manual effort." Appx1264-1265(¶56); Appx29(Abstract); Appx11179-11180(¶48); Appx11181-11182(¶53). "The benefits of the improved

[system] over the prior art methods are significant," and patent-eligible. *Rapid Litig.*, 827 F.3d at 1050; *Cellspin*, 927 F.3d at 1318 (relying on complaint's allegations to find claims patent-eligible).

Several asserted claims add further improvements on top of this fundamental advance. The project builder in claim 1 of the '497 patent "assemble[s]" the advertisement based on "user preferences" about how to tailor the "media assets" and "project template" elicited through "an interactive interview." Appx53(14:44-59). Claim 7 of the '6,253 patent likewise "automatically selects the media asset based upon one or more criteria provided by the user." Appx159(15:60-63). These inventions clearly improve conventional techniques that required custom programming to create media-rich advertisements. Appx47(1:41-44, 1:65-2:5); Appx1264-1265(¶56).

*Second*, the claimed inventions use a "software as a service" model that places the project builder and other components on a server. Appx47(1:12-16, 2:49-52); Appx48(3:6-8). This server-side architecture was unconventional at the time and provides significant benefits, especially given bandwidth constraints at the time. Appx1263(¶53); Appx1264-1265(¶¶55-56). For instance, claims 14 and 22 of the '618

patent allow easily making custom ads with media content that varies based on "data received from the recipient computing device" that will display the advertisement. Appx187(17:1-6). And claims 1 and 7 of the '8,253 patent similarly choose the "distribution format" of the user-created advertisement based on "data received from the recipient." Appx159(15:36-39). These features are possible, at least in part, because the project builder and formatter reside on a server with "a media repository" storing "templates" and "media assets." Appx159(15:19-24); Appx186-187(16:60-17:6) ("a project builder for accessing the recipient specific database as well as the media repository").

Whether the claimed inventions rely on "well-known program constructs" or "generic computer components" makes no difference. Appx15-16. Section 101 asks whether claims improve a technological process, not whether they run on specialized hardware or require novel programming techniques. *See Koninklijke*, 942 F.3d at 1150; *Enfish*, 822 F.3d at 1335. The district court's focus on whether individual components were "well-known" or "generic computer components" is ultimately a symptom of a larger problem with its decision. Appx15-17. The inventive concept is the unconventional combination of those

elements, not the individual components viewed in isolation. *See Amdocs*, 841 F.3d at 1300-01; *BASCOM*, 827 F.3d at 1350.

*BASCOM* is instructive. In that case, the district court held a system that combined conventional components in an atypical manner failed to recite a patent-eligible inventive concept. *BASCOM*, 827 F.3d at 1349-50. This Court disagreed, holding the claims did more than "recite the abstract idea of filtering content" on the internet or "perform it on a set of generic computer components" because the claimed combination resulted in a system that "cannot be said, as a matter of law, to have been conventional or generic." *Id.* at 1350; *see DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (holding claims were patent-eligible because the claimed "ordered combination" of elements was not a "routine or conventional use of the Internet").

The same is true here. The claimed combinations are far more than well-known components arranged in a conventional way. Taken together, they provide new techniques for creating, modifying, and distributing media-rich online advertisements that even the prevailing computerized approaches could not match. Appx1251(¶2); Appx1264-1265(¶¶55-57); Appx29(Abstract); Appx11337(¶1208). Unlike

conventional approaches, the specific techniques Impact Engine claimed enable users to make and distribute such communications more easily, efficiently, and cost-effectively. *See, e.g.*, *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 133 (Fed. Cir. 2022) (claims improving performance and reducing costs were patent-eligible). Further, due to their layered and compartmentalized structure, communications made by the claimed systems also improved computer functionality by enabling dynamic tailoring of the communication and consuming less internet bandwidth than prior-art communications. Appx1264(¶55); Appx11335-11336(¶1206); Appx8031. The claims do not preempt all ways of achieving these results, but instead narrowly recite systems with specific structures arranged in a particular manner. Appx11337(¶1209); *see BASCOM*, 827 F.3d at 1350.

Were there any doubt, the Patent Office agreed during prosecution of the '618 patent. Appx1138-1139. The examiner initially rejected the claims under §101, but later withdrew that rejection after concluding the claims recited patent-eligible technology. *Id.* The examiner ultimately concluded the "media repository," "project builder," "project viewer," and other "technical elements" amount "to more than simply implementing

the functional limitations 'by a computer.'" Appx1094. These "technical elements" "actively communicat[e] between each other, integrate[] and deeply connect[] with each other, and perform[] the recited functional limitations" in non-abstract and unconventional ways. *Id.* Just as "claims directed to a new and useful technique for defining a database that runs on general-purpose computer equipment are patent eligible," so too are Impact Engine's claims for more easily and cost-effectively creating media-rich online advertisements. *Thales Visionex Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017).

### C. Claims Reciting the "Project Viewer" Component Are Patent-Eligible for Additional Reasons.

The asserted claims of the '8,253, '832, and '632 patents are patent-eligible for a second, equally important reason: each requires a "project viewer." Appx105(15:18-21, 16:11-13, 16:22-24); Appx132(15:11-17, 15:20-24, 16:20-26, 16:39-42); Appx159(15:25-29, 15:57-63, 16:28-33). The district court held that term is a means-plus-function element and that—regardless of the function it performs in a given claim—must contain all the corresponding structure in columns 4:27-9:19. Appx7; Appx24-25. Impact Engine disagrees with that construction. *See infra* §II.A. But if the Court affirms that construction, it confirms every claim

with a project viewer is patent-eligible. Appx11465-11466(¶¶11-12); Appx11457-11459(¶¶1214-1218).

Indeed, the district court held two other claims are patent-eligible because they require a project viewer with structures recited in columns 4:27-9:19. Appx16(n.6). It found the "project viewer" recited in at least claim 9 of the '497 patent and claim 1 of the '6,253 patent was not "a known software application" because the specification described the "project viewer" as "significantly more complex than prior art known 'viewer' applications," which drove the district court's construction of that term. Appx12(n.4); Appx6-7. The district court explained, because the "project viewer" was construed "to be a specific and limited component part of the system" that was not a known construct, it was patent-eligible. Appx16(n.6); Appx12(n.4); Appx11463-11464(¶8); Appx11458(¶1216). The same reasoning applies to the "project viewer" terms in the '8,253, '832, and '632 patents.

In its summary judgment decision, the district court did not acknowledge that "project viewer" in those patents is a means-plus-function term. The court instead held the project viewer in these patents is "a known programming construct operating in a manner familiar to

one of skill in the art." Appx25-26. The district court cannot have it both ways, treating "project viewer" as a nonce term for purposes of claim construction and infringement but as a known programming construct for purposes of invalidity. Impact Engine made this point below, but the district court ignored it. Appx11421.

Even if the Court modifies the district court's construction of "project viewer" to limit the necessary structure to the claimed function as Impact Engine proposes, the district court's §101 ruling for the '8,253, '832, and '632 patents should still be reversed. The corresponding structure for sending the advertisement to a client computer—the project-viewer function claimed in these patents—limits the claims to a "specific, discrete implementation" of the allegedly "abstract idea." *BASCOM*, 827 F.3d at 1350. Rather than generically transmitting the ad, the claims require providing software to the client device for receiving the rendered communication from the server, either as standalone software or as software embedded in the project builder graphical user interface. Appx6-7; Appx102(9:9-46); Appx105(15:18-21); Appx132(15:11-14); Appx159(15:26-29); Appx8352-8353(¶251); Appx8354(¶254); Appx8426-8427(¶324); Appx8459(¶347);

Appx8486(¶379). This means-plus-function requirement restricts how the claimed system sends advertisements in ways the district court did not consider and that further confirm the patent-eligibility of the ’8,253, ’832, and ’632 patent claims. *See Amdocs*, 841 F.3d at 1310.

## II. The District Court Improperly Granted Summary Judgment of Noninfringement Based on an Incorrect Construction of "Project Viewer."

The district court erroneously granted summary judgment that Google does not infringe claim 9 of the ’497 patent and claim 1 of the ’6,253 patent. Its decision rests on an incorrect construction of the claimed "project viewer"—a term in ten asserted claims across five asserted patents that the district court treated as a means-plus-function limitation. Rather than focusing on the corresponding structure for the specific functions recited in each asserted claim, the district court held the "project viewer" in each claim must contain the corresponding structures for *all the functions* recited across all ten claims. This improperly construed the "project viewer" term in each claim as requiring structures unnecessary to performing the claimed functions.

There is at least a genuine dispute of material fact over whether the accused products contain the "project viewer" recited in claim 9 of the

’497 patent and claim 1 of the ’6,253 patent. Indeed, even under the district court’s erroneous construction, summary judgment was improper. Impact Engine proffered evidence supported by expert opinion that Google’s products contain *all* the corresponding structure identified by the district court. The district court never addressed that evidence.

### A. The District Court Legally Erred by Construing the Claimed “Project Viewer” as Requiring Structures That Do Not Correspond to the Claimed Functions.

Impact Engine does not dispute on appeal that “project viewer” is a means-plus-function claim term subject to §112(f). A means-plus-function claim limitation is one that “recit[es] a function to be performed rather than by reciting structure or materials for performing that function” and is subject to 35 U.S.C. §112(¶6) (now §112(f)).[2] *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003). Means-plus-function claim limitations are construed using “a two-step process” in which the court “first identif[ies] the claimed function” and then “determine[s] what structure, if any, disclosed in the specification corresponds to the claimed function.” *Williamson*, 792 F.3d at 1351. The

[2] Section 112(f), which applies to patents issuing from applications filed after September 16, 2012, *see Williamson*, 792 F.3d at 1343 n.2, is identical to §112 ¶6, and the analysis under both provisions is the same.

only claim-construction dispute for purposes of this appeal is whether the district court properly identified the scope of the corresponding structures for each claimed function. It did not.

The "project viewer" term appears in ten different claims and performs almost as many different functions. Claim 1 of the '6,253 patent, for instance, recites "a project viewer" that "renders [a] communication in the graphical user interface" and displays slides of the communication "using either auto-play on or auto-play off." Appx78-79(14:64-15:3). Claim 9 of the '497 requires a project viewer that performs the rendering function *and* "transmits the rendered communication via the network to the client computer," but need not include the auto-play function. Appx54(16:5-9). The asserted claims of the '832 and '632 patent recite a project viewer that "send[s] the communication" over "the network" but do not require the viewer render or auto-play the communication. Appx105(15:17-20, 16:10-12, 16:22-24); Appx132(15:11-14, 15:20-24, 16:23-26, 16:39-42). Finally, claims 1, 7, and 12 of the '8,253 patent require a project viewer that "allow[s] the user to view both the online advertisement templates and the media assets" and "to select a media asset for integration with an advertising template."

Appx159(15:25-31, 15:60-63, 16:28-35). A proper means-plus-function construction must identify the corresponding structure for each of these different and separately claimed functions.

The district court, however, did not conduct that analysis. In its claim construction order, it merely summarized the functions associated with the project viewer across all claims, then stated "[t]he structures disclosed to perform the functions of the Project Viewer are described at Col. 4:27 through Col. 9:19." Appx7. The district court did not identify which structures described in these five columns of the specification correspond to each recited function. Later, in the non-infringement portion of its summary judgment order, the district court followed Google's new and misguided argument, concluding the claimed "project viewer" must possess *all* the structures in the entire universe of identified structures corresponding to *any* "project viewer" function. Appx24-25. In other words, the district court ignored the disparate functions of the "project viewer" recited in each individual asserted claim it identified and instead decided, regardless of the function performed by the project viewer in a given claim, the required corresponding structure is *always everything* described in over 300 lines of the specification.

Nothing in principle or precedent supports that construction. It divorces the "project viewer" term and its corresponding structure from the function described in each claim and requires structures far exceeding the corresponding functions in each claim. Once the focus properly returns to the corresponding structure necessary to perform the rendering and auto-play functions recited in claim 1 of the '6,253 patent, the relevant corresponding structure is in column 4:27-42 and 4:48-58. Similarly, the corresponding structure for the rendering and transmitting functions recited in claim 9 of the '497 patent corresponds to columns 4:27-42 and 8:60-9:29—not every structure described in columns 4:27-9:29. The district court erred by concluding otherwise.

#### 1. The District Court's "Project Viewer" Construction, Which Does Not Map Structures to Claimed Functions, Is Legally Erroneously.

The district court's construction of "project viewer" cannot be squared with §112(f)'s text, precedent, or sound policy. Nothing in the statutory text authorizing means-plus-function claiming permits courts to restrict claim scope by demanding structure that exceeds the claimed function. Quite the opposite. Section 112(f) states, when "[a]n element in a claim for a combination [is] expressed as a means or step for

performing *a specified function* without the recital of structure," that "claim shall be construed to cover *the corresponding structure* … described in the specification and equivalents thereof." 35 U.S.C. §112(f). This provision directly ties the "specified function" in the claim to the "corresponding structure" and its equivalents in the specification that are described for performing the "specified function." *Id.*

This Court's precedents have likewise rejected the district court's means-plus-function analysis. Consistent with the statutory text, this Court has consistently held "the statute [does not] permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999); *see Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 561 F. App'x 934, 941 (Fed. Cir. 2014) (stating the corresponding structure for a means-plus-function claim "need only include what is necessary to perform the claimed function"); *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 437 F. App'x 886, 890 (Fed. Cir. 2010) (similar); *Northrop*, 325 F.3d at 1352 ("A court may not import into the claim features that are unnecessary to perform the claimed function.").

That makes sense. A means-plus-function term is, by definition, a meaningless word that derives meaning exclusively from its associated function. *See Williamson*, 792 F.3d at 1350; *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019). Once §112 is invoked, a means-plus-function term such as "project viewer" may essentially be replaced with the word "means" as a placeholder for the structure in the specification necessary to perform the associated claimed function. The fact that same nonce word appears in different claims associated with different functions is irrelevant. The meaning and corresponding structure associated with the otherwise meaningless means-plus-function term in one claim does not carry over to other claims associated with different functions.

Here, the district court violated these principles by requiring structure "beyond that necessary to perform the claimed function" of the "project viewer" recited in each claim. *Micro*, 194 F.3d at 1258. For example, although claim 9 of the '497 patent recites a "project viewer" that performs only two functions—"render[ing] an assembled communication" and "transmit[ting] the rendered communication via the network to the client computer for viewing in the graphical user

interface," Appx54(16:5-10)—the district court construed the corresponding structure to include algorithms for loading content for playback, Appx48(4:43-48), for exchanging information/commands "between the different design layers, or between the project viewer itself and a specific layer," Appx48-49(4:59-5:6), and exemplary design files used to define the layout and content of communications, Appx49-50(5:7-8:49). Those structures are unnecessary to the only specified functions in claim 9 of the '497 patent of "render[ing]" and "transmit[ting]." *See* Appx8352-8354(¶¶249-254).

As another example, those same structures are all required by the district court's construction of "project viewer" for claim 1 of the '6,253 patent, although that claim similarly recites only two functions: "render[ing] the communication" and "display[ing]" the slides using certain "auto-play" settings. Appx78-79(14:64-15:3). Again, neither of those functions requires the structure recited above. *See* Appx8392-8395(¶¶293-300); *see also* Appx8353-8354(¶253). The same holds true for every other claim reciting a "project viewer," none of which specify functions requiring *every* structure described in columns 4:27-9:29 of the '497 patent. *Compare* Appx105(16:10-12, 16:22-24) (specifying claimed

functions); Appx132(15:20-24, 16:23-26, 16:39-42) (similar); Appx159(15:14-42, 15:60-63, 16:14-47) (similar), *with* Appx48-51(4:27-9:29) (describing "project viewer" structures). Because the district court's "project viewer" construction demands structures unnecessary to achieve the specified functions of each asserted claim, just as in *Micro*, *John Mezzalingua*, and *Northrop*, this Court should reverse the district court's decision.

#### 2. This Court Should Correct the District Court's "Project Viewer" Construction to Match Claimed Functions with Only Necessary Structure.

Correctly applying §112(f), the corresponding structure for the four specified "project viewer" functions recited in the asserted claims is narrower than the broad set of structure identified by the district court. In software patents, structure may be supplied by an algorithm. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011); *Intelligent Automation Design, LLC v. Zimmer Biomet CMF & Thoracic, LLC*, 799 F. App'x 847, 851 (Fed. Cir. 2020). As shown below, each claimed function of the "project viewer" is clearly linked to corresponding structure in the specification through textual descriptions of algorithms implemented in computer software.

| Claimed "Project Viewer" Function | Corresponding Structure in '497 Patent Shared Specification |
|---|---|
| "renders" the communication | 4:27-42 |
| "transmits" or "sends" the communication to the client computer | 8:60-9:29 |
| "display[s]" slides using either auto-play on or auto-play off | 4:48-58 |
| "allow[s]" the user to view templates and media assets | 4:27-36;<br>8:60-9:29 |

**Rendering the communication.** One specified function of the project viewer in claim 9 of the '497 patent and claim 1 of the '6,253 patent is "render[ing]" the communication. Appx54(16:5-10); Appx78(14:64-66). The district court construed "rendering" to mean "serializing the project slides and content into a format that can be stored or transmitted." Appx3 (citing Appx48(4:27-30)). The corresponding structure in the specification necessary to perform that function includes algorithms implemented in software for: receiving as an input a project object containing information necessary for rendering; loading and interpreting the project object; and determining a load sequence for the communication project. Appx48(4:27-42); Appx8352(¶250); Appx8353-8354(¶253). That structure is described in column 4:27-42 of the '497 patent. Appx48(4:27-42).

This portion of the specification describes "a data structure and associated software programs called the project object" that "contains the information necessary for the communication project to render." *Id.*(4:30-33). "Slides are represented in the project object as elements in an array," *id.*(4:34-35), and algorithms allow the project viewer to "load[] and interpret[]" the project object and then "determine[] a load sequence for the communication project content" in an outputted set of files. *Id.*(4:35-38). An algorithm for sequencing comports with the fact that the "communication project" exists as a "collection of slides," which are layers comprising design layers, design elements, and content containers. *Id.*(3:30, 3:42-43, 4:43-46); Appx50-51(8:61-9:5); Appx11479.

The district court's determination that rendering a communication requires all the structure described in the "significant portion of the specification" running from "Col. 4:27 through Col. 9:19 of the '497 patent" is plainly wrong. Appx24; *see* Appx7826(14:14-24). Not even Google believed all that structure was required, initially identifying the corresponding structure as only columns 4:27-46 and 8:61-9:5. Appx2552-2553. Google pivoted to asserting that rendering a communication requires over 300 lines of corresponding structure only

after the district court off-handedly remarked when construing a different term that all of columns 4:27-8:59 "describ[e] the operation of the project viewer component to render the selections into the slides." Appx11483; *see* Appx7400. Google offered no analysis for its change of heart justifying sweeping in so much additional structure. Appx7400.

Google had it (mostly) right the first time.[3] An "algorithm need only include what is necessary to perform the claimed function." *Univ. of Pittsburgh*, 561 F. App'x at 941. The additional structure identified by the district court is not necessary to perform the claimed rendering. The "core design files," "configuration file," and "container components" discussed in the specification describe a specific implementation of the claimed algorithm rather than the algorithm itself. Appx49-51(5:18-8:64, 9:10-29). But a means-plus-function term is not limited to "specific embodiments of the invention" or particular "*implementations* of the algorithm." *Univ. of Pittsburgh*, 561 F. App'x at 941. "[O]ther implementations are possible" and within the scope of the claims. *Id.*

---

[3] Google proposed including 8:61-9:5 as corresponding structure based on a construction of "render" that was not adopted. *See* Appx7400; Appx7402; Appx3.

Other structure the district court identified are even less necessary. The structure described in columns 8:64-9:9 are explicitly described as "example[s]," "one embodiment," "a preferred exemplary embodiment," and "an alternative embodiment." These examples are, by definition, not a *necessary* part of the rendering algorithm and, as discussed below, in fact relate to the separate function of sending a communication to a client computer. The auto-play features detailed at 4:48-58 describes the separate and distinct auto-play function recited in claim 1 of the '6,253 and not claimed at all in the '497 patent. Appx48(4:48-58); Appx54(16:5-10); Appx78-79(14:64-15:3).

As another example, the portion of the specification identified by the district court encompasses structure for enabling "basic 'built-in' functionality" between communication components, which is unnecessary to "rendering" the communication (*i.e.*, performing the act of "*serializing*" the communication slides and content). Appx48-50(4:59-8:59); Appx8353-8354(¶253). Indeed, serialization occurs before the communication is transmitted to the client computer or loaded for playback, does not require the data of the communication be in any particular format or file type, and is distinct from providing the

communication "with functionality." Appx48(4:27-30); Appx8353-8354(¶253); *see* Appx48(4:32-34) (distinguishing between "render" and "playback"); *id.*(4:38-42).

The district court itself recognized in its claim construction order that the claimed "project viewer" performs multiple functions beyond "rendering" the communication, such as "displaying slides in auto-play on or auto-play off modes; sending the communication to the client computer; [and] allowing the user to view templates and media assets." Appx7. The corresponding structures for *all* those functions, not just the "rendering" function, are in columns 4:27-9:29. Appx48-51(4:27-9:29). This Court should thus narrow the corresponding structure for the rendering functionality to the algorithm necessary to perform that function—the algorithm described in column 4:27-42. Appx48(4:27-42).

**Sending the communication to the client computer.** Another specified function in some claims is the project viewer "transmits" or "send[s]" the communication to the client computer. Appx54(16:5-10); Appx105(15:18-21, 16:10-12, 16:22-24); Appx132(15:11-14, 15:20-24, 16:23-26, 16:39-42). The corresponding structure described in the specification necessary to perform that function includes either

standalone software that enables live viewing or, alternatively, software embedded into the project builder interface. Appx50-51(8:60-9:29); Appx8352-8353(¶251); Appx8354(¶254). This structure is described at columns 8:60-9:29. Appx50-51(8:60-9:29).

This portion of the specification describes "View Modes" relating to how communications appear to users. *Id.* It describes two exemplary project viewers, including one suitable "for live playback of the communication project" by the user and another "embedded within the communication project builder." Appx51(9:1-5). A skilled artisan would have recognized either structure is sufficient to perform the claimed transmitting function. Appx8354(¶254).

**Displaying slides using auto-play modes.** Another function in claim 1 of the '6,253 patent of the "project viewer" is it allows "display[ing]" the slides "using either auto-play on or auto-play off." Appx79(15:1-3). The corresponding algorithm is described in column 4:48-58. Appx48(4:48-58). This portion of the specification explains the communication project can be played back in one of "two states," either "auto-play on" or "auto-play off." *Id.*(4:48-49). In the "auto-play on" state, the software is programmed so the project viewer automatically advances

through the sequence of communication slides based on a specified time interval. *Id.*(4:51-56). "If auto-play is off, users must use the slide navigation controls to view a different slide." *Id.*(4:56-58).

**Allowing the user to view templates and media assets.** The only specified function of the "project viewer" in claims 1, 7, and 12 of the '8,253 patent is it "allow[s]" the user to view both "online advertisement templates" and "media assets" on the graphical user interface. Appx159(15:26-29, 15:60-63, 16:28-35). "Templates" are "pre-existing general structures and arrangements of a multimedia communication," Appx2-3 (citing Appx52(11:41-43)), and examples of "media assets" described in the patents are "text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc." Appx52(11:50-52). The corresponding structures described in the specification are algorithms for: receiving as an input a project object containing information necessary for rendering; loading and interpreting the project object; and either standalone software enabling live viewing or, alternatively, software embedded into the project builder interface. Appx48(4:27-36); Appx8352-8353(¶¶250-251); Appx8486(¶¶378-379).

As explained above with respect to the claimed "rendering" and "sending"/"transmitting" functions, that structure is described in columns 4:27-36 and 8:60-9:29 of the '497 patent. Appx48(4:27-36); Appx50-51(8:60-9:29). A skilled artisan would recognize this structure allows users to see templates and media assets associated with the project object. Appx8486(¶379). Although some of the structures corresponding to the disparate claimed functions overlap, this Court and its predecessor have recognized "a single structural element may perform two functions." *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 4 F. App'x 832, 839-40 (Fed. Cir. 2001) (citing *In re Kelley*, 305 F.2d 909, 914 (C.C.P.A. 1962)).

The table below summarizes the correct function and corresponding structure for each asserted claim with a project viewer.

| **Claims** | **Function(s)** | **Structure(s)** |
|---|---|---|
| '497 patent, claim 9 | rendering | 4:27-42 |
| | transmitting | 8:60-9:29 |
| '6,253 patent, claim 1 | rendering | 4:27-42 |
| | displaying using auto-play | 4:48-58 |

| Claims | Function(s) | Structure(s) |
|---|---|---|
| ’832 patent, claims 14 & 18 | transmitting | 8:60-9:29 |
| ’632 patent, claims 4, 21, & 25 | | |
| ’8,253 patent, claims 1, 7, & 12 | allowing viewing of templates and media assets | 4:27-36; 8:60-9:29 |

The Court should replace the district court’s omnibus construction of “project viewer” with these claim-by-claim constructions. *See, e.g.*, *John Mezzalingua*, 437 F. App’x at 890; *Bernard Dalsin Mfg. Co. v. RMR Prods., Inc.*, 10 F. App’x 882, 887 (Fed. Cir. 2001).

### B. The District Court Erred by Granting Summary Judgment of Noninfringement Based on Its Erroneous Construction of “Project Viewer.”

After correcting the district court’s flawed construction of “project viewer,” the Court should reverse its summary judgment order. This Court generally reverses grants of summary judgment predicated on improperly construed claims. *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1369 (Fed. Cir. 2004); *see Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338 (Fed. Cir. 2014). The district court’s flawed construction is reason enough to vacate the summary judgment order and

remand for further proceedings. The Court need not resolve the parties' summary judgment dispute, as a matter of first impression, under the correct construction. "[W]here the district court's claim construction is reversed and a new one is given, we frequently remand for the district court to reconsider … whether a genuine issue of material fact exists and whether either party is entitled to summary judgment … using the new claim construction." *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1370 (Fed. Cir. 2003); *see Edgewell Personal Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 922 (Fed. Cir. 2021).

But, if the Court reaches the issue, Impact Engine introduced plenty of evidence that the accused Google products infringe the asserted claims of the '497 and '6,253 patents. Impact Engine's expert, Dr. Wicker, offered detailed opinions explaining where the accused products contain the structures in columns 4:27-42, 4:48-58, and 8:60-9:29. Dr. Wicker supported those opinions with copious citations to Google documents, Google source code, screenshots of the accused systems, deposition testimony from Google witnesses, and opinions from another Impact Engine expert Dr. Krein. *See* Appx8355-8388(¶¶256-282) (explaining Google Ads renders and transmits communications); Appx8392-

8395(¶¶294-300) (showing Google Ads displays communications using auto-play functionality); Appx8647-8660(¶¶496-499, 501-511) (demonstrating Google Display & Video 360 renders communications and displays them using auto-play functionality); Appx8880-8886(¶¶731-743) (same for YouTube Video Builder); *see also* Appx10202-10210(¶¶126-139) (describing certain Google preview functionality). A jury viewing this evidence could reasonably conclude Google's accused products embody the "project viewer" claimed in the '497 and '6,253 patents. *See Liquid Dynamics*, 355 F.3d at 1369.

**The '497 patent**. The project viewer of the '497 patent, as discussed above, performs two functions: "render[ing] an assembled communication" and "transmit[ting]" that rendered communication to the client computer for viewing. Appx54(16:5-10). Dr. Wicker identified where the corresponding structure for those functions is found in the accused Google Ads product. Appx8351-8354(¶¶249-254); Appx8355-8388(¶¶256-282). For the rendering function, Dr. Wicker established Google Ads uses algorithms for serializing project slides and content into a format that can be stored or transmitted by receiving a project object as an input, loading and interpreting that project object, and determining

**CONFIDENTIAL MATERIAL OMITTED**

a load sequence for the communication project. Appx8357-8371(¶¶259-275); *see* Appx10211-10220(¶¶140-158). This corresponds to the structures at column 4:27-42, and Google did not dispute the sufficiency of this evidence below.

Dr. Wicker also showed where the structure for the transmitting function is found in Google Ads. Appx8354(¶254); Appx8372-8388(¶¶276-282). For example, he showed Google Ads contains a accused feature that uses the network to send the communication to the client computer for viewing in the graphical user interface, either [redacted] accused feature or in an accused feature pop-up window. *Id.* This corresponds to the structures from columns 8:60-9:29, and Google again did not challenge the sufficiency of this evidence.

**The ’6,253 patent.** That leaves the project viewer functionality claimed in the ’6,253 patent, structure that renders a communication and displays it using certain auto-play settings. Appx78-79(14:64-15:3). The same evidence discussed above for the ’497 patent establishes Google Ads contains the necessary corresponding structure for the rendering functionality. Appx8392-8394(¶¶293-298). Dr. Wicker also showed the other accused products also contain the structure for that function.

Appx8647-8652(¶¶496-499); Appx8652-8658(¶¶501-508); Appx8880-8885(¶¶731-740).

As for the auto-play setting, Dr. Wicker further established the accused products display the communication with different auto-play modes using the same structure described in the ’6,253 patent. Appx8393-8395(¶¶296-297, 299-300); Appx8658-8660(¶¶509-511); Appx8885-8886(¶¶741-743). For example, he explained “previews of ad variants can be cycled through or paused,” accused feature may be accused feature or accused feature “use of the play/pause button” may allow users to control whether a preview is in an auto-play on or off mode, and whether such modes are used for a preview may be accused feature on accused feature Appx8394-8395(¶¶299-300); Appx8658-8660(¶¶509-511); Appx8885-8886(¶¶741-743). Dr. Krein further identified accused feature and accused feature parameters in the source code of certain Google ad templates. Appx10190-10192(¶¶63-65). This corresponds to the structures at column 4:48-58 of the ’497 patent. That is enough for Impact Engine’s infringement claims to reach the jury.

### C. Even Under the District Court's Flawed Construction, Material Factual Disputes Preclude Summary Judgment.

The Court should reverse the district court's judgment granting summary judgment of non-infringement based on its erroneous construction of "project viewer." But even if the Court affirms that construction, summary judgment still is not warranted. Dr. Wicker offered detailed opinions that the accused Google products contain *all nine* algorithmic structures (or their equivalents) recited in columns 4:27-9:29 of the '497 patent. *See, e.g.*, Appx8352-8353(¶¶249-251) (identifying nine algorithmic structures described at 4:27-9:29); Appx8388-8391(¶¶283-287) (showing the additional structures are present in Google Ads); Appx8395(¶301) (same); Appx8660-8669(¶¶512-521) (same for Display & Video 360); Appx8886-8890(¶¶744-754) (same for YouTube Video Builder). Indeed, Dr. Wicker unequivocally stated the accused products embody the claimed project viewer "even assuming that each of the nine algorithmic structures described in the identified columns is required to be present." Appx8354(¶255) (Google Ads); Appx8721(¶594) (Display & Video 360); *see* Appx8886(¶744) (YouTube Video Builder);

Appx8889(¶751) (same). The district court, without explanation, never addressed this evidence.

Dr. Wicker's opinions were not cursory. Although it is not pertinent to any project viewer function claimed in the '497 and '6,253 patents, he explained at length that each accused product includes algorithms for viewing templates and media assets, for loading content for playback, for an interface permitting interaction between communication components, and for embodiments of the project object structure defining communication layout and content. *See* Appx8388-8391(¶¶283-284, 286-287) (reciting evidence for Google Ads); Appx8395(¶301) (same); Appx8660-8669(¶¶512-521) (same for Display & Video 360); Appx8886-8890(¶¶744-754) (same for YouTube Video Builder).

Dr. Wicker supported those opinions with, among other things, Google documents, *e.g.*, Appx8389-8391(¶¶284, 286-287), Dr. Krein's analysis of Google's source code, *e.g.*, Appx8389(¶284); Appx8390-8391(¶287); Appx10217-10219(¶¶151-155), testimony from Google engineers, *e.g.*, Appx8667-8668(¶520), and screenshots of the accused systems, *e.g.*, Appx8888(¶748). Dr. Wicker also thoroughly analyzed the data structures used in those systems. *See, e.g.*, Appx8235-8236(¶209)

(discussing media repository); Appx8318-8325(¶¶237-239) (describing design layers); Appx8395-8400(¶¶302-303) (same); Appx8360-8362(¶¶263-264) (assessing load sequence); Appx8370(¶273) (same); Appx8368-8370(¶272) (explaining communication generation process).

At the very least, that evidence creates genuine disputes of material fact as to whether the accused products possess the claimed "project viewer" even under the district court's flawed construction. Dr. Wicker's opinions also highlight the district court's conclusion that "Impact Engine's expert did not apply *any* of [the] detailed description of how the project viewer uses the information it is provided to render a communication" found in columns 4:27-9:19 of the '497 patent is simply wrong. Appx24. Dr. Wicker did apply those structures, and his opinions show Google's products infringe. Under any construction, the district court's non-infringement finding must be set aside.

## III. The District Court Erred in Granting Summary Judgment of Invalidity Under §112.

Finally, the district court's grant of summary judgment that claim 30 the '898 patent is invalid under §112 for lack of adequate written

description and enablement should be vacated, if not outright reversed.[4] Google forfeited this invalidity argument, the evidentiary record is rife with facts precluding summary judgment, and the district court failed to conduct a legally proper analysis showing Google satisfied the clear-and-convincing-evidence standard.

### A. Google Forfeited Its §112 Invalidity Challenges.

The district court's §112 ruling should be vacated because it is based on an argument Google forfeited. Failing to timely assert a right or argument amounts to forfeiture. *In re Google Tech. Holdings LLC*, 980 F.3d 858, 862-63 (Fed. Cir. 2020). Google was required to include any §112 invalidity challenge in its invalidity contentions, S. Dist. Cal. Local Patent R. 3.3(e), 3.6(b), but it failed to do so and thus forfeited its argument that claim 30 reciting a "compiling engine" lacks adequate written description and enablement. Appx10481-10487. Although Impact Engine presented its forfeiture argument below, Appx9876-9877, the district court did not address it. "A district court abuses its discretion when, as here, it fails to conduct an adequate inquiry." *Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*, 858

[4] This is another claim the district court did not invalidate under §101.

F.3d 1383, 1388 (Fed. Cir. 2017) (internal quotation marks and citation omitted). For that reason alone, the district court's §112 invalidity decision should be vacated with instructions to address Impact Engine's forfeiture arguments.

### B. Genuine Disputes of Material Fact Preclude Summary Judgment of Invalidity Under §112.

Rather than vacate, however, the Court should reverse. Genuine disputes of material fact preclude summary judgment. The written description requirement is satisfied if "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Vasudevan*, 782 F.3d at 682. The enablement requirement is met if a skilled artisan, reading the specification, would be able "to make and use the claimed invention" without undue experimentation. *Id.* at 684. A reasonable jury could find those standards are met here.

As the district court recognized, the '898 patent is not silent with respect to the claimed "compiling engine." Appx27. For example, in Figure 1, the patent "illustrates a multimedia communication system" having a "Compiler" 116, which interacts with a "Project Viewer" 118 and "Media Repository" 110. Appx190(Fig.1); Appx206(2:56). As another

example, Figure 3 depicts a method "for template customization and media asset usage," which involves "receiv[ing] and compil[ing] [a] customized communication project." Appx192(Fig.3); Appx206(2:59-60). The specification explains "the customized communication project(s) are received from the user and compiled into a format suitable for transmission," where the communication project is "a collection of slides" and a "grouping of design layers, design elements, and content containers." Appx207(3:56, 4:1-2); Appx211(12:52-54). Consistent with this disclosure, claim 30 tasks the "compiling engine" with "integrating" the selected media asset with the selected template, "grouping" the design layers, design elements, and content containers into a collection of slides, and "generat[ing]" the communication. Appx215(20:11-18).

Impact Engine's expert, Dr. Wicker, demonstrated the patents' disclosures are adequate and enabling. He explained a skilled artisan "would have understood how to implement this functionality in software," including because "[o]bject-oriented concepts, wherein custom data structures are defined using custom data fields and functions, were well-understood in computer science and in popular use with languages such as Java and C++." Appx10494-10495(¶1192). While the district

court expressed concern that a skilled artisan would not know "how a compiler" would perform its "group[ing]" function "into a collection of slides to generate a communication," Appx27, Dr. Wicker explained skilled artisans "would have understood how to apply [known] techniques in order to compile the project object described in the [specification] without undue experimentation." Appx10494-10495(¶1192). Indeed, the district court itself recognized compilers were known "program[s] that translate[] source code into machine or object code."[5] Appx27.

Further, although the district court faulted the specification for describing "how the *project viewer* limitation of the system performs [the] tasks" of grouping layers, elements, and containers to generate a communication, *id.*, that analysis overlooks Dr. Wicker's undisputed testimony that a skilled artisan would have understood "the functionality attributed to the project viewer in certain embodiments may similarly be incorporated into other modules, such as the compiler or compiling engine." Appx10493-10494(¶1191). That is because "the disclosed functionality is embodied in software, so the distinction between different

---

[5] Although this is one type of "compiler," a skilled artisan would have understood a "compiler" is not so limited. *See* Appx2496-2499(¶¶79-84).

modules is somewhat arbitrary" and thus "functionality could be duplicated … or reallocated from one module to another without undue experimentation." *Id.*

Google's expert offered almost no evidence in rebuttal, and certainly none that would resolve at summary judgment what are at best factual disputes over the patent's disclosure and the state of the art at the time of the invention. Appx10499-10501(¶¶1901-1906). Dr. Jansen based his invalidity opinions on statements by the district court that nothing in the patents "describes a compiler rendering in the concept of serializing." Appx10500-10501(¶1905); *see* Appx10499-10500(¶¶1901-1904). But those statements are not evidence, would not be admissible at trial, and are based on a flawed understanding of the asserted claims. No claim requires the compiling engine render the communication. Instead, claim 30 of the '898 patent merely requires the compiling engine group components "into the collection of slides so as to generate the communication *capable of being rendered* …." Appx215(20:11-18); Appx10491-10493(¶¶1188-1190); *see Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 940 (Fed. Cir. 2014) (vacating summary judgment of invalidity predicated on an incorrect claim interpretation).

In sum, the record is replete with facts from which a reasonable jury could find claim 30 of the '898 patent is adequately described and enabled. *See Vasudevan*, 782 F.3d at 683 (noting summary judgment generally is inappropriate when expert testimony supports the non-moving party's case). Google bears the burden to establish invalidity by clear-and-convincing evidence, and at summary judgment Google must show no reasonable jury could find its proof falls short of that demanding evidentiary standard. *See Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1340 (Fed. Cir. 2022); *Vasudevan*, 782 F.3d at 682, 684. Google failed to meet that heavy burden here.

### C. The District Court's Invalidity Analysis Was Legally Improper Under §112.

If more were needed, the district court did not even conduct a legally proper invalidity analysis. Enablement often turns on whether the amount of experimentation necessary to practice a patent would have been "undue." *Wands*, 858 F.2d at 737. In *Wands*, this Court set out eight "[f]actors to be considered in determining whether a disclosure would require undue experimentation." *Id.* Here, Google's expert and the district court failed to consider *any Wands* factor. Although courts

are not required to evaluate every factor, the district court's failure to recognize these factors or consider even a single factor was error.

Moreover, "written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described." *Centrak*, 915 F.3d at 1366. Yet the district court, again following Google's lead, did not address that issue in its analysis. Appx27. Nowhere in its two-paragraph analysis does the district court even mention or grapple with Dr. Wicker's opinion that a skilled artisan would have understood the claimed compiling engine was adequately described. Appx10491-10495(¶¶1188-1192).

That is further proof summary judgment is inappropriate here. Google—and the district court—cannot establish the relevant claims are not adequately described or enabled without even trying to undertake the legally required analysis guided by this Court's precedent. The district court instead granted summary judgment based on its misplaced "frustration" that Impact Engine used slightly different terminology in different patents. Appx27-28(n.8). But there is no frustration-based exception in §112 permitting district courts to short-circuit the normal §112 analyses this Court's precedents require before invalidating a duly-

issued patent whose terminology did not frustrate the Patent Office. For that reason alone, the district court's written description and enablement findings cannot stand.

## CONCLUSION

The district court's judgment should be reversed.

February 2, 2023

Respectfully submitted,

*/s/ Jason M. Wilcox*

Jason M. Wilcox, P.C.
Stephen C. DeSalvo
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 389-5000

Garret A. Leach, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Sharre Lotfollahi, P.C.
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
(310) 552-4200

*Counsel for Plaintiff-Appellant Impact Engine, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of Fed. Cir. R. 32 and Fed. R. App. P. 32. According to the word processing system used to prepare it, the brief contains 13,996 words.

*/s/ Jason M. Wilcox*

## CERTIFICATE OF COMPLIANCE WITH RULE 25.1

The foregoing document contains twelve (12) unique words (including numbers) marked confidential. This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

*/s/ Jason M. Wilcox*

## CERTIFICATE OF SERVICE

On February 2, 2023, the non-confidential version of this brief was submitted to the Court by CM/ECF and thereby served on all parties. All parties consented to electronic service of the confidential version of the brief, which was served on February 2, 2023, on the following counsel at the email addresses below.

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, NH 03755
DBagatell@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 E. Main Street, Suite 201
Madison, WI 53703
ADufresne@perkinscoie.com

Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, DC 20005
JTietz@perkinscoie.com

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
davenelson@quinnemanuel.com

David A. Perlson
Antonio R. Sistos
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davidperlson@quinnemanuel.com
antoniosistos@quinnemanuel.com

*Counsel for Defendant-Appellee Google LLC*

*/s/ Jason M. Wilcox*

# ADDENDUM

**Final Judgment** ........................................ **Appx1**

**Supplemental Claim Construction Order** ........................................ **Appx2**

**Third Motion to Dismiss Order** ........................................ **Appx8**

**Summary Judgment Order** ........................................ **Appx21**

**U.S. Patent No. 7,870,497** ........................................ **Appx29**

**U.S. Patent No. 8,356,253** ........................................ **Appx55**

**U.S. Patent No. 8,930,832** ........................................ **Appx80**

**U.S. Patent No. 9,361,632** ........................................ **Appx107**

**U.S. Patent No. 10,068,253** ........................................ **Appx134**

**U.S. Patent No. 10,565,618** ........................................ **Appx161**

**U.S. Patent No. 10,572,898** ........................................ **Appx188**

# United States District Court

**SOUTHERN DISTRICT OF CALIFORNIA**

Impact Engine, Inc.

**Plaintiff,**

**V.**

Google LLC

**Defendant.**

**Civil Action No.** 19-cv-01301-CAB-DEB

## JUDGMENT IN A CIVIL CASE

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

JUDGMENT in favor of the Defendant Google, LLC against Plaintiff Impact Engine, Inc. The case is hereby closed.

**Date:** 8/31/22

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By: s/ J. Olsen
J. Olsen, Deputy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

IMPACT ENGINE, INC.,
Plaintiff,
v.
GOOGLE LLC,
Defendant.

Case No.: 19-CV-1301-CAB-DEB

**SUPPLEMENTAL CLAIM CONSTRUCTION ORDER**

On February 5, 2021, the Court issued a claim construction order in this case. [Doc. No. 148.] The Court references that order for the background of the litigation and a description of the invention. In consideration of the constructions issued in that order, the parties were invited to submit additional terms that they felt might require construction. Google moved for the construction of three additional terms: **template**; **renders/rendered**; and **project viewer**. [Doc. No. 160.] The parties briefed the proposed constructions and argument was held on April 28, 2021.

Having considered the submissions of the parties and the arguments of counsel, and for the reasons set forth at the hearing and discussed further below, the Court issues the following supplemental claim construction order.

1. **Template** is construed as **pre-existing general structures and arrangements of a multimedia communication.** This construction is in accord with the description of

templates in the specification at Col. 11:41-43 in U.S. Patent No. 7,870,497. [Doc. No. 1-3.][1]

2. **Renders/Rendered** is construed as **serializing the project slides and content into a format that can be stored or transmitted.** This construction is in accord with the description of render in the specification at Col. 4:27-30.

3. **Project Viewer**

As discussed in the previous claim construction order, the patents are directed at a Multimedia Communications System and Method for creating, editing, sharing, and distributing high-quality, media-rich web-based communications. A user interacts with the system to create, edit, and distribute multimedia communications without needing to employ graphic design and computer programming professionals. Benefits of the system include that it is flexible, dynamic, cost-effective, and does not require the user to have in-depth programming knowledge.

The system is hosted on a server and made available to users over a network such as the Internet. The server-side aspect of the invention, identified as the Communication Building Engine, includes specific components. [Fig. 1; Col. 2:65-3:29.] There is a Media Repository that stores templates, media assets, and other resources that can be used to create a multimedia communication project and store a user's completed projects. There is a Distribution Program to format and distribute completed projects as directed by the user. There is a Sharing Program that allows a user to identify specific users to have access to the communication for editing or distribution.

There are three distinct server-side components of the Communication Building Engine that interact in the creation of the communication project. [Fig. 1.]

---

[1] All the asserted patents are continuations of the '497 patent and therefore share the same specification. Specification references herein will correspond to the pagination of the '497 patent.




The Project Builder, which the Court previously construed, is the component of the Engine that interfaces with the user to ascertain the user's needs and preferences and selects templates and media assets from the Media Repository to be used to assemble a communication project. A user's completed communication project is integrated by the Compiler and stored in the Media Repository for future distribution or editing. Between the Project Builder and the Compiler is the Project Viewer, "an application that renders or serializes the communication project slides and provides them with functionality." Col. 4:27-30. The parties dispute the construction of Project Viewer.

Asserted Claim 9 of the '497 patent is representative:

1. A multimedia communication system comprising:

> a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and
>
> a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assembly the communication.

9. A multimedia communications system in accordance with claim 1, further comprising a **project viewer** that renders an assembled

> communication and transmits the rendered communication via the network to the client computer for viewing in the graphical user interface.

Col. 14:38-59, Col. 16:6-10.

Claims of the patents provide that the Project Viewer component is connected to the Project Builder as shown in the specification. The Project Builder application generates or launches the Project Viewer application. Col. 3:9-10; Col. 4:30. The Project Viewer renders, or serializes, the communication using the selected templates and assets provided by the Project Builder into the collection of slides and transmits or sends the rendered communication to the client user for viewing and editing. Col. 4:27-49.

Impact Engine contends that the claimed Project Viewer is a known programming construct, i.e., software (an application) running on hardware (the server computer) for viewing the communication or advertisement that the user creates with the Project Builder. [Doc. No. 179-3, at ¶33; Doc. No. 190, at 10-11.] To exemplify that the Project Viewer limitation was a known programming construct, Impact Engine directs the Court to a definition of "viewer" from a 2002 Microsoft Computer Dictionary as "an application that displays or otherwise outputs a file in the same way as an application that created the file. An example of a viewer is a program to display GIF or JPEG files." [Doc. No. 179-3, at ¶37.]

Google agrees that the Project Viewer limitation is a software application. However, it contends that the Project Viewer limitation of these patents is not the "viewer" application known in the art referenced by Impact Engine. Rather, Google contends that the Project Viewer is a term coined for purposes of the patents-at-issue and there was no known programming construct understood to perform the various functions required of the Project Viewer. Google argues that in accordance with the claims and the specification of the patents-at-issue, Project Viewer is nonce term equivalent to "means" with no known structure and is defined by its functions. Google argues Project Viewer is subject to construction under 35 U.S.C. §112, ¶6. *See Advanced Ground Info. Sys., Inc., v. Life360*,

*Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016) (affirming application of §112, ¶6 to claim term "symbol generator" finding that although "symbol" and "generator" were terms of art in computer science, in the context of the relevant claim language the combination was an abstraction describing the function to be performed without definite structure.)

In determining whether to apply §112, ¶6 to a claim term, the standard is whether the words of the claim are understood by persons of skill in the art to have a sufficiently definite structure. *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1349 (Fed. Cir. 2015). The Court previously considered similar arguments regarding the construction of other components of the Communication Building Engine. The Court concluded that the Project Builder component of the server-side Communication Building Engine, as described by its functions and supported by the specification, is the client interview and selection tool of the Engine. Although Project Builder is a coined term in these patents, software applications to perform the functions of the Project Builder component would be sufficiently recognized by the functions claimed and were known in the computer industry at the relevant time. Similarly, the Court adopted Impact Engine's construction that the Distribution Program component of the server-side Communication Building Engine invoked known software applications to perform the disclosed functions.

If the Project Viewer function was confined to the function of displaying the communication created by another application, the Court would be inclined to accept Impact Engine's construction that "viewer" applications to do this function were known in the industry at the relevant time. The Court however is not persuaded that known "viewer" software applications, as described above, meet the requirements of the claimed Project Viewer in the context of these patents. The claims and the specification describe the patents' Project Viewer limitation as much more than an application to display a file created by another application.[2] Impact Engine has not demonstrated that there were

---

[2] The Court's construction of Project Builder rejected Impact Engine's contention that the Project Builder application of the system creates the communication as unsupported by the specification. The

known "viewer" applications to render or serialize the communication project slides and provide them with functionality as described by the patents such that a person of skill reading the claim term Project Viewer and its ascribed functions would understand the structure that would perform these functions. Impact Engine's proposed construction that the Project Viewer would be understood to be software (an application) running on hardware (a server) to perform the functions is too generic and does not identify anything sufficiently structural.

Although the claims do not use the word "means" Google has demonstrated that the claim term Project Viewer in the context of these patents is a non-structural place-holder identified only by its functions and is therefore subject to a means-plus-function analysis. Applying §112, ¶6, the Court must determine what structure, if any, disclosed in the specification corresponds to the claimed functions. *Williamson*, 792 F.3d at 1351.

The functions performed by the Project Viewer include rendering [serializing] the communication [i.e., collection of slides]; displaying slides in auto-play on or auto-play off modes; sending the communication to the client computer; allowing the user to view templates and media assets. *See e.g.*, '497 Patent, Claim 9; '6,253 Patent, Claim 1; '832 Patent, Claim 1; '8,253 Patent, Claim 1.

The structures disclosed to perform the functions of the Project Viewer are described at Col. 4:27 through Col. 9:19, and the Project Viewer is limited to those disclosed structures and their equivalents.

It is **SO ORDERED**.

Dated: May 14, 2021



Hon. Cathy Ann Bencivengo
United States District Judge

---

Project Builder is the client interface for selecting materials from the Media Repository to be used to create the slides that comprise the communication, however the patent identifies the Project Viewer as the application that receives that information and renders the project as configured by the user. Col. 4:27-38.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPACT ENGINE, INC., Plaintiff, v. GOOGLE LLC, Defendant. | Case No.: 19-CV-1301-CAB-DEB **Order on Motion to Dismiss Pursuant to Rule 12(c) for Patent Ineligibility** |

Plaintiff Impact Engine, Inc. alleges that defendant Google LLC infringes eight United States patents owned by Impact Engine. The asserted patents[1] are all continuations of U.S. Patent No. 7,870,497 [Doc. No. 1-3] [2], filed April 13, 2006, and have a common specification. Before the Court is Google's motion to dismiss certain of the asserted claims, pursuant to Fed.R.Civ.P. 12(c), on the basis that they are ineligible subject matter under 35 U.S.C. §101. [Doc. No. 225.] The matter has been fully briefed and the Court finds the motion suitable for determination on the papers submitted and without oral

[1] The following patents are at issue in this litigation: U.S. Patent Nos. 7,870,497; 8,356,253; 8,930,832; 9,361,632; 9,805,393; 10,068,253; 10,565,618; and 10,572,898. [Doc. Nos. 1-3 to 1-8, 53-14 and 53-15, respectively.]

[2] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

Case: 22-2291 Document: 23 Page: 106 Filed: 02/21/2023

argument in accordance with Civil Local Rule 7.1(d)(1). For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part.

## I. Procedural Background

Google previously sought to dismiss Impact Engine's complaint under Fed.R.Civ.P. 12(b)(6) based on patent ineligibility at the start of this litigation. [Doc. No. 21.] Google argued that all the asserted patents claim ineligible subject matter and that Claim 1 of the '497 patent was representative of all the claims of all the patents asserted by Impact Engine. The Court denied the motion, finding that Google did not establish that Claim 1 of the '497 patent was representative. Further, based only on consideration of the complaint, the patent and its history, the Court found it could not conclude that Claim 1 of the '497 patent was directed at an abstract idea. [Doc. No. 41 at 2.] However, Google was not precluded from reasserting the defense of patent ineligibility as to one or more of the patents' claims if claim construction or further evidence beyond the pleadings supported such a challenge in the future. [*Id*.]

Following the issuance of the Court's initial Claim Construction Order [Doc. No. 148], Google renewed its motion to dismiss pursuant to Fed.R.Civ.P. 12(c) based on patent ineligibility, this time asserting that Claims 1, 3, and 5 of U.S. Patent No. 8,356,253 ("the '6253 patent") were representative of all the claims at issue in the litigation. [Doc. No. 157.] At the same time, Google also filed a motion for additional construction of claim terms that are limitations in the representative claims of the '6253 patent. [Doc. No. 160.] Because Google's challenge to the patentability of the claims of the '6253 patent was premised in part on claim constructions that the Court did not adopt [Doc. No. 205], the Court denied the motion. [Doc. No. 206.]

Google's present motion to dismiss is directed specifically at Claim 1 of the '497 patent, Claims 14, 16 and 23[3] of the '618 patent, and Claim 30 of the '898 patent. Google

[3] Claim 23 is dependent from independent Claim 22, which is therefore included in the Court's analysis.

brings the motion pursuant to Fed.R.Civ.P. 12(c) and argues these specific claims, as construed by the Court and in consideration of the patent specification, are directed at an abstract idea and do not include additional elements that transform the claims into patent-eligible subject matter.

Impact Engine opposes Google's present motion, in part arguing it is an untimely motion for reconsideration of its previous motions challenging the validity of Impact Engine's patents based on section 101. The Court disagrees. Each motion brought by Google was distinct and separate. This motion is neither untimely nor a request for the Court to reconsider a prior ruling. The Court therefore turns to the merits of Google's motion.

## II. Legal Standard

Under Rule 12(c), judgment may be granted if the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. Whether a claim is drawn to patent-eligible subject matter under section 101 is ultimately an issue of law that may be decided on a Rule 12(c) motion under certain circumstances. Generally, the court may not consider matters outside the pleadings without converting a Rule 12(c) motion to a summary judgment motion under Rule 56. However, because claim construction is a question of law, a court "may take notice of and rely on its claim construction opinion without converting [a 12(c)] motion into a motion for summary judgment." *Intellectual Ventures I LLC v. AT&T Mobility LLC*, 235 F. Supp. 3d 577, 588 (D. Del. 2016).

Section 101 defines patent-eligible subject as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. §101. However, laws of nature, natural phenomena, and abstract ideas are not eligible for patenting. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). When a patent claim is alleged to involve one of these three types of subject matter, the court is to apply a two-step test for examining patent eligibility. *Id.* 573 U.S. at 217-18.

Case: 22-2291 Document: 13 Page: 108 Filed: 02/02/2023

The court must "distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more," to protect against "disproportionately tying up the use of the underlying ideas." *Id.* at 217.

The first step of the *Alice* test requires a court to determine whether the claim at issue is directed to a patent-ineligible concept, in this case an abstract idea. *Id.* at 218. The claim is considered in its entirety to ascertain whether its character as a whole is directed to excluded subject matter. *Internet Pats. Corp. v. Active Network Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). If so, the second step of the *Alice* test requires the court to examine the elements of the claim both individually and as an ordered combination to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application. *Alice*, 573 U.S. at 221. This inventive concept must do more than simply recite "well-understood, routine, conventional activities" previously known to the industry. *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 79-80 (2012).

**III. Summary of the Invention and Claim Construction**

The patents at-issue are directed at a Multimedia Communications System and Method for creating, editing, sharing, and distributing high-quality, media-rich web-based communications. [Doc. No. 1-3 at 2 (Abstract).] The systems and methods disclosed are intended to replace the "prior art" practice of contracting a professional graphic design or advertising agency to create works that can be distributed electronically in various formats such as a banner advertisement, website or email. Through the system, the user selects and creates the communication content, edits it, and distributes the communication in a selected format to a selected audience over the Internet. [*Id.* at Col. 1:12-26.]

Broadly, the patents describe a system in which a client user interacts through a graphical user interface with the system components located on a server connected over the Internet. The system includes a media repository that stores templates and media assets, such as music, artwork and graphics. The user interacts with the system using a project builder component which enables the user to select templates and assets from the repository

to create a communication, such as an advertisement. The project viewer component renders or serializes the selections made by the user to display and playback the communication as configured by the user. The system's compiler integrates the selections into a final communication that is stored in the repository. The system also includes a sharing program that enables the communication to be shared and edited by designated users. The system further includes a distribution program that formats the communication into one or more formats selected by the user and electronically delivers the formatted communication to the user's selected audience. [*Id.* at Col. 2:65-Col. 3:29, Col. 11:36-Col. 12:37; Figs. 1-5.] Benefits of the system include that it is flexible, dynamic, cost-effective, and does not require the user to have in-depth programming knowledge. [*Id.*, Abstract; Col. 1:12-25, 41-44.]

At claim construction, Impact Engine argued that various components of the server-side communication builder engine (i.e., project builder, project viewer, compiler, and distribution program) required no construction as each component at the time of filing of the parent application was a "known program construct that would be familiar to one of skill in the art." [Doc. No. 108 at 19, 22, and 25; Doc. No. 179 at 9.] Impact Engine represented that these components of the system were familiar applications (software) implemented on a server (hardware) used to build a communication or advertisement based on input from the user. [Doc. No. 108 at 14-17; Doc No. 179 at 11.] The Court generally adopted Impact Engine's proposed constructions that these components of the system were known software applications to provide for the selection of user preferences to create a communication based on those selections and to format and distribute the communication according to the user's directions. [Doc. No. 148.][4]

---

[4] Impact Engine's proposed construction that the "project viewer" component was also a known software application for a user to "preview of a communication" [Doc. No. 179 at 11] was not adopted by the Court. The specification discloses the system functions of the project viewer as significantly more complex than prior art known "viewer" applications described by Impact Engine. [Doc. No. 205.]

Based on these constructions, Google now argues that the challenged claims below are simply for known software applications to create and distribute a user defined communication and as such they claim an abstract idea without inventive concept.

**IV. Challenged Claims**

**A. U.S. Patent No. 10,565,618**

Claims 14, 16, 22, and 23 claim:

14. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet based on recipient specific data received from a user of a recipient computing device, the system comprising:

a server having a connection to the Internet to communicate with a user of a recipient computing device via a graphical user interface displayed by the recipient computing device, the system comprising:

a recipient specific database for storing qualitative and/or quantitative data received from a user of the recipient computing device;

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder for accessing the recipient specific database as well as the media repository, and for selecting a media asset for integration with an advertisement template, the media asset being selected based on qualitative or quantitative data received from the recipient computing device;

a compiler associated with the project builder, the compiler for integrating the selected media asset with the online advertisement template to generate an online advertisement;

a formatter for selecting and formatting the online advertisement in an electronic distribution format; and

a distribution program for performing the targeted broadcasting of the online advertisement over the Internet to the recipient computer device.

16. The multimedia communication system in accordance with claim 14, wherein the recipient specific data comprises data pertaining to the user received from a social network, a geographical location, or a web page visited by the user.

22. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet, the system comprising:

> a server connected to the Internet to communicate with one or more of a user of a recipient computing device via a graphical user interface displayed by the recipient computing device and/or to a third-party database, the server comprising:
>
> > a media repository for storing a plurality of online advertisement templates and a plurality of medial assets;
> >
> > a compiler associated with the media repository, the compiler for integrating a selected media asset with a selected online advertisement template from the media repository, the media asset and the advertisement template being automatically selectable by the server based on a first set of data received from one or more of the recipient computing device and/or third-party database to generate a online advertisement;
> >
> > a formatter for automatically formatting the online advertisement in at least one of a plurality of electronic distribution formats for display at the graphical user interface of the recipient computing device, the formatting of the online advertisement being determine based on the first set of data received from one or more of the recipient computing device and/or third-party database; and
> >
> > a distribution program for the targeted broadcasting of the online advertisement over the Internet to the recipient computing device in the determined electronic distribution format.
>
> 23. The multimedia communications system in accordance with claim 22, wherein the media asset and the template are selected based on the first set of data received from the recipient computing device, and the formatting of the online advertisement is determined based on whether the recipient computing device is a desktop or laptop computer or a mobile device.

[Doc. No. 53-14 at Col. 16:53-Col. 17:16; Col. 17:21-24; Col. 17:48-Col. 18:25.]

During the prosecution of the ‘618 patent, the examiner issued a rejection of the claims based on section 101, finding that the claimed subject matter recites a judicial exception -- that they claim an abstract idea of creating and distributing advertisement content. [Doc. No. 28-8 at 6.] The Court agrees.

In applying the first step of the *Alice* analysis, the Court finds that the claims are directed at the abstract idea of a system for generating customized or tailored computer communications based on user information. *See Intellectual Ventures I LLC v. Capital*

*One Bank (USA)*, 792 F.3d 1363, 1369-70 (Fed. Cir. 2015) (holding that a patent claiming a system for customizing web content based on user information was directed to an abstract idea). These claims of the '618 patent relate to creating online advertisements based on user input to select materials from a library of stored materials and to format and distribute the advertisement over the Internet based on user preferences.

As the patent itself discloses, the creation and distribution of such advertisements was traditionally performed by professional advertisement agencies, and the system and method of the patent automates the process of creating and distributing such professional quality communications. [Doc. No. 53-14 at Col. 1:34-48.] The system of these claims employs a library of assets, a software application to determine the user's preferences, a compiler to integrate the assets selected from the library into an advertisement, and a distribution system[5] to deliver the advertisements to the user's selected audience in a preferred format. As advocated by Impact Engine and adopted by the Court, all these elements of the system were well-known program constructs defined by their functions that were familiar to one of skill in the art at the relevant time. No advancement or improvement to any of these elements is disclosed or claimed.

The patent examiner found that, although directed to "a judicial exception," the server-side technical elements of the media repository, project builder, project viewer (which is not present in these claims), compiler, formatter (although not disclosed in the specification) and distribution program "actively communicating between each other, integrated and deeply connected with each other, and performing the recited functional limitations amounts to more than simply implementing the functional limitations 'by a computer.'" The examiner therefore concluded that the second step of the *Alice* test was satisfied, and the claims as a whole applied the judicial exception in some other meaningful

---

[5] A "formatter" is not identified in the patent specification. However, the patent does disclose that the distribution program controls the format and communication protocols for distributing the communications. [Id. at Col. 3:45-46.]

way beyond generally linking the use to a particular technological environment. [Doc. No. 28-8 at 6-7.] The Court disagrees.

"Claims that amount to nothing significantly more than an instruction to apply an abstract idea using some unspecified, generic computer and in which each step does no more than require a generic computer to perform generic computer functions do not make an abstract idea patent-eligible." *Alice*, 573 U.S. at 225-26. These claims do not include any improvement in the functioning of these "well-known program constructs." That they are located on the server does not impart a meaningful improvement or advance as there is no claim or disclosure that the server does anything more than house the generic components.

The specification provides little about the interactions of the generic computer software and hardware components of these claims and how these interactions happen, much less identifying an improvement in the known ways they would interact in a computer system. The actual mechanism of how the communications are compiled, formatted, and distributed on the Internet is not disclosed other than by known methods. For these claims, there is no specific or limiting recitation of improved computer technology.[6] *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (holding that a claim directed to an abstract idea that contains no restriction on how the result is accomplished or description of the mechanism to do so, although stated to be the essential innovation, is not patent-eligible).

These claims recite only generic computer components functioning in their known conventional manner, which may improve the experience of the user, but does not improve the functions of the computer. Automating conventional activities using generic

---

[6] The Court construed the limitation of the "project viewer" to be a specific and limited component part of the system. Consequently, claims that contain the project viewer limitation, which discloses a mechanism for creating communications that can be easily edited and distributed on the Internet, are distinguished from the claims at issue in Google's present motion. Without that limitation, these claims broadly encompass collecting user preference information and making an advertisement to be distributed on the Internet using known conventional computer software and hardware.

technology does not amount to inventive concept. These asserted claims of the '618 patent are not patent-eligible under 35 U.S.C §101. The motion is **GRANTED** as to Claims 14, 16, 22 and 23 of the '618 patent.

**B. U.S. Patent No. 7,870,497**

Claim 1 of the '497 patent claims:

> 1. A multimedia communication system comprising:
> a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and
> a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assembly the communication.

[Doc. No. 1-3 at Col. 14:38-67.]

Having applied the above analysis to this claim, the Court finds that it is also not patent eligible. This claim is for a server-side media library and a software program that selects materials from that library to make a communication based on user provided preferences obtained through a graphical user interface. The patent does not claim the creation of media repositories or any improvement to such known databases. It does not claim to have created or improved graphical user interfaces. It does not disclose any advancement in "known program constructs" used to "interview" a user to determine preferences.

This claim recites only generic computer components functioning in their known conventional manner, which again may improve the experience of the user, but does not

improve the functions of the computer. Automating conventional activities using generic technology does not amount to inventive concept. This asserted claim of the ‘497 patent is not patent-eligible under 35 U.S.C §101. The motion is **GRANTED** as to Claims 1 of the ‘497 patent.

**C. U.S. Patent No. 10,572,898**

Claim 30 of the ‘898 patent claims:

> 30. An online advertisement generation system for autonomously generating and broadcasting a communication to a graphical user interface of a recipient device, the communication capable of being rendered, the online advertisement generation system comprising:
>
> a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;
>
> a communications system server coupled to the media repository, the communications system server being connectable to an internet network, the communications system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data, and comprising:
>
> > an advertisement generation engine for autonomously generating the communication, the advertisement generation engine for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to generate the communication, the communication including a collection of slides comprising a grouping of design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;
> >
> > a formatting engine for formatting the communication; and
> >
> > a distribution engine wherein once the communication is generated and formatted, the communications system server autonomously broadcasts the one of more communications via the distribution engine to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or and auto-play off format.

[Doc. No. 53-15 at Col. 19:39 – Col. 20:27.]

The Court applied the *Alice* analysis to the above claim, and while finding that it also claims the abstract idea of creating and distributing advertisement content, this claim

includes restrictions on how the result is accomplished and the patent describes the mechanism to do so. Therefore, the claim is patent eligible.

This patent, the most recent in the family tree of continuations from the initial application, attaches different labels to the system components, but it is based on the same specification and the corresponding components remain the same "known program constructs." For example, the claimed "communications system server" is a new label for the disclosed communication builder engine (102) and the "advertisement generation engine" is the disclosed project builder (108). The claimed "formatting engine" remains a bit of mystery as is not identified in the specification other than as a function of the "distribution engine" disclosed as the distribution program (112). These components of the claimed system are not advancements in the functioning of the computer, as discussed above. To the extent that the claim includes the "autonomous" generation and broadcasting of a communication, the patent does not disclose a mechanism or advancement in the art for such independent function. The generation and distribution of a communication is accomplished by known program constructs, and nothing is disclosed to inform how any autonomous function occurs that is an advancement over what was known in the art.

Nevertheless, the claim includes the limitation that the communication is not just a collection of slides, but a collection comprised of a grouping of design layers, design elements and content containers. The description of how these layered slides with content containers are created, managed, and populated is disclosed in great detail in the specification. [Id. at Col. 4:1 - Col 9:10] This limitation as part of the claim provides inventive concept by requiring that the system not just create a customized communication based on user preferences, but create that communication using a particular format, and the patent describes the mechanism to do so.

Considering Claim 30 as an ordered combination of elements, it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application under 35 U.S.C. §101. The motion is **DENIED** as to Claim 30 of the '898 patent.

**V. Conclusion**

For the reasons stated above, Google's motion to dismiss certain claims asserted in this litigation pursuant to Rule 12(c) as patent ineligible subject matter under 35 U.S.C. § 101 is:

**GRANTED** as to Claims 14, 16, 22, and 23 of the '618 Patent and Claim 1 of the '497 Patent; and

**DENIED** as to Claim 30 of the '898 Patent.

**IT IS SO ORDERED.**

Dated: November 10, 2021



Hon. Cathy Ann Bencivengo
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPACT ENGINE, INC., Plaintiff, v. GOOGLE LLC, Defendant. | Case No.: 19-CV-1301-CAB-DEB **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** [Doc. Nos. 317, 319, 321, 367, 369, 371, 421] |

Before the Court is Defendant Google, LLC's motion for summary judgment against all the patent claims asserted by Plaintiff Impact Engine, Inc. [Doc. No. 317, 318.][1] At the hearing on the motion,[2] the Court *sua sponte* raised concerns that certain of the asserted claims appeared to be subject to a 35 U.S.C. § 101 unpatentability finding based on the Court's previous ruling [Doc. No. 268] related to similar claims of this patent family. As this issue was not briefed by the parties, the Court ordered supplemental briefing.[3] Having

[1] Impact Engine's opposition is filed at Doc. No. 336. Google's reply is filed at Doc. No. 348.
[2] Hearing Transcript, Doc. No. 420.
[3] See Doc. Nos. 418, 422, 427, 430.

now considered the initial submissions of the parties, the arguments at the hearing. and the supplemental submissions on the section 101 issue, the Court grants Google's motion.

## I. Background

This case initially involved the assertion of eight patents[4] all flowing from the same specification[5] directed at a Multimedia Communications System and Method for creating, editing, sharing, and distributing high-quality, media-rich web-based communications. Impact Engine represented to the Court that its patented system revolutionized the creation and distribution of advertising on the Internet. By allowing a client user to interact with the server-based components of the system over the Internet, the user can create, edit, and distribute customized communications to a select audience, replacing the need to employ professional graphic designers or advertising agencies and computer programmers.

Over the course of this litigation, however, Impact Engine has advocated that the components of the patented system are less than revolutionary, and rather a collection of programming constructs, i.e., software (applications) running on hardware (the server computer), operating in ways that were readily known to those of skill in the art in 2005. Having adopted Impact Engine's proposed constructions[6] for many components of the server-side system as known program constructs operating in a manner familiar to one of skill in the art, the Court subsequently granted in part Google's motion to dismiss some of the asserted claims as patent ineligible. [Doc. No. 268.]

The dismissed claims provided for a user to make individualized selections from a library of materials, and the components of the system would generate, format, and distribute a communication (i.e., advertisement) based on those user preferences with no restrictions on how that was accomplished or any description of the mechanism to do so.

---

[4] The following patents were initially asserted in this litigation: U.S. Patent Nos. 7,870,497; 8,356,253; 8,930,832; 9,361,632; 9,805,393; 10,068,253; 10,565,618; and 10,572,898. [Doc. Nos. 1-3 to 1-8, 53-14 and 53-15, respectively.]

[5] As the patents all share a common specification, all references to drawings, columns and lines of the patent specification are based on the '497 patent [Doc. No. 1-3.] unless otherwise indicated.

[6] Court's Claim Construction Orders are at Doc. Nos. 148 and 205.

The limitations of the dismissed claims, by Impact Engine's own constructions, were simply components operating in their known conventional manner to create and distribute customized communications with no identifiable improvement over their function, interactions, or mechanisms.

The Court found one component of the system to be a significant exception to "known programming construct" definition that Impact Engine advanced for the component parts of its system: the limitation of the project viewer. Although Impact Engine strenuously asserted that the project viewer claim limitation was also simply a known programming construct that provided for viewing of the created communication or advertisement by the user, the language of the claims and the description in the specification dictated a different construction. The Court's analysis is set forth in its Supplemental Claim Construction Order [Doc. No. 205] and will not be repeated here. In summary, the Court concluded that the claimed functions of the component identified as the project viewer dramatically exceeded Impact Engine's assertion that it was limited to a known function of displaying a file to the user. The Court therefore found that the project viewer limitation was subject to construction under 35 U.S.C. §112, ¶6.

The Court determined that structures disclosed in the patent to perform the functions of the project viewer which included rendering or serializing the communication project slides and providing them with functionality were set forth at Col. 4:27 through Col. 9:19 of the '497 patent specification. Consequently, to establish infringement for those claims in which the project viewer renders the communication, Impact Engine must demonstrate that the accused systems function in accordance with the project viewer structure for rendering communications disclosed in the patent or its equivalent. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).

## II. Legal Standard

The familiar standard for summary judgment applies. Summary judgment is authorized if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Case: 22-2291 Document: 13 Page: 121 Filed: 01/31/2023

A patent infringement analysis involves two steps: (1) claim construction and; (2) application of the properly construed claim to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). If a reasonable jury cannot find that every limitation or its equivalent of a properly construed claim is found in the accused product, the court may enter summary judgment of noninfringement. *Medgraph Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016).

**III. Discussion**

Google moves for summary judgment on the remaining asserted claims in this litigation. Google contends that (1) Impact Engine's infringement analysis does not apply the Court's claim construction of the project viewer limitation to the accused systems and therefore a reasonable jury cannot find infringement, and (2) certain asserted claims are either unpatentable subject matter or are invalid for lack of enablement and written description and therefore cannot be infringed. The Court agrees.

**A. Impact Engine's Infringement Analysis does not apply the Court's Claim Construction for the Project Viewer Limitation.**

For those claims that include the limitation that the project viewer render the communications, Impact Engine's infringement analysis does not apply the Court's claim construction. Impact Engine's infringement analysis is premised on the contention that the Court's §112, ¶6 construction did not "set forth any required structure" and left it to the parties to determine the structures necessary to perform the claimed functions. [Doc. No. 340, at 8-9.] The Court however identified a significant portion of the specification that describes how the project viewer renders a communication based on the user's selections, starting at Col. 4:27 through Col. 9:19 of the '497 patent. [Doc. No. 1-3.] Within these columns, the specification discloses in detail how the project viewer loads the content and design elements selected by the user into containers at various layers to render a communication. [Col. 5:7-Col.8:59.]

Impact Engine's expert did not apply any of this detailed description of how the project viewer uses the information it is provided to render a communication. Rather he

concluded that the structure disclosed for the project viewer to render a communication is simply receipt by the project viewer of the "project object," the information necessary for the project viewer to render the communication as configured by the end user. [Col. 4:27-38.] The receipt of the information to render a communication as configured by the end user is not the structure for the actual rendering of the communication as required by the claims and the Court's construction. Having based its infringement analysis on a construction that does not comport with the Court's claim construction, Impact Engine cannot sustain its burden to prove infringement of claim 9 of the '497 patent (requiring a communication system in which the project viewer renders an assembled communication) or claim 1 of the '6253 patent (requiring a project viewer that renders a communication that is a collection of slides comprising a grouping of design layers, design elements and content containers).

Google's motion for summary judgment of non-infringement of these patents is therefore granted.

**B. Claims that Identify the Project Builder Limitation as the Generator of the Communications Claim Unpatentable Subject Matter**

Impact Engine asserts claim 12 of the '8253 patent.[7] The asserted claims of the '832 patent all depend from its independent claim 1 and the asserted claims of the '632 patent all depend from its independent claim 1. In these independent claims, the communication, or advertisement, is generated by the project builder component of the system. Although the project viewer component is a limitation of these claims, its function is narrowly drawn to sending the generated communication or advertisement to the user's computer. This limited function of the project viewer is the specific function Impact Engine advanced in claim construction when it advocated that the Court construe the project viewer component

[7] Impact Engine also asserts claim 1 of the '8253 patent. Court finds this claim substantively indistinguishable from claim 14 of the '618 patent previously found to claim unpatentable subject matter and therefore invalidates claim 1 of the '8253 patent on the same grounds.

as a known programming construct operating in a manner familiar to one of skill in the art. [Doc. No. 205.]

Consequently, in the scope of these asserted claims, the function of the project viewer is to operate in its known and familiar capacity—to display a file in the same way as the application that created the file, and not to render the communication. In these claims the communication is generated by the project builder component. In accordance with the specification, the project builder selects appropriate templates and assets from the media library based on user preferences to create a customized communication applying known program constructs to do so. The Court has previously determined that claims directed at a system of known software applications to provide for the selection of user preferences to create a communication based on these selections and to format and distribute the communication according to the user's directions, claim an abstract idea without inventive concept. [Doc. No. 268.]

The Court applies the same analysis here and finds that claim 12 of the '8253 patent, claim 1 of the '832 patent and claim 1 of the '632 patent are directed at an abstract idea of generating customized communications based on user preferences using unspecified, generic computer applications in their known capabilities to automate functions previously performed by professional graphic designers or advertising agencies and computer programmers. The actual mechanisms of how the communications are generated, complied, formatted, and distributed is not disclosed other than by reference to known methods.

The Court therefore grants Google's motion for summary judgment based on its finding that the asserted claims of the '8253 patent, '832 patent and '632 patent are not patent eligible under 35 U.S.C. §101.

### C. The Patent Specification Does Not Disclose How the Compiler Component of the System Generates a Communication as Required by the '898 Patent

Impact Engine asserts claim 30 of the '898 patent, which requires in part a compiling engine for integrating the selected media asset with the selected advertisement template and grouping the design layers, design elements and content containers into the collection of slides so as to generate the communication capable of being rendered in manner so as to be content specific to the user data. [Doc. No. 53-15, Col. 20:11-17.] The specification's limited references to the compiler component of the system are (i) a box in Figure 1 labeled compiler (116) with no corresponding reference in the text of the specification as to the purpose and function of the compiler, and (ii) Fig. 3, a flow chart depicting a method for template customization and media asset usage which teaches that the customized project is received from the user and compiled into a format suitable for transmission. [Fig. 3 (306), Col. 12:9-11.]

A compiler in the computer arts at the time the patent was filed was a program that translates source code into machine or object code. [Court's Claim construction, Doc. No. 148 at 67.] The '898 patent does not disclose any information or mechanism that would inform a person of skill in the art how a compiler as construed in this patent would group the claimed design layers, design elements and content containers into a collection of slides to generate a communication. The patent discloses at length how the project viewer limitation of the system performs these tasks but it does not teach how a compiling program at the time of the filing of the original patent would do so. This claim does not comply with 35 U.S.C. § 112, as the patent does not contain the enablement and written-description requirements of patentability to support this claim.[8]

---

[8] The Court notes that throughout this litigation, Impact Engine and its experts have treated various claim terms representing separate component parts of the patented system as interchangeable and advocated for interpretations that broadly substitute individual parts of the system for each other in ways not supported by the teaching of the specification. Additionally, new claim terms appear over the course of the issuance

The Court therefore grants Google's motion for summary judgment of invalidity of the only asserted claim of the '898 patent.

**IV. Conclusion**

For the reasons set forth above, it is hereby **ORDERED** as follows:

1. Google's motion for summary judgment as to all the remaining claims asserted in this litigation [Doc. No. 317-318] is **GRANTED**;
2. All other pending motions [Doc. Nos. 319, 321, 367, 369, 371, 421] are **DENIED AS MOOT**; and,
3. The Clerk of Court shall enter **JUDGMENT** in favor of the Defendant and against Plaintiff and **CLOSE** this case.

It is **SO ORDERED.**

Dated: August 31, 2022



Hon. Cathy Ann Bencivengo
United States District Judge

---

of continuation patents in this family tree that have no reference whatsoever in the specification. While the Court is mindful of not limiting claims to examples in the specification, the claims must be interpreted in light of the specification and the substituting and switching of the labels for components without anchor to the disclosure has caused much frustration for the Court in understanding the claims, the proper construction of the limitations, and the scope of the patents.

US007870497B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 7,870,497 B2**
(45) **Date of Patent: Jan. 11, 2011**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(75) Inventors: **Neil Greer**, San Diego, CA (US); **Bennett Blank**, San Diego, CA (US); **Bryan Depew**, Del Mar, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 869 days.

(21) Appl. No.: **11/404,509**

(22) Filed: **Apr. 13, 2006**

(65) **Prior Publication Data**

US 2007/0028172 A1 Feb. 1, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**
***G06F 3/00*** (2006.01)
***G06F 3/048*** (2006.01)

(52) **U.S. Cl.** ........................ **715/762**; 715/716; 715/781; 715/753

(58) **Field of Classification Search** ................. 715/716, 715/719, 752, 756, 762, 764, 765, 781, 810, 715/811, 221, 222; 707/1, 104.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,601,057 B1 * 7/2003 Underwood et al. ........... 707/1
6,694,353 B2 2/2004 Sommerer
6,976,028 B2 * 12/2005 Fenton et al. ............... 707/102
2002/0194195 A1 12/2002 Fenton et al.
2004/0093377 A1 5/2004 Jurgen et al.
2005/0114784 A1 * 5/2005 Spring et al. ................ 715/762
2006/0085360 A1 * 4/2006 Grim et al. .................... 705/67

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1376406 1/2004

(Continued)

OTHER PUBLICATIONS

"Press Release: Create Flashy Web Images with the New Macromedia", Retrieved from the Internet: < URL:www.scalado.com>, [Retrieved on Oct. 13, 2003].

(Continued)

*Primary Examiner*—X. L Bautista
(74) *Attorney, Agent, or Firm*—Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**10 Claims, 16 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2006/0129417 | A1* | 6/2006 | Williams et al. | 705/1 |
| 2006/0150088 | A1* | 7/2006 | Kraft et al. | 715/517 |
| 2006/0253542 | A1* | 11/2006 | McCausland et al. | 709/207 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1431977 | 6/2004 |
| WO | WO 94/28480 | 12/1994 |
| WO | WO02/103568 | 12/2002 |
| WO | WO-02/103568 A1 | 12/2002 |
| WO | WO2004/097688 | 11/2004 |

OTHER PUBLICATIONS

EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527.

First Office Action received Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383.

* cited by examiner


CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


CREATE COMMUNICATION PROJECT TEMPLATE(S)
202
PROVIDE MEDIA ASSETS FOR GENERAL USE
204
RECEIVE MEDIA ASSETS FOR PRIVATE USE
206
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY
208
200

FIG. 2


302
INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
304
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
306
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
300
308
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT

FIG. 3


RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
402
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
404
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
406
400

FIG. 4


502
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
504
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
506
PROCESS SELECTION THROUGH SHARING PROGRAM
508
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

| Start | Step 1 | Step 2 | Step 3 | Step 4 |
|---|---|---|---|---|

Advanced

Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme
and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
Page Style
Up
DOWN
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10


Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue

FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12


Step 5: Presentation Playback Control
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Show Playback Progress Timer
Checkbox
Show Viewer Play/Pause Buttons
Checkbox
Show Viewer Back/Next Buttons
Checkbox
Show Graphic Navigation Menus
Checkbox
Activate Auto Advance to Next Page
Checkbox
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT

FIG. 13


Step 6: Editorial Control- Team
Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout
Checkbox
Allow changes to project style settings
Checkbox
Allow changes to navigation settings
Checkbox
Allow changes to the headline text
Checkbox
Allow changes to the headline media
Checkbox
Allow changes to the page text
Checkbox
Allow changes to the page media
Checkbox
Allow changes to the page playback settings
Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next page in
Seconds
Section 2
Auto Advance to next page in
Section 3
Auto Advance to next page in
Section 4
Auto Advance to next page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

The present application claims priority under 35 U.S.C. §119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled MULTIMEDIA COMMUNICATION SYSTEM AND METHOD, the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.



## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example,

content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.

Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nav.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).

A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. 1, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites, dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodi-

ment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nav.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nav.fla file. Native functions of this file include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.



A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nav.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.

changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to changeSlide( )-changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controller Width: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are

substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.

Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

EXAMPLE

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next

to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by typing in any URL (i.e. www.mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.

A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2-5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.



At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a

module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

The invention claimed is:

1. A multimedia communication system comprising:

a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and

a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assemble the communication.

2. A multimedia communication system in accordance with claim 1, further comprising a compiler to integrate the one or more media assets into the one of the communication project templates to generate the communication.

3. A multimedia communication system in accordance with claim 2, further comprising a distribution program that formats the communication according to selected ones of an electronic distribution format.

4. A multimedia communication system in accordance with claim 3, wherein the electronic distribution format includes an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

5. A multimedia communication system in accordance with claim 1, further comprising a sharing program configured to receive user instructions for sharing the communication with other users via the network.

6. A multimedia communication system in accordance with claim 1, wherein the project builder further comprises a plurality of media asset palettes, each media asset palette comprising a content type, and which is displayed in the graphical user interface according to the user preferences.

7. A multimedia communication system in accordance with claim 1, wherein the media assets are classified according to content types, and wherein the content types include images, audio, video and text.



8. A multimedia communication system in accordance with claim 1, further comprising an application programming interface providing a template designer with design options for designing each communication project template.

9. A multimedia communication system in accordance with claim 1, further comprising a project viewer that renders an assembled communication and transmits the rendered communication via the network to the client computer for viewing in the graphical user interface.

10. A multimedia communication system in accordance with claim 1, wherein one or both of a communication project template and a media asset is automatically selected based on results of the interactive interview.

* * * * *

US008356253B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 8,356,253 B2**
(45) **Date of Patent: *Jan. 15, 2013**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(75) Inventors: **Neil Greer**, San Diego, CA (US); **Bennett Blank**, San Diego, CA (US); **Bryan Depew**, Del Mar, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/004,862**

(22) Filed: **Jan. 11, 2011**

(65) **Prior Publication Data**

US 2011/0113314 A1 May 12, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**
***G06F 3/048*** (2006.01)
***G06F 17/00*** (2006.01)

(52) **U.S. Cl.** ........ **715/762**; 715/731; 715/781; 715/810; 715/753; 715/716; 715/202

(58) **Field of Classification Search** .................. 715/716, 715/719, 752, 753, 762, 764, 765, 781, 810, 715/811, 221, 222, 730–732, 202; 707/705, 707/805; 709/203, 204
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,601,057 | B1 * | 7/2003 | Underwood et al. | 715/207 |
| 6,910,049 | B2 | 6/2005 | Fenton et al. | |
| 6,976,028 | B2 * | 12/2005 | Fenton et al. | 715/700 |
| 2002/0194195 | A1 * | 12/2002 | Fenton et al. | 707/104.1 |
| 2006/0015904 | A1 * | 1/2006 | Marcus | 725/46 |
| 2006/0129417 | A1 * | 6/2006 | Williams et al. | 705/1 |
| 2006/0150088 | A1 * | 7/2006 | Kraft et al. | 715/517 |
| 2006/0253542 | A1 * | 11/2006 | McCausland et al. | 709/207 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 10-2004-0040406 | | 5/2004 |

* cited by examiner

*Primary Examiner* — Xiomar L Bautista
(74) *Attorney, Agent, or Firm* — Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**10 Claims, 16 Drawing Sheets**




CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


202
CREATE COMMUNICATION PROJECT TEMPLATE(S)
204
PROVIDE MEDIA ASSETS FOR GENERAL USE
206
RECEIVE MEDIA ASSETS FOR PRIVATE USE
200
208
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY

FIG. 2


INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
302
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
304
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
306
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
308
300

FIG. 3


RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
402
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
404
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
406
400

FIG. 4



RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
502
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
504
PROCESS SELECTION THROUGH SHARING PROGRAM
506
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED
508


FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

| Start | Step 1 | Step 2 | Step 3 | Step 4 |
|---|---|---|---|---|

Advanced

Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
blts
Page Style
Up
DOWN
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10



Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue


FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12

## Step 5: Presentation Playback Control

| Start | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Finish |
|---|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Show Playback Progress Timer | Checkbox |
| Show Viewer Play/Pause Buttons | Checkbox |
| Show Viewer Back/Next Buttons | Checkbox |

| | |
|---|---|
| Show Graphic Navigation Menus | Checkbox |
| Activate Auto Advance to Next Page | Checkbox |

| | |
|---|---|
| Welcome | |
| Show The Contents Of This Page | Checkbox |
| Show Navigation Button For This Page | Checkbox |
| Auto Advance To Next Page In: Seconds | ________ |
| Launch Web-Link URL / email Click "Edit" To Add Link. | EDIT |

| | |
|---|---|
| Welcome | |
| Show The Contents Of This Page | Checkbox |
| Show Navigation Button For This Page | Checkbox |
| Auto Advance To Next Page In: Seconds | ________ |
| Launch Web-Link URL / email Click "Edit" To Add Link. | EDIT |

FIG. 13


Step 6: Editorial Control- Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout Checkbox
Allow changes to project style settings Checkbox
Allow changes to navigation settings Checkbox
Allow changes to the headline text Checkbox
Allow changes to the headline media Checkbox
Allow changes to the page text Checkbox
Allow changes to the page media Checkbox
Allow changes to the page playback settings Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next page in
Seconds
Section 2
Auto Advance to next page in
Section 3
Auto Advance to next page in
Section 4
Auto Advance to next page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation and claims the benefit of priority under 35 U.S.C. §120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006 now U.S. Pat. No. 7,870,497 entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. §119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.



In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming

or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.

Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nav.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).

A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For



example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites, dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the dif-

ferent design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nav.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.



Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nav.fla file. Native functions of this file include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed: to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nav.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e., movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.
- changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of

the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to change Slide( )—changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controllerWidth: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.

Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

Example

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The

steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by typing in any URL (i.e. mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.

A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2-5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g.,

code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

The invention claimed is:

1. A multimedia communication system comprising:

a media repository storing communication project templates and media assets of a number of content types, the communication project templates and media assets being accessible by a graphical user interface on a client computer via a network;

a project builder providing the graphical user interface for the client computer, the graphical user interface comprising controls for selecting at least one communication project template and at least one of the media assets for integration into the communication project template for assembling a communication; and

a project viewer, connected via the graphical user interface via the network, that renders the communication in the graphical user interface, wherein the communication is a collection of slides comprising a grouping of design

layers, design elements, and content containers, the slides displayed by the project viewer using either auto-play on or auto-play off .

**2**. The multimedia communication system in accordance with claim **1**, further comprising a compiler to integrate the selected ones of the media assets into the one of the communication project templates to generate the communication.

**3**. The multimedia communication system in accordance with claim **2**, further comprising a distribution program that formats the communication according to selected ones of an electronic distribution format.

**4**. The multimedia communication system in accordance with claim **3**, wherein the electronic distribution format includes an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

**5**. The multimedia communication system in accordance with claim **1**, further comprising a sharing program configured to receive user instructions for sharing the communication with other users.

**6**. The multimedia communication system in accordance with claim **1**, wherein the project builder further comprises a plurality of media asset palettes, each media asset palette comprising a content type, and which is displayed in the graphical user interface according to user preferences.

**7**. The multimedia communication system in accordance with claim **1**, wherein the media assets are classified according to content types, and wherein the content types include images, audio, video and text.



**8**. A multimedia communication method comprising:

providing, from a server computer, an interactive interview to a graphical user interface of a client computer;

receiving, via the interactive interview, information about a user to indicate user preferences for a communication project template and a set of associated selectable media assets, the communication project template and media assets being accessible by the graphical user interface on the client computer; and

providing, in the graphical user interface, a palette of at least one communication project template, and a palette of selectable media assets of at least one content type, for selection by the user to generate a communication , wherein the communication is a collection of slides comprising a grouping of design layers, design elements, and content containers, the slides displayed by the project viewer using either auto-play on or auto-play off.

**9**. A multimedia communication method in accordance with claim **8**, further comprising:

receiving user selections of at least one communication project template, and at least one media asset; and

integrating the at least one media asset with the communication project template to generate the communication.

**10**. A multimedia communication method in accordance with claim **9**, further comprising formatting the communication into selected ones of a plurality of electronic distribution formats.

* * * * *

US008930832B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 8,930,832 B2**
(45) **Date of Patent: *Jan. 6, 2015**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(71) Applicants: **Neil Greer**, San Diego, CA (US); **Bennett Blank**, San Diego, CA (US); **Bryan Depew**, San Diego, CA (US)

(72) Inventors: **Neil Greer**, San Diego, CA (US); **Bennett Blank**, San Diego, CA (US); **Bryan Depew**, San Diego, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/741,332**

(22) Filed: **Jan. 14, 2013**

(65) **Prior Publication Data**

US 2013/0132849 A1 May 23, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/004,862, filed on Jan. 11, 2011, now Pat. No. 8,356,253, which is a continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**

***G06F 3/0481*** (2013.01)
***H04L 12/24*** (2006.01)
***G06F 17/30*** (2006.01)

(52) **U.S. Cl.**

CPC .......... ***H04L 41/22*** (2013.01); ***G06F 17/30056*** (2013.01); ***G06F 17/30244*** (2013.01)
USPC ........... **715/762**; 715/731; 715/781; 715/810; 715/753; 715/716; 715/202

(58) **Field of Classification Search**

CPC . H04N 5/44543; G11B 27/34; G06Q 10/107; G06Q 10/10; G06F 3/0481; G06F 9/4443; G06F 9/44543; G06F 3/0482; G06F 17/243; G06F 17/30864; G06F 17/30286; G06F 17/30017; H04L 29/08072
USPC ......... 715/716, 719, 730–732, 752, 753, 762, 715/764, 765, 781, 810, 811, 202, 221, 715/222; 707/705, 805; 709/203, 204
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,266,683 B1 * 7/2001 Yehuda et al. ................ 715/234
6,601,057 B1 7/2003 Underwood et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1376406 A2 1/2004
EP 1431977 A2 6/2004

(Continued)

OTHER PUBLICATIONS

EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527.

(Continued)

*Primary Examiner* — Xiomar L Bautista

(74) *Attorney, Agent, or Firm* — Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**28 Claims, 16 Drawing Sheets**

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

* Answers to these questions automatically takes them to the START tab

* Second time they log in takes them to our current service home page where the Easy Start button is always accessible

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,694,353 | B2 | 2/2004 | Sommerer | |
| 6,910,049 | B2 | 6/2005 | Fenton et al. | |
| 6,976,028 | B2 | 12/2005 | Fenton et al. | |
| 7,111,254 | B1 * | 9/2006 | Rosen et al. | 715/856 |
| 7,219,303 | B2 * | 5/2007 | Fish | 715/753 |
| 7,315,983 | B2 | 1/2008 | Evans et al. | |
| 7,398,473 | B2 * | 7/2008 | Stoner et al. | 715/762 |
| 7,519,912 | B2 * | 4/2009 | Moody et al. | 715/753 |
| 2001/0010059 | A1 * | 7/2001 | Burman et al. | 709/224 |
| 2002/0194195 | A1 * | 12/2002 | Fenton et al. | 707/104.1 |
| 2004/0093377 | A1 | 5/2004 | Lumera et al. | |
| 2004/0123238 | A1 * | 6/2004 | Hefetz et al. | 715/513 |
| 2005/0094206 | A1 * | 5/2005 | Tonisson | 358/1.18 |
| 2005/0114784 | A1 * | 5/2005 | Spring et al. | 715/762 |
| 2005/0251742 | A1 * | 11/2005 | Mogilevsky et al. | 715/521 |
| 2006/0015904 | A1 | 1/2006 | Marcus | |
| 2006/0085360 | A1 | 4/2006 | Grim et al. | |
| 2006/0095320 | A1 * | 5/2006 | Jones | 705/14 |
| 2006/0129417 | A1 | 6/2006 | Williams et al. | |
| 2006/0150088 | A1 | 7/2006 | Kraft et al. | |
| 2006/0253542 | A1 | 11/2006 | McCausland et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 10-2004-0040406 | | 5/2004 |
| WO | WO-94/28480 | A1 | 12/1994 |
| WO | WO-02/103568 | A1 | 12/2002 |
| WO | WO-2004/097688 | A1 | 11/2004 |

OTHER PUBLICATIONS

First Office Action received Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383.

"Press Release: Create Flashy Web Images with the New Macromedia", Retrieved from the Internet< URL:www.scalado.com>, [Retrieved on Oct. 13, 2003].

* cited by examiner


CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


202
CREATE COMMUNICATION PROJECT TEMPLATE(S)
204
PROVIDE MEDIA ASSETS FOR GENERAL USE
206
RECEIVE MEDIA ASSETS FOR PRIVATE USE
200
208
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY

FIG. 2


302
INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
304
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
306
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
308
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
300

FIG. 3


RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
402
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
404
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
406
400

FIG. 4


RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
502
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
504
PROCESS SELECTION THROUGH SHARING PROGRAM
506
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED
508

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

Start | Step 1 | Step 2 | Step 3 | Step 4    Advanced    Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
blts
Page Style
Up
DOWN
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10


Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue

FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12


Step 5: Presentation Playback Control
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Show Playback Progress Timer
Checkbox
Show Viewer Play/Pause Buttons
Checkbox
Show Viewer Back/Next Buttons
Checkbox
Show Graphic Navigation Menus
Checkbox
Activate Auto Advance to Next Page
Checkbox
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT

FIG. 13


Step 6: Editorial Control- Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout
Checkbox
Allow changes to project style settings
Checkbox
Allow changes to navigation settings
Checkbox
Allow changes to the headline text
Checkbox
Allow changes to the headline media
Checkbox
Allow changes to the page text
Checkbox
Allow changes to the page media
Checkbox
Allow changes to the page playback settings
Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next page in
Seconds
Section 2
Auto Advance to next page in
Section 3
Auto Advance to next page in
Section 4
Auto Advance to next page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation U.S. patent application Ser. No. 13/004,862 filed on Jan. 11, 2011, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD" which is a continuation and claims the benefit of priority under 35 U.S.C. §120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. §119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-



specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Fur-

thermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.

Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nav.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).



A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites, dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops

on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nav.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.



Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nav.fla file. Native functions of this file include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nav.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.
- changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu

controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to change Slide( )—changeSlide (1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controllerWidth: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data

from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.



Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

## EXAMPLE

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any

changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by typing in any URL (for example, URL corresponding to mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.

A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2-5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.



Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

What is claimed:

**1**. A multimedia communication system comprising:

a media repository storing communication project templates categorized according to a plurality of communication categories, the communication categories of the communication project templates being displayed on a graphical user interface of a client computer connected to the media repository via a network;

a project builder obtaining a communication project template from the media repository when a communication category associated with the communication project template is selected on the graphical user interface from the plurality of communication categories, the project builder generating a communication displaying data

specified on the graphical user interface in accordance with the selected communication project template;

a distribution program connected to the media repository, the distribution program formatting the communication according to an electronic distribution format specified on the graphical user interface, the electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in-stream ad, an in-video ad, an animated video file for display on a computer, an animated file dynamically matching a user's geographic location with content the user is viewing for display on a computer, an expandable video file for display on a computer, an animated file containing keywords for display on a computer and an animated file for display on a computer; and

a project viewer connected to the project builder, the project viewer sending the communication according to the electronic distribution format via the network to the graphical user interface of the client computer.

**2**. The multimedia communication system in accordance with claim **1**, further comprising:

a compiler connected to the media repository and the project viewer, the compiler integrating the data specified on the graphical user interface with the selected communication template to generate compiled result data that is used by the project builder to generate the communication.

**3**. The multimedia communication system in accordance with claim **1**, further comprising a sharing program connected to the media repository, the sharing program sending the communication to a plurality of entities specified on the graphical user interface via a communication mode specified on the graphical user interface.

**4**. The multimedia communication system in accordance with claim **1**, wherein the project builder further comprises a plurality of media asset palettes, each media asset palette comprising a content type, and which is displayed in the graphical user interface according to user preferences.

**5**. The multimedia communication system in accordance with claim **1**, wherein the data specified on the graphical user interface comprises multimedia data including one or more of: images, audio, video and text.

**6**. The multimedia communication system in accordance with claim **1**, wherein the communication comprises a plurality of slides.

**7**. The multimedia communication system in accordance with claim **6**, wherein the plurality of slides comprise design layers, design elements, and content containers.

**8**. The multimedia communication system in accordance with claim **1**, wherein the plurality of communication categories comprise: a product showcase category, a service brochure category, an electronic business card category, a product or service brochure category, and an event promotion category.

**9**. The multimedia communication system in accordance with claim **1**, wherein the communication includes a banner advertisement for display on the web page.

**10**. The multimedia communication system in accordance with claim **9**, wherein the communication includes content provided by a social network.

**11**. The multimedia communication system in accordance with claim **9**, wherein the data content includes an animated banner advertisement.

**12**. The multimedia communication system in accordance with claim **1**, wherein the distribution program uses keywords provided by a search engine, to determine when to display the communication.

**13**. The multimedia communication system in accordance with claim **12**, wherein the communication further comprises: a keyword provided by the distribution program, content provided by a communication network, and content provided by a content source.

**14**. The multimedia communication system in accordance with claim **12**, wherein the keywords are provided to the search engine by an online advertising service.

**15**. The multimedia communication system in accordance with claim **1**, wherein the communication is paid for.

**16**. The multimedia communication system in accordance with claim **1**, wherein the distribution program interfaces with a geographical location determining system.

**17**. The multimedia communication system in accordance with claim **16**, wherein geographical location determining system includes a Global Positioning System.

**18**. The multimedia communication system in accordance with claim **1**, further comprising a tracking program for tracking the communication.

**19**. The multimedia communication system in accordance with claim **1**, wherein the project builder sends an update to the project viewer each time additional data is input into the user interface and the project viewer provides an updated communication to the user interface.

**20**. A multimedia communication method comprising:

providing, from a server computer via a network, an input screen to a graphical user interface of a client computer hosted by a mobile device connected with the network;

receiving, via the input screen of the graphical user interface and via the network, user preferences for a communication project template and a set of associated selectable media assets, the communication project template and media assets being accessible by the graphical user interface on the client computer;

providing, in the graphical user interface, a palette of at least one communication project template, and a palette of selectable media assets of at least one content type, for selection by the user to generate a communication, the communication comprising a plurality of slides defined by a grouping of design layers, design elements, and content containers; and

formatting, by the server computer, the communication according to an electronic distribution format specified on the graphical user interface, the electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in-stream ad, an in-video ad, an animated video file for display on a computer, an animated file dynamically matching a user's geographic location with content the user is viewing for display on a computer, an expandable video file for display on a computer, an animated file containing keywords for display on a computer, and an animated file for display on a computer.

**21**. A multimedia communication method in accordance with claim **20**, further comprising:

receiving user selections of at least one communication project template, and at least one media asset; and

integrating the at least one media asset with the communication project template to generate the communication.

**22**. A multimedia communication method in accordance with claim **21**, further comprising formatting the communication into selected ones of a plurality of electronic distribution formats.

**23**. A multimedia communication method in accordance with claim **21**, wherein at least one of the plurality of electronic distribution formats is compatible with the client computer hosted by the mobile device.

**24**. A method comprising: displaying, by a graphical user interface of a client computer, a plurality of presentation categories and a plurality of industries;

receiving, at the graphical user interface, a selection of a presentation category from the plurality of presentation categories and a selection of an industry from the plurality of industries;

displaying, on the graphical user interface, a plurality of presentation styles associated with a plurality of categories of multimedia data;

receiving, at the graphical user interface, data characterizing a selection of a presentation style associated with each category of multimedia data;

generating, by a server computer connected to the client computer via a communication network, a presentation having data presented according to the presentation style associated with each selected category of multimedia data, the data of the presentation being embedded on a template identified by the server computer based on the selected presentation category and the selected industry; and

formatting, by the server computer, the communication according to an electronic distribution format specified on the graphical user interface, the electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in-stream ad, an in-video ad, an animated video file for display on a computer, an animated file dynamically matching a user's geographic location with content the user is viewing for display on a computer, an expandable video file for display on a computer, an animated file containing keywords for display on a computer, and an animated file for display on a plurality of recipient computers.

**25**. The method in accordance with claim **24**, wherein the plurality of presentation categories comprise: a product showcase category, a service brochure category, an electronic business card category, a product or service brochure category, and an event promotion category.

**26**. The method in accordance with claim **24**, wherein the plurality of categories of multimedia data comprise: color scheme, audio, images, animation, text and titles, graphics, playback control, and video.

**27**. The method in accordance with claim **24**, wherein the presentation comprises a plurality of slides.

**28**. The method in accordance with claim **24**, further comprising:

enabling, by the server computer, a user to edit the presentation by allowing receipt of modified data on the graphical user interface.

* * * * *

US009361632B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 9,361,632 B2**
(45) **Date of Patent: *Jun. 7, 2016**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(71) Applicants: **Neil Greer**, La Jolla, CA (US); **Bennett Blank**, La Jolla, CA (US); **Bryan Depew**, La Jolla, CA (US)

(72) Inventors: **Neil Greer**, La Jolla, CA (US); **Bennett Blank**, La Jolla, CA (US); **Bryan Depew**, La Jolla, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/590,881**

(22) Filed: **Jan. 6, 2015**

(65) **Prior Publication Data**

US 2015/0127458 A1 May 7, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/741,332, filed on Jan. 14, 2013, now Pat. No. 8,930,832, which is a continuation of application No. 13/004,862, filed on Jan. 11, 2011, now Pat. No. 8,356,253, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 3/0481*** | (2013.01) |
| ***G06Q 30/02*** | (2012.01) |

(Continued)

(52) **U.S. Cl.**

CPC ...... ***G06Q 30/0256*** (2013.01); ***G06F 17/30056*** (2013.01); ***G06F 17/30244*** (2013.01); ***G06Q 30/0277*** (2013.01); ***H04L 41/22*** (2013.01)

(58) **Field of Classification Search**

CPC .. G11B 27/034; G11B 27/34; H04N 5/44543; G06F 3/00; G06F 3/048; G06F 3/0481; G06F 3/0482; G06F 9/44543; G06F 9/4443; G06F 17/30017; G06F 17/243; G06F 17/30864; G06F 17/30286; G06Q 10/107; G06Q 10/10; H04L 29/08072

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,266,683 B1 | 7/2001 | Yehuda et al. |
| 6,601,057 B1 | 7/2003 | Underwood et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1376406 A2 | 1/2004 |
| EP | 1431977 A2 | 6/2004 |

(Continued)

OTHER PUBLICATIONS

EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527.

(Continued)

*Primary Examiner* — Xiomar L Bautista

(74) *Attorney, Agent, or Firm* — Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**41 Claims, 16 Drawing Sheets**

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
- Event Promotion
- Invitation
- Other

2) What is your Industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

**Related U.S. Application Data**

continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**
***G06F 17/30*** (2006.01)
***H04L 12/24*** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,694,353 | B2 | 2/2004 | Sommerer |
| 6,910,049 | B2 | 6/2005 | Fenton et al. |
| 6,976,028 | B2 | 12/2005 | Fenton et al. |
| 7,111,254 | B1 | 9/2006 | Rosen et al. |
| 7,219,303 | B2 | 5/2007 | Fish |
| 7,315,983 | B2 | 1/2008 | Evans et al. |
| 7,398,473 | B2 | 7/2008 | Stoner et al. |
| 7,519,912 | B2 | 4/2009 | Moody et al. |
| 7,870,497 | B2 | 1/2011 | Greer et al. |
| 8,356,253 | B2 | 1/2013 | Greer et al. |
| 8,930,832 | B2 | 1/2015 | Greer et al. |
| 2001/0010059 | A1 | 7/2001 | Burman et al. |
| 2002/0194195 | A1 | 12/2002 | Fenton et al. |
| 2004/0093377 | A1 | 5/2004 | Lumera et al. |
| 2004/0123238 | A1 | 6/2004 | Hefetz et al. |
| 2005/0094206 | A1 | 5/2005 | Tonisson |
| 2005/0114784 | A1 | 5/2005 | Spring et al. |
| 2005/0251742 | A1 | 11/2005 | Mogilevsky et al. |
| 2006/0015904 | A1 | 1/2006 | Marcus |
| 2006/0085360 | A1 | 4/2006 | Grim et al. |
| 2006/0095320 | A1 | 5/2006 | Jones |
| 2006/0129417 | A1 | 6/2006 | Williams et al. |
| 2006/0150088 | A1 | 7/2006 | Kraft et al. |
| 2006/0253542 | A1 | 11/2006 | McCausland et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 10-2004-0040406 | | 5/2004 |
| WO | WO-94/28480 | A1 | 12/1994 |
| WO | WO-02/103568 | A1 | 12/2002 |
| WO | WO-2004/097688 | A1 | 11/2004 |

OTHER PUBLICATIONS

First Office Action received Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383.

"Press Release: Create Flashy Web Images with the New Macromedia", Retrieved from the Internet:< URL:www.scalado.com>, [Retrieved on Oct. 13, 2003].


CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1



CREATE COMMUNICATION PROJECT TEMPLATE(S)
202
PROVIDE MEDIA ASSETS FOR GENERAL USE
204
RECEIVE MEDIA ASSETS FOR PRIVATE USE
206
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY
208
200


FIG. 2


INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
302
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
304
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
306
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
308
300

FIG. 3



402
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
404
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
406
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
400


FIG. 4


502
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
504
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
506
PROCESS SELECTION THROUGH SHARING PROGRAM
508
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6


Welcome to the "EDIT Mode" for this presentation.
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. Note: To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Top of Form 1
Presentation Templates
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.
1. Presentation Title: 2. Select Your Presentation Style:
Venture
Mystic
Flow
Currents
Tech
Process
Modern
Whitehaus
Atmosphere
Depth
Titanium
Elements
Horizon
Edge
Classic
Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
bits
Up
DOWN
Page Style
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
l large image
Text Only
Continue

FIG. 10


Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue

FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12


Step 5: Presentation Playback Control
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Show Playback Progress Timer
Checkbox
Show Viewer Play/Pause Buttons
Checkbox
Show Viewer Back/Next Buttons
Checkbox
Show Graphic Navigation Menus
Checkbox
Activate Auto Advance to Next Page
Checkbox
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT

FIG. 13


Step 6: Editorial Control- Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout
Checkbox
Allow changes to project style settings
Checkbox
Allow changes to navigation settings
Checkbox
Allow changes to the headline text
Checkbox
Allow changes to the headline media
Checkbox
Allow changes to the page text
Checkbox
Allow changes to the page media
Checkbox
Allow changes to the page playback settings
Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next page in
Seconds
Section 2
Auto Advance to next page in
Section 3
Auto Advance to next page in
Section 4
Auto Advance to next page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/741,332 filed Jan. 14, 2013, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation and claims the benefit of priority under 35 U.S.C. §120 of U.S. patent application Ser. No. 13/004,862 filed on Jan. 11, 2011, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD" which is a continuation and claims the benefit of priority under 35 U.S.C. §120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. §119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.



In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The

systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.

Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nay.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).



A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites, dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer

waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nay.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.



Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nay.fla file. Native functions of this file include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlaybackO: This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nay.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.

changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to changeSlide( )—changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground .swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controller Width: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground .swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema

allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.



Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

## Example

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any

changes in the forms provided. When finished, the user selects the “finish” button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in “Edit Mode” by selecting the “Upload” button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the “Show” button next to the name of the communication to be sent. The “Show” button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic “view” link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and “from” name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user’s home page. To execute this functionality, a user can click on the “My Websites” from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system’s servers, and the website is available by typing in any URL (i.e. www.mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.

A communication can also be added to an existing web page by clicking on the “Show” from inside the account to generate HTML or the actionscript (“objectembed”) code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2-5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as



text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

What is claimed:

**1**. A multimedia communication system comprising:

a media repository storing online advertisement templates available for display on a graphical user interface of a client computer coupled to the media repository via the Internet;

a project builder on a server computer obtaining an online advertisement template from the media repository, the project builder generating an online advertisement based on an online advertisement template selected on the graphical user interface;

a distribution program on the server computer coupled to the media repository for broadcasting the online adver-

tisement, the distribution program using keywords in to determining the distribution of the online advertisement;

the server computer formatting the online advertisement, in an electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in stream ad, an in-video ad, an animated video file for display on a computer, an expandable video file for display on a computer, and an animated file for display on a computer; and

a project viewer for sending at least one version of the online advertisement via the Internet to a client computer having a graphical user interface that displays the online advertisement.

**2**. The multimedia communication system in accordance with claim **1**, wherein the distribution program uses keywords provided by a search engine.

**3**. The multimedia communication system in accordance with claim **2**, wherein the search engine is Google.

**4**. The multimedia communication system in accordance with claim **2**, wherein the online advertisement further comprises at least one of: a keyword provided by the distribution program, content provided by a communication network, and content provided by a content source.

**5**. The multimedia communication system in accordance with claim **2**, wherein the keywords are provided to the search engine by an online advertising service.

**6**. The multimedia communication system in accordance with claim **1**, wherein the distribution program is provided by Google Ad Words.

**7**. The multimedia communication system in accordance with claim **1**, wherein the distribution program uses data provided by Google Ad Words to determine the distribution of the online advertisement.

**8**. The multimedia communication system in accordance with claim **1**, further comprising:

a compiler on the server computer coupled to the media repository and the project viewer, the compiler integrating data received via the graphical user interface with the selected online advertisement template to generate compiled result data that is used by the project builder to generate the online advertisement.

**9**. The multimedia communication system in accordance with claim **8**, wherein the graphical user interface comprises multimedia data including one or more of: images, audio, video and text.

**10**. The multimedia communication system in accordance with claim **8**, wherein the data specified on the graphical user interface includes one or more data feeds from one or more content sources.

**11**. The multimedia communication system in accordance with claim **1**, further comprising a sharing program on the server computer coupled to the media repository, the sharing program sending the online advertisement to a plurality of entities specified on the graphical user interface via a communication mode specified on the graphical user interface.

**12**. The multimedia communication system in accordance with claim **1**, wherein the project builder further comprises a plurality of media asset palettes, each media asset palette comprising a content type, and which is displayed in the graphical user interface according to user preferences.

**13**. The multimedia communication system in accordance with claim **1**, wherein the communication comprises a plurality of slides.

**14**. The multimedia communication system in accordance with claim **13**, wherein the plurality of slides comprise design layers, design elements, and content containers.

**15**. The multimedia communication system in accordance with claim **1**, wherein the online advertisement templates are categorized in one or more online advertisement categories including at least one of: a product showcase category, a service brochure category, an electronic business card category, a product or service brochure category, and an event promotion category.

**16**. The multimedia communication system in accordance with claim **1**, wherein the online advertisement is displayed on a web page.

**17**. The multimedia communication system in accordance with claim **16**, wherein the online advertisement includes an animated online advertisement.

**18**. The multimedia communication system in accordance with claim **1**, wherein the distribution program includes data provided by a social network.

**19**. The multimedia communication system in accordance with claim **1**, wherein the online advertisement is paid for.

**20**. The multimedia communication system in accordance with claim **1**, wherein the distribution program interfaces with a geographical location determining system.

**21**. The multimedia communication system in accordance with claim **20**, wherein the geographical location determining system provides a location of a potential recipient of the online advertisement.

**22**. The multimedia communication system in accordance with claim **20**, wherein geographical location determining system includes a Global Positioning System.

**23**. The multimedia communication system in accordance with claim **1**, further comprising a tracking program for tracking data relating to the online advertisement.

**24**. The multimedia communication system in accordance with claim **1**, wherein the project builder sends an update to the project viewer each time additional data is input into the graphical user interface and the project viewer provides an updated online advertisement for display on the graphical user interface.

**25**. The multimedia communication system in accordance with claim **1**, wherein multiple sizes of the online advertisement are created by the server computer and displayed to the graphical user interface for selection by the user.

**26**. The multimedia communication system in accordance with claim **1**, wherein multiple sizes and versions of the online advertisement are created by the server computer based upon data from a website specified on the graphical user interface by the user.

**27**. The multimedia communication system in accordance with claim **1**, wherein one or several user-defined online advertisement formats may be uploaded to a user account.

**28**. The multimedia communication system in accordance with claim **1**, wherein the media repository includes a catalog of stock media assets.

**29**. The multimedia communication system in accordance with claim **28**, wherein the catalog of stock media assets is made available by the server computer for selection and incorporation of stock media assets into online advertisements.

**30**. The multimedia communication system in accordance with claim **1**, further comprising a tracking program for tracking the online advertisement, wherein the tracking program can be used to create a report for download and use on a computer.

**31**. The multimedia communication system in accordance with claim **1**, further comprising a sharing program providing one or more master users editorial control of the online advertisements.

**32**. A multimedia communication method comprising:

providing, from a server computer via the Internet, an input screen to a graphical user interface of a client computer hosted by a mobile device coupled with the Internet;

receiving, at the server computer via the input screen of the graphical user interface and via the Internet, user preferences for an online advertising template and a set of associated selectable media assets, the online advertising template and media assets being accessible on the graphical user interface on the client computer;

providing, by the server computer, via the input screen of the graphical user interface, a palette of at least one online advertising template, and a palette of selectable media assets of at least one content type, for selection by the user to generate an online advertisement, the online advertisement comprising a plurality of slides defined by a grouping of design layers, design elements, and content containers;

formatting, by the server computer, the online advertisement according to an electronic distribution format specified on the graphical user interface, the electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in-stream ad, an in-video ad, an animated video file for display on a computer, an expandable video file for display on a computer, and an animated file for display on a computer; and,

broadcasting the online advertisement on the Internet.

**33**. A multimedia communication method in accordance with claim **32**, further comprising:

receiving user selections of at least one online advertising template, and at least one media asset; and

integrating on the server computer the at least one media asset with the online advertising template to generate the online advertisement.

**34**. A multimedia communication method in accordance with claim **33**, further comprising formatting the online advertisement into selected ones of a plurality of electronic distribution formats.

**35**. A multimedia communication method in accordance with claim **33**, wherein at least one of the plurality of electronic distribution formats is compatible with the client computer hosted by the mobile device.

**36**. A method comprising:

providing by a server computer for display, on a graphical user interface of a client computer coupled by a communication network to the server computer, a plurality of online advertisement categories and a list of a plurality of industries;



receiving, by the server computer, a selection made via the graphical user interface of an online advertisement category from the list of the plurality of online advertisement categories and a selection of an industry from the plurality of industries;

providing by the server computer for display, on the graphical user interface, a plurality of online advertisement styles associated with a plurality of categories of multimedia data;

receiving by the server computer, via the graphical user interface, data characterizing a selection of an online advertisement style associated with a category of multimedia data;

generating, by the server computer, an online advertisement having data presented according to the online advertisement style associated with the selected category of multimedia data, the data of the online advertisement being embedded on an online advertisement template identified by the server computer based on the selected online advertisement category and the selected industry;

formatting, by the server computer, the online advertisement according to an electronic distribution format specified on the graphical user interface, the electronic distribution format being selectable from a set of two or more options of an electronic mail, a web page, an electronic brochure, a text ad, a mobile ad, an in-stream ad, a in-video ad, an animated video file for display on a computer, an expandable video file for display on a computer, and an animated file for display on a plurality of recipient computers; and,

broadcasting the online advertisement on the Internet.

**37**. The method in accordance with claim **36**, wherein the plurality of online advertisement categories includes at least one of: a product showcase category, a service brochure category, an electronic business card category, a product or service brochure category, and an event promotion category.

**38**. The method in accordance with claim **36**, wherein the plurality of categories of multimedia data comprise one or more of: color scheme, audio, images, animation, text and titles, graphics, playback control, and video.

**39**. The method in accordance with claim **36**, wherein the online advertisement comprises a plurality of slides.

**40**. The multimedia communication system in accordance with claim **39**, wherein the plurality of slides comprise design layers, design elements, and content containers.

**41**. The method in accordance with claim **36**, further comprising: enabling, by the server computer, a user to edit the online advertisement by allowing receipt of modified data on the graphical user interface.

* * * * *

US010068253B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 10,068,253 B2**
(45) **Date of Patent: *Sep. 4, 2018**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(71) Applicant: **Impact Engine, Inc.**, La Jolla, CA (US)

(72) Inventors: **Neil Greer**, La Jolla, CA (US); **Bennett Blank**, La Jolla, CA (US); **Bryan Depew**, La Jolla, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/795,136**

(22) Filed: **Oct. 26, 2017**

(65) **Prior Publication Data**

US 2018/0047054 A1 Feb. 15, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/174,945, filed on Jun. 6, 2016, now Pat. No. 9,805,393, which is a

(Continued)

(51) **Int. Cl.**

***G06F 3/0481*** (2013.01)
***G06Q 30/02*** (2012.01)

(Continued)

(52) **U.S. Cl.**

CPC ....... ***G06Q 30/0256*** (2013.01); ***G06F 3/0482*** (2013.01); ***G06F 17/211*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .......... G06F 3/00; G06F 3/048; G06F 3/0481; G06F 3/0482; G06F 9/4443;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,266,683 B1 7/2001 Yehuda et al.
6,601,057 B1 7/2003 Underwood et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1376406 A2 1/2004
EP 1431977 A2 6/2004

(Continued)

OTHER PUBLICATIONS

"Press Release: Create Flashy Web Images with the New Macromedia", Retrieved from the Internet:< URL:www.scalado.com>, [Retrieved on Oct. 13, 2003].

(Continued)

*Primary Examiner* — Xiomar L Bautista

(74) *Attorney, Agent, or Firm* — Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**24 Claims, 16 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 14/590,881, filed on Jan. 6, 2015, now Pat. No. 9,361,632, which is a continuation of application No. 13/741,332, filed on Jan. 14, 2013, now Pat. No. 8,930,832, which is a continuation of application No. 13/004,862, filed on Jan. 11, 2011, now Pat. No. 8,356,253, which is a continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 3/0482*** | (2013.01) |
| ***G06F 17/21*** | (2006.01) |
| ***G06F 17/22*** | (2006.01) |
| ***G06F 17/24*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |
| ***G06F 17/30*** | (2006.01) |
| ***H04L 12/24*** | (2006.01) |

(52) **U.S. Cl.**
CPC ........ ***G06F 17/2288*** (2013.01); ***G06F 17/248*** (2013.01); ***G06F 17/30056*** (2013.01); ***G06F 17/30244*** (2013.01); ***G06Q 30/0276*** (2013.01); ***G06Q 30/0277*** (2013.01); ***H04L 41/22*** (2013.01); ***H04L 65/4076*** (2013.01)

(58) **Field of Classification Search**
CPC ............. G06F 17/30017; G06F 17/243; G06F 17/30864; G06F 17/30286; G11B 27/034; G11B 27/34; H04N 5/44543; H04L 29/08072; G06Q 10/10; G06Q 10/107
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,694,353 | B2 | 2/2004 | Sommerer |
| 6,910,049 | B2 | 6/2005 | Fenton et al. |
| 6,976,028 | B2 | 12/2005 | Fenton et al. |
| 7,111,254 | B1 | 9/2006 | Rosen et al. |
| 7,219,303 | B2 | 5/2007 | Fish |
| 7,315,983 | B2 | 1/2008 | Evans et al. |
| 7,398,473 | B2 | 7/2008 | Stoner et al. |
| 7,519,912 | B2 | 4/2009 | Moody et al. |
| 7,707,226 | B1 | 4/2010 | Tonse |
| 7,870,497 | B2 | 1/2011 | Greer et al. |
| 8,356,253 | B2 | 1/2013 | Greer et al. |
| 8,930,832 | B2 | 1/2015 | Greer et al. |
| 2001/0010059 | A1 | 7/2001 | Burman et al. |
| 2002/0194195 | A1 | 12/2002 | Fenton et al. |
| 2004/0093377 | A1 | 5/2004 | Lumera et al. |
| 2004/0123238 | A1 | 6/2004 | Hefetz et al. |
| 2005/0094206 | A1 | 5/2005 | Tonisson |
| 2005/0114784 | A1 | 5/2005 | Spring et al. |
| 2005/0251742 | A1 | 11/2005 | Mogilevsky et al. |
| 2006/0015904 | A1 | 1/2006 | Marcus |
| 2006/0085360 | A1 | 4/2006 | Grim et al. |
| 2006/0085431 | A1 | 4/2006 | Burns et al. |
| 2006/0095320 | A1 | 5/2006 | Jones |
| 2006/0129417 | A1 | 6/2006 | Williams et al. |
| 2006/0150088 | A1 | 7/2006 | Kraft et al. |
| 2006/0253542 | A1 | 11/2006 | McCausland et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 1020040040406 | | 5/2004 |
| WO | WO-94/28480 | A1 | 12/1994 |
| WO | WO-02/103568 | A1 | 12/2002 |
| WO | WO-2004/097688 | A1 | 11/2004 |

OTHER PUBLICATIONS

EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527.
First Office Action dated Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383.


CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


202
CREATE COMMUNICATION PROJECT TEMPLATE(S)
204
PROVIDE MEDIA ASSETS FOR GENERAL USE
206
RECEIVE MEDIA ASSETS FOR PRIVATE USE
200
208
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY

FIG. 2


INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
302
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
304
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
306
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
308
300

FIG. 3


402
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
404
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
406
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
400

FIG. 4


RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
502
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
504
PROCESS SELECTION THROUGH SHARING PROGRAM
506
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED
508

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

Start | Step 1 | Step 2 | Step 3 | Step 4    Advanced    Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
blts
Page Style
Opens To:
U p
D O W N
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10



Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue


FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12


Step 5: Presentation Playback Control
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Show Playback Progress Timer
Checkbox
Show Viewer Play/Pause Buttons
Checkbox
Show Viewer Back/Next Buttons
Checkbox
Show Graphic Navigation Menus
Checkbox
Activate Auto Advance to Next Page
Checkbox
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT

FIG. 13


Step 6: Editorial Control- Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout
Checkbox
Allow changes to project style settings
Checkbox
Allow changes to navigation settings
Checkbox
Allow changes to the headline text
Checkbox
Allow changes to the headline media
Checkbox
Allow changes to the page text
Checkbox
Allow changes to the page media
Checkbox
Allow changes to the page playback settings
Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next Page in
Seconds
Section 2
Auto Advance to next Page in
Section 3
Auto Advance to next Page in
Section 4
Auto Advance to next Page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/174,945 filed Jun. 6, 2016, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 14/590,881 filed Jan. 6, 2015, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 13/741,332 filed Jan. 14, 2013, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 13/004,862 filed on Jan. 11, 2011, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD" which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. § 119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model

in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.

Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nay.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).

A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites, dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project

will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nay.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:



- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nay.fla file. Native functions of this file include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nay.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to

distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.

changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to changeSlide( )—changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".



Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controllerWidth: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component.

Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are “foreground”, “background”, and “communication”.

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content “stacks” according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or “serialize” completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled “staticView”. Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

“Live View” describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

“Edit View” is experienced within the project builder and, in some instances, the “Live View” where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This “display” view offers the users context within the design so content can be configured and assigned to containers.

Groups

“Groups” is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls



to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a “Team account.” In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.

Sharing

“Sharing” is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a “main” communication and up to N “derivative” communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several “main” communication and up to N “derivative” communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

## EXAMPLE

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered based on a user’s individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the

account (and associated communications), a user must first login from a homepage, i.e. impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by typing in any URL (i.e. mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.



A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2-5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder

engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational;

for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

What is claimed:

**1**. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over the Internet based on one or more of data pertaining to a keyword or other recipient data, the system comprising:

a server having a network internet connection to communicate with a user of a client computer via a graphical user interface displayed by the client computer, the server comprising:

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder for accessing the media repository and for generating a project viewer, the project viewer for allowing the user to view both the online advertisement templates and the media assets on the graphical user interface, and comprising a plurality of controls for allowing the user to select a media asset for integration with an advertisement template;

a compiler associated with the project builder, the compiler for integrating the media asset with the online advertisement template to generate an online advertisement;

a formatter for selecting and formatting the online advertisement in an electronic distribution format based on one or more of the data pertaining to the keyword and the other data received from the recipient; and

a distribution program for performing the targeted broadcasting of the online advertisement over the Internet to the recipient.

**2**. The multimedia communication system in accordance with claim **1**, wherein the keyword is entered at a browser application presented for display to the recipient.

**3**. The multimedia communication system in accordance with claim **2**, wherein one or both of the data pertaining to a keyword and other data received from the recipient is data from a social network, a geographical location determining system, or a web page.

**4**. The multimedia communication system in accordance with claim **1**, wherein the data pertaining to the keyword is provided by Google Ad Words for the targeted broadcasting.

**5**. The multimedia communication system in accordance with claim **1**, wherein the other recipient data comprises geographical location determining data.

**6**. The multimedia communication system in accordance with claim **1**, wherein the media asset is an image, audio clip, video clip, or text.

**7**. The multimedia communication system in accordance with claim **6**, wherein the project builder automatically selects the media asset based upon one or more criteria provided by the user of the client computer.

**8**. The multimedia communication system in accordance with claim **6**, wherein the project builder extracts the media asset used by the compiler from one or more of data pertaining to a keyword or other recipient data.

**9**. The multimedia communication system in accordance with claim **8**, wherein the formatter is configured for automatically selecting and formatting the online advertisement.

**10**. The multimedia communication system in accordance with claim **9**, wherein the selected online advertisement is formatted in a plurality of distribution formats, and the distribution program is configured for broadcasting the online advertisement in the plurality of distribution formats.

**11**. The multimedia communication system in accordance with claim **10**, wherein the plurality of distribution formats comprises advertisements formatted for display on a web page and advertisements formatted for display on a mobile device.

**12**. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over the Internet based on data pertaining to one or more keywords, the system comprising:

a server having a network internet connection to communicate with a user of a client computer via a graphical user interface of the client computer, the server comprising a media repository for storing online advertisement templates and media assets;

the server further comprising a project builder, the project builder for accessing the media repository, and generating an online advertisement based on one or more selection criterion;

the server further comprising a project viewer, the project viewer being accessible via the project builder and configured for allowing the user of the client computer to view both the media asset and the online advertisement template at the graphical user interface of the client computer, and further comprising controls for allowing the selection of the media asset for integration into the advertisement template;

the server further comprising a compiler for integrating the selected media asset with the selected online advertisement template to produce the online advertisement;

the server further comprising a formatting program for formatting the online advertisement in a format suitable for display at one or more of a web page and a mobile device; and

the server further comprising a distribution program for accessing the online advertisement and for broadcasting the online advertisement in a targeted format over the Internet to an advertising recipient based on the data pertaining to one or more keywords.

**13**. The multimedia communication system in accordance with claim **12**, wherein the selection of the media asset for integration into the advertisement template is performed automatically by the server.

**14**. The multimedia communication system in accordance with claim **12**, wherein the selection is performed by a user of the multimedia communication system.

**15**. The multimedia communication system in accordance with claim **14**, wherein the controls allow the user to edit the online advertisement.

**16**. The multimedia communication system in accordance with claim **12**, wherein the integration is performed automatically based on the data pertaining to the one or more keywords.

**17**. The multimedia communication system in accordance with claim **16**, wherein the integration is performed automatically based on the data pertaining to the one or more keywords.

**18**. The multimedia communication system in accordance with claim **17**, wherein the one or more keywords comprise

keywords that have been entered at a browser application presented on a display of the one or more recipient client computers.

**19**. The multimedia communication system in accordance with claim **18**, wherein the online advertisement is formatted for distribution in one or both of a web page format and a mobile device format, and the distribution program is configured for the targeted broadcasting of the online advertisement in the plurality of distribution formats.

**20**. An online advertisement generation system for automatically generating and broadcasting one or more banner ads, the online advertisement generation system comprising:

a communications system server being coupled to a recipient device via an internet network connection, the recipient device having a graphical user interface being configured for receiving an input directed to a query, the query comprising one or more keywords, the communications system server further being coupled with a media repository for storing media rich communication content, the media rich communication content comprising a plurality of online advertisement templates and a plurality of media assets, the communications system server being configured for receiving the query from the recipient device via the internet network connection as well as for generating and broadcasting the one or more banner ads to the recipient device in response to the received query, the communication system server having an advertisement generation engine for generating the one or more banner ads, the advertisement generation engine comprising:

an advertisement builder, the advertisement builder for automatically identifying and extracting data pertaining to the one or more keywords from the query, and further configured for accessing the media repository and selecting, based on the one or more keywords, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets;



a compiler associated with the project builder, the compiler for automatically integrating the at least one selected media asset with the at least one selected online advertisement template to generate the one or more banner ads in a manner so as to be content specific to the one or more keywords; and

a formatter associated with the compiler, the formatter for formatting each banner ad, wherein once the one or more banner ads is generated and formatted, the communications system server automatically broadcasts the one or more banner ads to the recipient device.

**21**. The online advertisement generation system of claim **20**, wherein the communications system server comprises a distribution program for performing the broadcasting, and wherein the distribution program uses data pertaining to the one or more keywords for performing the broadcasting.

**22**. The multimedia communication system in accordance with claim **21**, wherein the data is provided by Google Ad Words for targeted broadcasting.

**23**. The multimedia communication system in accordance with claim **22**, wherein the data is from a social network, a geographical location determining system, or a web page.

**24**. The online advertisement generation system of claim **21**, wherein the formatter is configured for automatically formatting each content specific banner ad in a plurality of electronic distribution formats, the plurality of electronic distribution formats comprising a banner ad formatted for display on a web page and a banner ad formatted for display on a mobile device, and the distribution program is configured for broadcasting the online advertisement in the plurality of distribution formats.

* * * * *

US010565618B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 10,565,618 B2**
(45) **Date of Patent: *Feb. 18, 2020**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(71) Applicant: **Impact Engine, Inc.**, La Jolla, CA (US)

(72) Inventors: **Neil Greer**, La Jolla, CA (US); **Bennett Blank**, La Jolla, CA (US); **Bryan Depew**, La Jolla, CA (US)

(73) Assignee: **Impact Engine, Inc.**, La Jolla, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/937,568**

(22) Filed: **Mar. 27, 2018**

(65) **Prior Publication Data**

US 2018/0218401 A1 Aug. 2, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/795,136, filed on Oct. 26, 2017, now Pat. No. 10,068,253, which is a

(Continued)

(51) **Int. Cl.**

***G06Q 30/02*** (2012.01)
***G06F 16/50*** (2019.01)

(Continued)

(52) **U.S. Cl.**

CPC ....... ***G06Q 30/0256*** (2013.01); ***G06F 3/0482*** (2013.01); ***G06F 16/4393*** (2019.01);

(Continued)

(58) **Field of Classification Search**

CPC combination set(s) only.
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,266,683 B1 7/2001 Yehuda et al.
6,601,057 B1 7/2003 Underwood et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1376406 A2 1/2004
EP 1431977 A2 6/2004

(Continued)

OTHER PUBLICATIONS

"EdgeSuite 5.0: ESI Developer's Guide", by Akamai. Aug. 29, 2004. pp. 7-11, 99, 104-105. (Year: 2004).*

(Continued)

*Primary Examiner* — William A Brandenburg

(74) *Attorney, Agent, or Firm* — Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**30 Claims, 16 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 15/174,945, filed on Jun. 6, 2016, now Pat. No. 9,805,393, which is a continuation of application No. 14/590,881, filed on Jan. 6, 2015, now Pat. No. 9,361,632, which is a continuation of application No. 13/741,332, filed on Jan. 14, 2013, now Pat. No. 8,930,832, which is a continuation of application No. 13/004,862, filed on Jan. 11, 2011, now Pat. No. 8,356,253, which is a continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 16/438*** | (2019.01) |
| ***H04L 12/24*** | (2006.01) |
| ***G06F 3/0482*** | (2013.01) |
| ***G06F 17/21*** | (2006.01) |
| ***G06F 17/22*** | (2006.01) |
| ***G06F 17/24*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***G06F 16/50*** (2019.01); ***G06F 17/211*** (2013.01); ***G06F 17/2288*** (2013.01); ***G06F 17/248*** (2013.01); ***G06Q 30/0276*** (2013.01); ***G06Q 30/0277*** (2013.01); ***H04L 41/22*** (2013.01); ***H04L 65/4076*** (2013.01)

(56) **References Cited**


U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,694,353 | B2 | 2/2004 | Sommerer | |
| 6,910,049 | B2 | 6/2005 | Fenton et al. | |
| 6,976,028 | B2 | 12/2005 | Fenton et al. | |
| 7,111,254 | B1 | 9/2006 | Rosen et al. | |
| 7,219,303 | B2 | 5/2007 | Fish | |
| 7,315,983 | B2 | 1/2008 | Evans et al. | |
| 7,398,473 | B2 | 7/2008 | Stoner et al. | |
| 7,519,912 | B2 | 4/2009 | Moody et al. | |
| 7,707,226 | B1 | 4/2010 | Tonse | |
| 7,870,497 | B2 | 1/2011 | Greer et al. | |
| 8,356,253 | B2 | 1/2013 | Greer et al. | |
| 8,447,651 | B1 * | 5/2013 | Scholl | G06Q 30/02 705/14.4 |
| 8,930,832 | B2 | 1/2015 | Greer et al. | |
| 2001/0010059 | A1 | 7/2001 | Burman et al. | |
| 2002/0194195 | A1 | 12/2002 | Fenton et al. | |
| 2004/0093377 | A1 | 5/2004 | Lumera et al. | |
| 2004/0123238 | A1 | 6/2004 | Hefetz et al. | |
| 2005/0094206 | A1 | 5/2005 | Tonisson | |
| 2005/0114784 | A1 | 5/2005 | Spring et al. | |
| 2005/0245241 | A1 | 11/2005 | Durand et al. | |
| 2005/0251742 | A1 | 11/2005 | Mogilevsky et al. | |
| 2006/0015904 | A1 | 1/2006 | Marcus | |
| 2006/0074751 | A1 * | 4/2006 | Kline | G06Q 30/02 705/14.55 |
| 2006/0085360 | A1 | 4/2006 | Grim et al. | |
| 2006/0085431 | A1 | 4/2006 | Burns et al. | |
| 2006/0095320 | A1 | 5/2006 | Jones | |
| 2006/0129417 | A1 | 6/2006 | Williams et al. | |
| 2006/0150088 | A1 | 7/2006 | Kraft et al. | |
| 2006/0253542 | A1 | 11/2006 | McCausland et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 102004004040 | | 5/2004 |
| WO | WO-94/28480 | A1 | 12/1994 |
| WO | WO-02/103568 | A1 | 12/2002 |
| WO | WO-2004/097688 | A1 | 11/2004 |

OTHER PUBLICATIONS

Anonymous: "Press Release: Create Flashy Web Images with the New Macromedia",Jan. 22, 2003. pp. 1-2. Retrieved from the Internet. <URL:www.scalado.com>, [Retrieved on Oct. 13, 2003].
EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527. 7 pages.
First Office Action Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383. 6 pages.


* cited by examiner


CLIENT USER INTERFACE
104
100
106
NETWORK
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


CREATE COMMUNICATION PROJECT TEMPLATE(S)
202
PROVIDE MEDIA ASSETS FOR GENERAL USE
204
RECEIVE MEDIA ASSETS FOR PRIVATE USE
206
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY
208
200

FIG. 2



INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
302
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
304
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
306
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
308
300


FIG. 3


402
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
404
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
406
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
400

FIG. 4


502
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
504
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
506
PROCESS SELECTION THROUGH SHARING PROGRAM
508
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

| Start | Step 1 | Step 2 | Step 3 | Step 4 |
|---|---|---|---|---|

Advanced

Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
blts
Page Style
Up
DOWN
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10


Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue

FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12


Step 5: Presentation Playback Control
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Show Playback Progress Timer
Checkbox
Show Viewer Play/Pause Buttons
Checkbox
Show Viewer Back/Next Buttons
Checkbox
Show Graphic Navigation Menus
Checkbox
Activate Auto Advance to Next Page
Checkbox
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT
Welcome
Show The Contents Of This Page
Checkbox
Show Navigation Button For This Page
Checkbox
Auto Advance To Next Page In: Seconds
Launch Web-Link URL / email
Click "Edit" To Add Link.
EDIT

FIG. 13


Step 6: Editorial Control
– Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout Checkbox
Allow changes to project style settings Checkbox
Allow changes to navigation settings Checkbox
Allow changes to the headline text Checkbox
Allow changes to the headline media Checkbox
Allow changes to the page text Checkbox
Allow changes to the page media Checkbox
Allow changes to the page playback settings Checkbox

FIG. 14


Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice To Your Presentations
Section 1
Auto Advance to next page in
Seconds
Section 2
Auto Advance to next page in
Section 3
Auto Advance to next page in
Section 4
Auto Advance to next page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/795,136 filed Oct. 26, 2017, entitled "Multimedia Communication System And Method", which is a continuation of U.S. patent application Ser. No. 15/174,945 filed Jun. 6, 2016, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 14/590,881 filed Jan. 6, 2015, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 13/741,332 filed Jan. 14, 2013, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 13/004,862 filed on Jan. 11, 2011, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD" which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. § 119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on



Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.



Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nav.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).

A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites,

 

dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "foreground.fla". This file is loaded just under the top-most position (nav.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nav.fla file. Native functions of this file include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.
- setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.
- startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nav.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

- initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.

changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to changeSlide( )-changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

containerWidth: sets the width of the display pane.

containerHeight: sets the height of the display pane.

containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

containerWidth: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controllerWidth: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

containerWidth: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.

Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

EXAMPLE

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered

based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by



typing in any URL (i.e. www.mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.

A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2**-**5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hardcopy or print). At **406**, the selected communications are

distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

What is claimed:

**1**. An online advertisement system, comprising:

a server, the server comprising:

a server-side media repository, the server-side media repository for storing one or more online advertisement templates and one or more media assets;

a server-side project builder, the server-side project builder configured for accessing the server-side media repository, and for generating one or more online advertisements based on a selected online advertisement template and a selected media asset;

a server-side project viewer accessible via the project builder, the project viewer for viewing and/or editing both the selected media asset and the selected online advertisement template;

a server side compiler associated with the project builder, the compiler for integrating the selected media asset with the selected online advertisement template to generate an online advertisement;

a server side formatter for automatically formatting the online advertisement in a distribution format based on data pertaining to one or more keywords or other recipient data; and

a server-side distribution program for broadcasting the online advertisement over the Internet, the distribution program using the data pertaining to the one or more keywords or other recipient data for performing targeted broadcasting of the online advertisement to one or more recipient devices.

**2**. The online advertisement system in accordance with claim **1**, wherein the one or more keywords or other recipient data is entered at a browser application presented for display at the one or more recipient devices.

**3**. The online advertisement system in accordance with claim **2**, wherein the one or more keywords or other recipient data is from a social network, a geographical location determining system, or a web page.

**4**. The online advertisement system in accordance with claim **3**, wherein the one or more keywords or other recipient data is provided by Google Ad Words for the targeted broadcasting.

**5**. The online advertisement system in accordance with claim **4**, wherein the online advertisement is formatted for one or both of distribution to a web page and distribution to a mobile device, and the distribution program is configured for broadcasting the online advertisement in the plurality of distribution formats.

**6**. A multimedia communication system for generating an online advertisement in a plurality of electronic distribution formats to accommodate targeted broadcasting over a network internet connection, the system comprising:



a server having a network internet connection to communicate with a user of a computing device via a graphical user interface displayed by the computing device, the server comprising:

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder, associated with the media repository, the project builder for obtaining and extracting data from a data feed received by the server from the computing device, and using the extracted data to select a media asset from the media repository, the media asset for integration with an advertisement template;

a compiler associated with the project builder, the compiler for receiving and integrating the selected media asset with the online advertisement template from the project builder to generate the online advertisement;

a formatter associated with the compiler, the formatter for automatically formatting the online advertisement in at least one of a plurality of electronic distribution formats; and

a distribution program for the targeted broadcasting of the online advertisement over the network internet connection.

**7**. The multimedia communication system in accordance with claim **6**, wherein the extracted data comprises data determining a look and feel of the online advertisement.

**8**. The multimedia communication system in accordance with claim **6**, wherein the extracted data comprises one or both of data pertaining to a keyword and other data received from the computing device.

**9**. The multimedia communication system in accordance with claim **8**, wherein the extracted data comprises data received from a social network, a geographical location determining system, or a web page.

**10**. The multimedia communication system in accordance with claim **8**, wherein the extracted data comprises a keyword, and the keyword is provided by Google Ad Words for the targeted broadcasting.

**11**. The multimedia communication system in accordance with claim **8**, wherein the extracted data comprises other data received from the computing device, and the other data received from the computing device comprises geographical location determining data.

**12**. The multimedia communication system in accordance with claim **6**, wherein the media asset is an image, audio clip, video clip, or text.

**13**. The multimedia communication system in accordance with claim **6**, wherein the project builder automatically selects the one or more of the online advertisement template.

**14**. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet based on recipient specific data received from a user of a recipient computing device, the system comprising:

a server having a connection to the Internet to communicate with a user of a recipient computing device via a graphical user interface displayed by the recipient computing device, the server comprising:

a recipient specific database for storing qualitative and/or quantitative data received from a user of the recipient computing device;

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder for accessing the recipient specific database as well as the media repository, and for selecting a media asset for integration with an advertisement template, the media asset being selected based on qualitative or quantitative data received from the recipient computing device;

a compiler associated with the project builder, the compiler for integrating the selected media asset with the online advertisement template to generate an online advertisement;

a formatter for selecting and formatting the online advertisement in an electronic distribution format; and

a distribution program for performing the targeted broadcasting of the online advertisement over the Internet to the recipient computing device.

**15**. The multimedia communication system in accordance with claim **14**, wherein the recipient specific data comprises one or both of data pertaining to a keyword and other data received from the recipient computing device.

**16**. The multimedia communication system in accordance with claim **14**, wherein the recipient specific data comprises data pertaining to the user received from a social network, a geographical location, or a web page visited by the user.

**17**. The multimedia communication system in accordance with claim **15**, wherein the recipient specific data comprises a user specific data or a keyword entered at the graphic user interface presented for display to the recipient computing device.

**18**. The multimedia communication system in accordance with claim **15**, wherein the recipient specific data comprises a keyword, and the keyword is provided by Google Ad Words for the targeted broadcasting.

**19**. The multimedia communication system in accordance with claim **15**, wherein the recipient specific data comprises geographical location determining data.

**20**. The multimedia communication system in accordance with claim **14**, wherein the project builder automatically selects one or more of the online advertisement template and the media asset based upon one or more criteria provided by the user of the recipient computing device.

**21**. The multimedia communication system in accordance with claim **20**, further comprising a third party database, wherein the project builder automatically selects one or more of the online advertisement template and the media asset based upon data retrieved by the project builder from the third party database.

**22**. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet, the system comprising:

a server connected to the Internet to communicate with one or more of a user of a recipient computing device via a graphical user interface displayed by the recipient computing device and/or to a third-party database, the server comprising:

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a compiler associated with the media repository, the compiler for integrating a selected media asset with a selected online advertisement template from the media repository, the media asset and the advertisement template being automatically selectable by the server based on a first set of data received from one or more of the recipient computing device and/or third-party database to generate a online advertisement;

a formatter for automatically formatting the online advertisement in at least one of a plurality of electronic distribution formats for display at the graphical user interface of the recipient computing device, the formatting of the online advertisement being determined based on the first set of data received from one or more of the recipient computing device and/or third-party database; and

a distribution program for the targeted broadcasting of the online advertisement over the Internet to the recipient computing device in the determined electronic distribution format.



**23**. The multimedia communication system in accordance with claim **22**, wherein the media asset and the template are selected based on the first set of data received from the recipient computing device, and the formatting of the online advertisement is determined based on whether the recipient computing device is a desktop or laptop computer or a mobile device.

**24**. The multimedia communication system in accordance with claim **23**, wherein the first set of data received from the recipient computing device comprises data determining a look and feel of the online advertisement, and the look and feel of the online advertisement is updated based on that data.

**25**. The multimedia communication system in accordance with claim **24**, wherein the server is configured for receiving a second set of data from one or more of the recipient computing device and/or the third-party database, the second set of data being generated by one or more of the user of the recipient computing device and/or the third-party database in response to the received online advertisement.

**26**. The multimedia communication system in accordance with claim **25**, wherein upon receipt of a second set of data by the system, the compiler automatically updates the online advertisement for immediate distribution of a second online advertisement by the distribution program over the Internet back to the recipient computing device.

**27**. The multimedia communication system in accordance with claim **26**, wherein the second set of data comprises data determining a look and feel of the online advertisement, and the second online advertisement is generated based on that look and feel.

**28**. The multimedia communication system in accordance with claim **23**, wherein one or more of the first and second set of data comprises one or both of data pertaining to a keyword and other data received from the computing device and/or the third-party database.

**29**. The multimedia communication system in accordance with claim **28**, wherein one or more of the first and second set of data comprises a keyword, and the keyword is provided by Google Ad Words for the targeted broadcasting.

**30**. The multimedia communication system in accordance with claim **23**, wherein one or more of the first set of data comprises data received from a social network, a geographical location determining system, or a web page.

* * * * *

US010572898B2

(12) **United States Patent**
**Greer et al.**

(10) **Patent No.: US 10,572,898 B2**
(45) **Date of Patent: *Feb. 25, 2020**

(54) **MULTIMEDIA COMMUNICATION SYSTEM AND METHOD**

(71) Applicant: **Impact Engine, Inc.**, La Jolla, CA (US)

(72) Inventors: **Neil Greer**, La Jolla, CA (US); **Bennett Blank**, La Jolla, CA (US); **Bryan Depew**, La Jolla, CA (US)

(73) Assignee: **IMPACT ENGINE, INC.**, La Jolla, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/119,915**

(22) Filed: **Aug. 31, 2018**

(65) **Prior Publication Data**

US 2018/0374122 A1 Dec. 27, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/937,568, filed on Mar. 27, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
***G06Q 30/02*** (2012.01)
***G06F 16/50*** (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... ***G06Q 30/0256*** (2013.01); ***G06F 3/0482*** (2013.01); ***G06F 16/4393*** (2019.01);
(Continued)

(58) **Field of Classification Search**
CPC combination set(s) only.
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,266,683 B1 7/2001 Yehuda et al.
6,601,057 B1 7/2003 Underwood et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP 1376406 A2 1/2004
EP 1431977 A2 6/2004
(Continued)

OTHER PUBLICATIONS

"EdgeSuite 5.0: ESI Developer's Guide", by Akamai. Aug. 29, 2004. pp. 7-11, 99, 104-105. (Year: 2004).*
(Continued)

*Primary Examiner* — William A Brandenburg
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

Systems and methods are disclosed for creating, editing, sharing and distributing high-quality, media-rich web-based communications. The communications are created in a layered fashion that integrates user-selected text, colors, background patterns, images, sound, music, video, or other media. The systems and methods are used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages, without the need for the user to understand complex programming languages.

**35 Claims, 16 Drawing Sheets**



**Related U.S. Application Data**

No. 15/795,136, filed on Oct. 26, 2017, now Pat. No. 10,068,253, which is a continuation of application No. 15/174,945, filed on Jun. 6, 2016, now Pat. No. 9,805,393, which is a continuation of application No. 14/590,881, filed on Jan. 6, 2015, now Pat. No. 9,361,632, which is a continuation of application No. 13/741,332, filed on Jan. 14, 2013, now Pat. No. 8,930,832, which is a continuation of application No. 13/004,862, filed on Jan. 11, 2011, now Pat. No. 8,356,253, which is a continuation of application No. 11/404,509, filed on Apr. 13, 2006, now Pat. No. 7,870,497.

(60) Provisional application No. 60/671,170, filed on Apr. 13, 2005.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 16/438*** | (2019.01) |
| ***H04L 12/24*** | (2006.01) |
| ***G06F 3/0482*** | (2013.01) |
| ***G06F 17/21*** | (2006.01) |
| ***G06F 17/22*** | (2006.01) |
| ***G06F 17/24*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***G06F 16/50*** (2019.01); ***G06F 17/211*** (2013.01); ***G06F 17/2288*** (2013.01); ***G06F 17/248*** (2013.01); ***G06Q 30/0276*** (2013.01); ***G06Q 30/0277*** (2013.01); ***H04L 41/22*** (2013.01); ***H04L 65/4076*** (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,694,353 | B2 | 2/2004 | Sommerer | |
| 6,910,049 | B2 | 6/2005 | Fenton et al. | |
| 6,976,028 | B2 | 12/2005 | Fenton et al. | |
| 7,111,254 | B1 | 9/2006 | Rosen et al. | |
| 7,219,303 | B2 | 5/2007 | Fish | |
| 7,315,983 | B2 | 1/2008 | Evans et al. | |
| 7,398,473 | B2 | 7/2008 | Stoner et al. | |
| 7,519,912 | B2 | 4/2009 | Moody et al. | |
| 7,707,226 | B1 | 4/2010 | Tonse | |
| 7,870,497 | B2 | 1/2011 | Greer et al. | |
| 8,356,253 | B2 | 1/2013 | Greer et al. | |
| 8,447,651 | B1 * | 5/2013 | Scholl .................... | G06Q 30/02 705/14.4 |
| 8,930,832 | B2 | 1/2015 | Greer et al. | |
| 2001/0010059 | A1 | 7/2001 | Burman et al. | |
| 2002/0194195 | A1 | 12/2002 | Fenton et al. | |
| 2004/0093377 | A1 | 5/2004 | Lumera et al. | |
| 2004/0123238 | A1 | 6/2004 | Hefetz et al. | |
| 2005/0094206 | A1 | 5/2005 | Tonisson | |
| 2005/0114784 | A1 | 5/2005 | Spring et al. | |
| 2005/0245241 | A1 * | 11/2005 | Durand .................. | G06Q 30/02 455/414.1 |
| 2005/0251742 | A1 | 11/2005 | Mogilevsky et al. | |
| 2006/0015904 | A1 | 1/2006 | Marcus | |
| 2006/0074751 | A1 * | 4/2006 | Kline ..................... | G06Q 30/02 705/14.55 |
| 2006/0085360 | A1 | 4/2006 | Grim et al. | |
| 2006/0085431 | A1 | 4/2006 | Burns et al. | |
| 2006/0095320 | A1 | 5/2006 | Jones | |
| 2006/0129417 | A1 | 6/2006 | Williams et al. | |
| 2006/0150088 | A1 | 7/2006 | Kraft et al. | |
| 2006/0253542 | A1 | 11/2006 | McCausland et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2004533076 | A | 10/2004 |
| JP | 2004535006 | A | 11/2004 |
| KR | 1020040040406 | | 5/2004 |
| WO | WO-94/28480 | A1 | 12/1994 |
| WO | WO-02/103568 | A1 | 12/2002 |
| WO | WO-2004/097688 | A1 | 11/2004 |

OTHER PUBLICATIONS

"Press Release: Create Flashy Web Images with the New Macromedia", Jan. 22, 2003, Retrieved from the Internet. < URL: www.scalado.com>, [Retrieved on Oct. 13, 2003]. 2 pages.

EPO Form 2001, Communication pursuant to Article 94(3) EPC dated Jun. 30, 2009, issued in connection with corresponding European application 06750155.1-1527. 7 pages.

First Office Action dated Sep. 28, 2009, issued in connection with corresponding Chinese application 2006800211383. 6 pages.

* cited by examiner


CLIENT USER INTERFACE
104
100
NETWORK
106
102
108
118
116
PROJECT BUILDER
PROJECT VIEWER
COMPILER
110
MEDIA REPOSITORY
112
114
DISTRIBUTION PROGRAM
SHARING PROGRAM
COMMUNICATION BUILDER ENGINE

FIG. 1


CREATE COMMUNICATION PROJECT TEMPLATE(S)
202
PROVIDE MEDIA ASSETS FOR GENERAL USE
204
RECEIVE MEDIA ASSETS FOR PRIVATE USE
206
200
LOAD COMMUNICATION PROJECT TEMPLATE(S), GENERAL USE MEDIA ASSETS, AND PRIVATE MEDIA ASSETS INTO MEDIA REPOSITORY
208

FIG. 2


INTERVIEW USER TO DETERMINE APPROPRIATE TEMPLATE(S) AND/ OR MEDIA ASSETS FOR COMMUNICATION
302
PROVIDE APPROPRIATE TEMPLATE(S) AND MEDIA ASSETS TO PROJECT VIEWER FOR CUSTOMIZED COMMUNICATION PROJECT
304
RECEIVE AND COMPILE CUSTOMIZED COMMUNICATION PROJECT
306
STORE COMPILED CUSTOMIZED COMMUNICATION PROJECT
308
300

FIG. 3


402
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
404
RECEIVE SELECTION OF DISTRIBUTION MECHANISMS FOR SELECTED COMMUNICATION PROJECT(S)
406
DISTRIBUTE SELECTED COMMUNICATION PROJECT(S) VIA SELECTED DISTRIBUTION MECHANISMS
400

FIG. 4


502
RECEIVE SELECTION OF COMPLETED COMMUNICATION PROJECTS IN MEDIA REPOSITORY
504
RECEIVE SELECTION OF USERS WITH WHOM TO SHARE SELECTED COMPLETED COMMUNICATION PROJECTS
506
PROCESS SELECTION THROUGH SHARING PROGRAM
508
MAKE AVAILABLE PROCESSED COMMUNICATION PROJECTS TO USERS AS NON-LINKED OR SHARED

FIG. 5

Easy Start Interview
First Page You See When You First Log In.
After Your First Time, You Can Always Access
This Function By Clicking The "Easy Start"
button

1) What type of Presentation would you like to create? (Drop Down List or Radio Button Selector)

- Product Showcase
- Service Brochure
- E-Business Card
- Product/Service Brochure
-Event Promotion
-Invitation
- Other

2) What is your industry? (Drop Down List or Radio Button Selector)

- Real Estate
- Insurance
- Banking
- Health Care
- Product Manufacturing
- Accounting
- Legal
- Architecture

*** Answers to these questions automatically takes them to the START tab**

*** Second time they log in takes them to our current service home page where the Easy Start button is always accessible**

FIG. 6

**Welcome to the "EDIT Mode" for this presentation.**
Update the information and "look" of your multimedia presentation by Following the Steps below. When finished, click the "Finish" button to save your changes. **Note:** To create a presentation with up to 25 pages, select one of the templates marked "Up to 25 pages". To create a presentation with 5 pages, select one of the templates marked "5 pages".

| Start | Step 1 | Step 2 | Step 3 | Step 4 |
|---|---|---|---|---|

Advanced

Finish

Top of Form 1

**Presentation Templates**
Choose from the templates below to select the "look and feel" of your presentation. You can further customize your presentation in Steps 1-4 for a truly unique user experience.

1. Presentation Title: 2. Select Your Presentation Style:

| | | |
|---|---|---|
| Venture | Mystic | Flow |
| Currents | Tech | Process |
| Modern | Whitehaus | Atmosphere |
| Depth | Titanium | Elements |
| Horizon | Edge | Classic |

Continue

FIG. 7


Step 1: Color Scheme and Music
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Select a Color Scheme
Stock Color Schemes
My Color Schemes
Select
Add Your Own
2: Select your Background Music Loop
Stock Music Loops
My Music Loops
Select
Add Your Own
Continue

FIG. 8


Step 2: Intro Animation
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
1: Use the Introduction designed for this template
Line 1
Line 2
Line 3
2: Use one of your Intros
Select
Add Your Own
Continue

FIG. 9


Step 3: Text and Titles
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Main Headline Text
Sub Headline Text 1
Sub Headline Text 2
* Start with the layout matching the number of pages they have selected in their pre-built template; if starting from scratch, start with only one text box like shown
B
I
U
Make Link
Verdana
8
L
C
R
blts
Page Style
Up
DOWN
Opens To:
Add Main Page
Add Sub Page
Delete Page
If Graphic Only, show as non-editable
1 Txt 1 Image
2 Images
I large image
Text Only
Continue

FIG. 10


Step 4: Graphics
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Load Theme
Launch Gallery
Add Your Own
Apply Images To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Image Gallery
Continue

FIG. 11


THIS IS WHAT HAPPENS WHEN THE ADVANCED TAB IS CLICKED
Start
Step 1
Step 2
Step 3
Step 4
Advanced
Finish
Clicking on the Advanced Tab Spawns Steps 5 through 8
Step 5
Step 6
Step 7
Step 8

FIG. 12

# Step 5: Presentation Playback Control

| Start | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Finish |
|---|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Show Playback Progress Timer | Checkbox |
| Show Viewer Play/Pause Buttons | Checkbox |
| Show Viewer Back/Next Buttons | Checkbox |

| | |
|---|---|
| Show Graphic Navigation Menus | Checkbox |
| Activate Auto Advance to Next Page | Checkbox |

| | |
|---|---|
| Welcome | |
| Show The Contents Of This Page | Checkbox |
| Show Navigation Button For This Page | Checkbox |
| Auto Advance To Next Page In: Seconds | ________ |
| Launch Web-Link URL / email Click "Edit" To Add Link. | EDIT |

| | |
|---|---|
| Welcome | |
| Show The Contents Of This Page | Checkbox |
| Show Navigation Button For This Page | Checkbox |
| Auto Advance To Next Page In: Seconds | ________ |
| Launch Web-Link URL / email Click "Edit" To Add Link. | EDIT |

FIG. 13


Step 6: Editorial Control- Team Accounts Only
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
Allow changes to project layout
Checkbox
Allow changes to project style settings
Checkbox
Allow changes to navigation settings
Checkbox
Allow changes to the headline text
Checkbox
Allow changes to the headline media
Checkbox
Allow changes to the page text
Checkbox
Allow changes to the page media
Checkbox
Allow changes to the page playback settings
Checkbox

FIG. 14



Step 7: Video
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Videos
Add Your Own
Apply Your Video To Your Presentations
Section 1
Section 2
Section 3
Section 4
Section 5
Section 6
Preview Your Video
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue


FIG. 15


Step 8: Audio Voice Over
Start
Step 1
Step 2
Step 3
Step 4
Step 5
Step 6
Step 7
Step 8
Finish
My Voice-Overs
Add Your Own
Apply Your Voice Over To Your Presentation
Section 1
Auto Advance to next Page in
Seconds
Section 2
Auto Advance to next Page in
Section 3
Auto Advance to next Page in
Section 4
Auto Advance to next Page in
Preview Your Voice Over Cips
Audio Information (length, etc.)
Play/Pause/Forward/Back Controls/High/Low Quality Controls
Continue

FIG. 16

# MULTIMEDIA COMMUNICATION SYSTEM AND METHOD

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/937,568 filed on Mar. 27, 2018, which is a continuation of U.S. patent application Ser. No. 15/795,136 filed Oct. 26, 2017, entitled "Multimedia Communication System And Method", which is a continuation of U.S. patent application Ser. No. 15/174,945 filed Jun. 6, 2016, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 14/590,881 filed Jan. 6, 2015, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation of U.S. patent application Ser. No. 13/741,332 filed Jan. 14, 2013, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 13/004,862 filed on Jan. 11, 2011, entitled, "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD" which is a continuation and claims the benefit of priority under 35 U.S.C. § 120 of U.S. patent application Ser. No. 11/404,509, filed Apr. 13, 2006, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which claims priority under 35 U.S.C. § 119 to U.S. Provisional Application Ser. No. 60/671,170, filed Apr. 13, 2005, entitled "MULTIMEDIA COMMUNICATION SYSTEM AND METHOD", which the disclosure of which is incorporated herein by reference.

## BACKGROUND

In today's internet age, development of a communication piece such as a presentation, banner advertisement, website or brochure, whether static or dynamically employing multimedia, is usually contracted out to a professional graphic designer. Such professional is typically part of a professional agency, such as an advertisement agency, which are usually cost-prohibitive for small enterprises (i.e. sole proprietor or small business), and can be unnecessarily costly for larger enterprises. These agents or agencies consume large amounts of resources, in time and/or money particularly, for creating a media-rich communication, such as a website, an e-mail campaign, a banner advertisement, or other communication. Accordingly, a system and method which automates the process of creating and distributing professional quality, media-rich communications is needed.

## SUMMARY

This document discloses systems and methods for creating, editing, sharing and distributing high-quality, media-rich web-based communications, also known as "engines" or "creative works." The communications can be created in a layered fashion that integrates text, colors, background patterns, images, sound, music, and/or video. Other media can also be used. The systems and methods can be used to generate, edit, broadcast, and track electronic presentations, brochures, advertisements (such as banner advertisements on highly trafficked media websites), announcements, and interactive web pages.

In one aspect, a method and apparatus are provided for dividing the work of creating a multimedia file for a communication into a logical step-by-step, start-to-finish process



that requires no programming intervention. In a specific exemplary embodiment, the multimedia file is based on Flash, an authoring software developed by Macromedia for vector graphics-based animation programs with full-screen navigation interfaces, graphic illustrations, and simple interactivity in an antialiased, resizable file format that is small enough to stream across any type of Internet connection and play while downloading. Other multimedia software and/or protocols can be used.

In particular embodiments, a system and method are provided for creating and/or delivering multimedia files via a SaaS model, and for loading media assets into an advertising engine online. In other embodiments, a system and method are provided for automatically creating and hosting data-specific communications for use as websites, presentations, advertisements, brochures and the like, for use with various communication media, systems and networks. The data-specific communications include, without limitation, data related to software programs, web services, proprietary data from third party databases, persons, locations, keywords, companies and combinations thereof.

In another aspect, a method and system are provided for automatically extracting and formatting multimedia code, such as Flash or other actionscript code, for use as a template that can be edited via a user interface without the intervention of a programmer, and for providing editorial control of multimedia files, keyword and content specific files or websites by a master user controlling the editorial rights of one to N number of sub-users within the system.

In yet other aspects, a method and apparatus are provided for online creation and editing of multimedia files compiled from a set of data; for creation, editing and distribution of multimedia files created from a wide variety of content including video, audio, images, text, raw data, Flash™ programs, software programs, web services or other media-rich content; and for auto-determining the "content" to be included in a communication based on answers to a series of prompts or interview questions and/or other meta data.

In yet other aspects, a method and apparatus is provided for auto-determining the "look and feel" of a communication based on a series of interview questions and/or other meta data, and for combining data, content, and "look and feel" to create unique communications. Other systems and methods are provided for converting unique communications to multiple formats and media, such as a website, a multimedia file, a printed medium, a video, etc.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** illustrates a multimedia communication system.

FIG. **2** illustrates a method for creating a template includes creating one or more communication templates.

FIG. **3** illustrates a method **300** for template customization and media asset usage.

FIG. **4** illustrates a method **400** for distributing and tracking communications.

FIG. **5** illustrates sharing by users of media assets with other users.

FIGS. **6-16** are block diagrams depicting a general system and method for creating, distributing and tracking multimedia and hypermedia-based communications.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

The systems and methods described herein relate to software as a service (SaaS), a software distribution model in which applications are hosted by a service provider and made available to users over a network such as the Internet. The systems and methods include the use of templates and a thin client interface to create multimedia communications. Low-level functionality of the multimedia communication system is accessed through a set of function calls and easily understood pre-built components for populating the template. Furthermore, an API provides a user access to the full scope of a programming language which allows for template scalability without the need for in-depth knowledge of the programming or authoring language to produce highly functional, professional template-based communications. Additionally, the systems provide sample source files to encourage reverse engineering.

FIG. **1** illustrates a multimedia communication system **100** for creating, storing and distributing multimedia communications (hereafter, "communications") such as, for example, content-rich e-mails, presentations, websites and segments of websites. The communication system **100** includes a communication builder engine **102** that interacts with a client user interface **104** over a network **106**. The client user interface **104** can be a window in a browser application that runs on a personal computer. The network **106** is preferably the Internet, but can be any type of network, particularly as used in a client/server configuration.

The communication builder engine **102** includes a project builder **108** for generating a project viewer **118** via which a user can view and assemble various media components or assets into an integrated communication. The communication builder engine **102** further includes a media repository **110** for storing communication project templates, media assets, communication project metadata, and any other data resources used for creating, storing and distributing completed communication projects. The completed communication projects are accessed from the media repository **110** and distributed to selected recipients by a distribution program **112**. The distribution program **112** controls the format and communication protocols for distributing the communications.

The communication builder engine **102** further includes a sharing program **114**, which prompts a user to provide distribution parameters such as a type of communication (e-mail, website, etc.), a number and type of recipients, and communication medium by which the communication needs to be sent. The sharing program **114** can also report to the sending user certain qualitative and quantitative data such as transmission results, responses received from recipients, etc.

A communication is a collection of slides. The number of slides for any given communication project can range from 0 to N. The slide types that are available to any given communication project are dependant on the class of the communication, and are defined in the class XML file, and define a template class. The template class is chosen based on a number of user inputs. For example, one template class is chosen based on the responses to an interview/query process operated by the user of the system prior to creating the communication. This allows the system to only offer slide types that are relevant to the user's responses to the interview and/or query process.



Slides are a grouping of design layers, design elements, and content containers. The design layers are predefined and remain static. However, they are able to accommodate any design arrangement of content deemed necessary by the template designer. In an exemplary embodiment, the slide layers include background, main, foreground, and navigation. There is one core design file for each layer except for the main layer and they are as follows: background.fla, slideTypen.fla, foreground.fla, and nay.fla. The number of slideTypen.fla core files that exist depend on the number of slide types that are defined for the given class. For example, one particular class has five slide types defined in its XML class file. Therefore there are five main core design files (slideType0.fla, slideType1.fla, slideType2.fla, slideType3.fla, and slideType4.fla).

A class is a unique collection of slide type(s). The number of slide types in any given class can range from 1 to N. Classes are used to organize communication types by the quantity and type of content displayed on each slide in the class. For example, a template class can have five unique slide types, with each slide type containing no more than a certain number of content containers. In an embodiment, the slide type contains no more than five content containers, although more than five content containers can be used. However, instead of adding the new slide type to a template class, for example, a new class can be created to accommodate the new slide type(s). A class is defined, and a sufficient number of slide types are provided for the user to achieve their design goals, but the total number of slide types are limited as so not to overload the user with too many choices. The system manages and controls the creation and maintenance of all classes.

A slide type is a unique collection of media container(s). The number of containers for any given slide type can range from 1 to N. Slide types are used to organize the quantity and type of content that will be displayed on any given slide. In an exemplary embodiment, a number of standard container types can be used when creating a slide type. A text container includes text components and is used for displaying HTML formatted text, a image container includes image components and is used to display images and .swf files, and a video container includes video components and is used to display streaming video. An audio container includes audio components and is used to provide streaming audio or audio clips. The user is responsible for the layout of the containers that appear on a slide. The quantities and types of containers for a given slide type are defined in the class XML file. Other than following the naming convention defined in the XML class file for the containers, the system is flexible and allows the user to use the containers in any design arrangement they choose. Each content type component, or media asset, can be represented in a palette of related content types, for selection by a user and incorporation into a communication.

The project viewer, such as the project viewer **118** shown in FIG. **1**, is an application that renders or "serializes" the communication project slides and content, and provides them with functionality. When the project viewer is launched, it is passed a data structure and associated software programs called the project object. The project object contains the information necessary for the communication project to render and playback as configured by the end user. Slides are represented in the project object as elements in an array. Once the project object is loaded and interpreted, the project viewer determines a load sequence for the communication project content. The project object is agnostic as to the type of file it is rendering and is, therefore, able to produce a wide variety of communications such as websites,

dynamically created websites, Flash™ banner ads, presentations, brochures, advertisements on third party websites, and/or the like.

The content loads in the specific design layer (i.e. background, foreground, etc.) assigned by the end user. As each layer loads in the load sequence, the project viewer then loads the content into the containers in that layer. Once the sequence has finished executing, the communication project will begin playback. Communication project playback has two states: auto-play on and auto-play off.

In one embodiment, if auto-play is on, the project viewer determines the duration property of the current slide. If the value of that property is greater than zero, the project viewer waits for that value in seconds before automatically advancing to the next available slide in the communication project. If the value of that property equals zero, the slide viewer stops on the slide until the user navigates to a different slide. If auto-play is off, users must use the slide navigation controls to view a different slide.

The project viewer also provides the conduit for the exchange of information and/or commands between the different design layers, or between the project viewer itself and a specific layer, referred to herein as the Slide Layer Interface. This interface not only enables the basic "built-in" functionality between the layers, their containers, and the project viewer, but also allows for much greater programming control for advanced developers. This is because the Slide Layer Interface is basically a collection of pointers. In an embodiment, this interface allows the direct use of AS 1.0 as the command language. This will enable the creation of highly functional and complex core files able to achieve all customization needs that fit within the programming scope of AS 1.0, the specification for which is incorporated by reference herein.

Any content that loads on the main layer will change from slide type to slide type. Any content that loads on the background, foreground, or navigation layers typically remains constant and does not change between slides. That content is referred to as "universal content," and typically consists of header logos, communication titles, headlines, etc. Mechanisms allow slide layers to communicate with each other as well as load any type of content on any layer. All of the complex programming needed to govern content loading, playback, and functionality has been incorporated into the project viewer and container components.

The system includes a number of core design files. One such file is "background.fla." This file is loaded in the bottom-most position in the project viewer. Any content or design elements that needs to appear behind other content or design elements should be placed in this core file. The background.fla file has a number of native functions:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1 Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.



Another core design file is "foreground.fla". This file is loaded just under the top-most position (nay.fla) in the project viewer. Any content or design elements that need to appear above other content or design elements (except the navigation controls) are placed in this core file. Native functions of "foreground.fla" include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

Another core design file is "intro.fla". This file loads prior to any other core file. No other core files will render until this file is done executing. It is located on layer above the nay.fla file. Native functions of this file include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

A "slideTypen.fla" core design file loads above the background file and below the foreground file. Main slide content typically appears in this file. Its functions include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

startPlayback( ): This function is called by the project viewer after this .swf has been fully loaded and initialized.

A "nay.fla" core design file loads above the foreground file and includes the navigation controls. The visibility of the navigation controls is determined by the end user. Toggling the visibility to false causes the project viewer to skip the loading of this file. Its native functions include:

initTemplateObject( ): This function is called after the first frame is fully loaded. This function creates the templateObject object which is used by the project viewer.

setValues( ): This function is called after ieController has been assembled and distributed to the various layers. Color information is retrieved from the ieController object and stored in local variables (color1Value, color2Value, color3Value). These values can be used to dynamically color shape elements (i.e. movie-clips) used in the template. This function is also used to distribute any image, .swf, video, or HTML text content to their proper movie clips for the currently selected slide.

buildNavigation( ): This function is called by the navPane clip after it is fully loaded on the time line and after the ieNavXML XML object is created and placed on this time line. The ieNavXML XML object is created inside the project viewer based on the tree structure of the slides (i.e. how they are organized in the tree hierarchy). Main options are represented by Parent nodes in the XML object. Menu items are Children of the particular Parent node.

changeSlide(optionNumber, itemNumber): This function is called when an item is clicked in the navigation menu controls. Options are grouped by main options and sub options. The first main option is indexed at zero and all first sub-options are also zero-indexed. When a menu item is clicked, it simply passes the main option it is located at as the optionNumber parameter. The value of the itemNumber parameter is same as the menu item's position in the list of sub-options. For example: The third sub-option "About Our Company" of the second main option "About Us" would make the call to changeSlide( )-changeSlide(1, 2).

A configuration file "containerData.xml" defines the class. It is provided only as a reference as to how containers are declared within a slide type, and how slide types are declared within the class. This file is used by the project viewer application and the project builder application for determining available slide types and locating the containers within the slide.

Container Components

Working examples of container components are provided in a "Source.fla" folder to illustrate how the container components are integrated into the template design. In these examples is shown a fully functional template so that a deep understanding of how the components work is not necessary. Once the user is comfortable with the core design files and how the components operate, the system provides different ways to apply design style changes to the components.

Image Component

The image component is a multimedia module that is used inside the core design files to load and display images and/or .swf files. One such multimedia module is based on a Macromedia Flash MX® component, which in turn is based on AS 1.0. The user integrates and positions this component into their design. Once finished, the component will be able to load and display any image or .swf content that the end user assigns to it. The image component is easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The image component is used only in edit mode.

From the main timeline inside a core template file (for example: a five slide class, foreground.swf), this component can be found at the frame labeled "staticView", inside of a movie clip named foreground GaphicA. The module initLayout( ) is used to initialize the component and prepare it to begin loading image or .swf content. Properties include:

container Width: sets the width of the display pane.

containerHeight: sets the height of the display pane.



containerPath: is a component, such as a Flash™ component, as defined in the XML class file.

slideLayer: defines the layer in which this component is located. Valid values can include "foreground", "background", and/or "communication".

Video Component

The video component is used inside the core design files to load and display .flv video. In an embodiment, the video component is a Macromedia Flash MX® component based on AS 1.0. The template designer integrates and positions this component into their design. Once finished, the component will be able to load and display any .flv content that the end user assigns to it. The video component is also easy to integrate into any graphic layout or animation schema, and does not restrict the user from using Flash™ animation or other visual effects. The video component is used only in playback mode.

In order to use the video component, from the main timeline inside a core template file (for example: five slide class, foreground.swf), the video component can be found inside of a movie clip named imageContainer1.videoContent. The video component includes the following methods: initLayout( )—used to initialize the component and prepare it to begin playing a video stream; and initVideoPane(videoURL, bufferTime, videoVolume)—used to start the video stream. The properties of the video component include:

container Width: sets the width of the video pane.

containerHeight: sets the height of the video pane.

controllerXPos: sets the x-position of the playback controller. A value of −1 aligns the left edge of the controller with the left edge of the video pane.

controllerYPos: sets the y-position of the playback controller, where a value of −1 aligns the top edge of the controller with the bottom edge of the video pane.

controller Width: sets the width of the playback controller, where value of −1 causes the controller to adopt the width of the video pane.

callback: a function that gets called when the video buffer is full.

autoSizePane: that forces sizing, alignment, and position of the video pane and the playback controller.

controlBarHeight: sets the height of the playback controller.

Text Component

The text component is used inside the core design files to load and display HTML formatted text. In an embodiment, the text component is a Macromedia Flash MX® component based on AS 1.0. The user integrates and positions this component into their design, and then names the component according to the class XML file. Once finished, the component will be able to load and display any HTML text content that the end user assigns to it. The text component is needed only in edit mode. During playback, specific text content is manually assigned to a Flash™ text field by the user.

The text component can be found, from the main timeline inside a core template file (for example: five slide classes, foreground.swf), at the frame labeled "staticView", inside of the movie clips named foregroundTextA and foregroundTextB.

The function call "initLayout( )" is used to initialize the component and prepare it to begin displaying HTML text. Properties of the text component include:

container Width: sets the width of the text pane.

containerHeight: Sets the height of the text pane.

containerPath: The Flash path of the component as defined in the XML class file.

headline: a Boolean property that sets the display state of the component. Text components set to the headline state are able to use a custom movie clip to display the text content. This allows the user to use custom fonts and text styles and disable text formatting from the user.

staticHeadline: The name of the linked clip in the library to use to display the text content.

slideLayer: The layer in which this component is located. Valid values are "foreground", "background", and "communication".

Custom Components

Custom components are designed and implemented by the user or template designer, and can be used just like the standard components for integration into the communication project. Custom components pass a configuration object to the slide viewer which allows the user to configure any properties of the component. This object is a basic name/value structure that represents a hash of the property/value pairs. This hash is then be dynamically integrated into the system and assigned to the slide on which it is located. This schema allows user/developers to create and introduce powerful components that can handle tasks such as xml feeds (such as data from the Google Adwords or Overture system, or other proprietary data feeds from proprietary databases, conferencing/chatting, or web services), along with many other applications.

Custom components can include voiceover narration (i.e. digital voice files), personal audio files, special images and/or graphics such as logos, and videos that a user provides to the system for storing in the media repository,

View Modes

The user builds their layout in the core design files. The project viewer is able to open and render these files in a layered manner so that the content "stacks" according to the layer on which it is located. For example, content on the background layer appears below content in the foreground layer. In one embodiment, there are two project viewers. In a preferred exemplary embodiment, the two project viewers are substantially identical. One of the project viewers is provided for live playback of the communication project, while the other is embedded within the communication project builder and is needed to render the core files to the end user so that the user can edit desired content in the containers. In an alternative embodiment, another project viewer is provided to render out or "serialize" completed communication files into a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format.

Accordingly, all of the core files can support two states: a playback state and an edit state. These states are designated within each core file by a frame label. When loaded into the builder, the project viewer immediately sends the playhead inside the core files to the frame labeled "staticView". Otherwise, the playhead is positioned at the first frame and stopped until the communication project is ready to play.

Live View

"Live View" describes the full playback of a communication project. During live view, all functionality, design, and animation are active and visible to the end user. It is the finished product as configured by the user.

Edit View

"Edit View" is experienced within the project builder and, in some instances, the "Live View" where a user contributes edits or comments to a communication. Though functionality and design remain intact, animations are disabled. This "display" view offers the users context within the design so content can be configured and assigned to containers.

Groups

"Groups" is an application that enables groups of users to create, edit, share and distribute communications created by the system according to a set of business rules. For example, a group of 25 users can utilize the system to communicate a uniform message, yet still retain the autonomous controls to customize each communications piece according to the rules set up by the Administrator. Each Group contains a defined set of roles and abilities. These abilities are set by a system administrator, and then utilized by the users in that Group.

In one embodiment, a user can purchase access to a group of other users, called a "Team account." In the Team account, one administrator has the right to share communications with the other users; in effect, creating communications for them and giving them limited rights to edit the communication. In another embodiment, a user can purchase access to an enterprise group of users which can be N number of users and M number of administrators. This functionality gives the enterprise the ability to uniformly use the same communication, but tailor it to a specific market, segment, opportunity or the like.

Sharing

"Sharing" is an application that enables administrators and users to set up a system, whereby administrative users can create and share communications with N number of users in up to N accounts or physical locations. Several types of sharing exist, each having a set of advantages. In one example, three types of sharing include: Live Sharing, Linked Sharing, and Smart Sharing. Live Sharing maintains a link between the communications in use so that an administrator can make changes to a communication, so that changes to the communication are updated in real time. That is, there is no time delay between the time the edit is made and the time the edit is published live to the communication.

Linked Sharing allows an administrator to make changes to a "main" communication and up to N "derivative" communications such that changes to the main communication are disseminated to each derivative communication in real time. Accordingly, there is no time delay between when an edit is made and the time the edit is published live to each relevant communication.

Smart Sharing allows several Administrators to make changes to several "main" communication and up to N "derivative" communications, such that changes to the main communication are disseminated to each derivative communication in real time. Thus, there is no time delay between the time an edit is made and the time the edit is published live to each derivative communication. However, in Smart Sharing, business rules are applied so that an organizational hierarchy can be created to manage the flow of the main and derivative communications. Business rules of Smart Sharing are also applied to allow for deletion of derivative communications from the system without affecting other derivative communications in the linked chain. This allows for the consistent and rapid dissemination of information across a broad range of users, and is particularly useful for a corporate salesforce or regional advertisers in maintaining a consistent communications message.

## Example

The following describes an example of the functionality of the system and method described herein, as used by a user.

A membership account includes online access to all the functions for editing, distributing, and tracking your communications. A variety of selectable options are offered

based on a user's individual needs. The number of communications in an account is based on the membership level purchased. A user may edit communications as often as desired, and as many copies as desired can be saved to a storage device, such as a computer hard drive. To access the account (and associated communications), a user must first login from a homepage, i.e. www.impactengine.com. The user then must specify a user name and password that was used to sign up. To change account information, a user can select a "My Account" link from a main navigation bar, shown in the screen shots as being located on the left side of a page, and then select a "Make Changes" control to make a change.

Edit Process

There is no limit to how often a communication can be updated. Accordingly, recipients and viewers can always see the most up-to-date information. To edit a communication, a user first enters "Edit Mode" by selecting the "Edit" button next to the name of the selected communication. The "Edit" button is located in a communication Control Panel on the "MyHome" page, preferably at the top of the page.

Once in Edit Mode, a user will see a new navigation menu above, and can click on the appropriate tab and make any changes in the forms provided. When finished, the user selects the "finish" button and the communication will be updated. The communication is pre-filled with default text, however all fields can be updated with whatever information chosen. Graphics may be uploaded in "Edit Mode" by selecting the "Upload" button to access and upload images. The steps to be followed can be displayed to upload images from your hard drive. Each membership includes an amount of disk space memory, i.e. up to a gigabyte of disk space, in which images are stored.

Distribute

Once a communication is created, a user may use it in a variety of ways including: as a website, as a printed communication, as an email, or as a communication stored on a hard disk, CD-rom or other media device. All features are available from the main navigation inside a user account. An email function can be accessed by selecting the "Show" button next to the name of the communication to be sent. The "Show" button is located in the communication Control Panel on the home page. The user is provided a form to complete, and the communication will be sent to the designated e-mail recipients. Each recipient is sent a standard email with a graphic "view" link at the bottom. This link launches the communication directly from a designated website. There are no attachments or downloads needed. The body, title, and "from" name of the message can be customized.

The email interface allows a user to send a communication to one or more recipients at a time. In an embodiment, the number of recipients is limited to a particular number, i.e. six recipients. A user may send as many emails as desired. Spamming of any kind is forbidden in conjunction with an account.

CD-ROM cards that include the communication can also be created. CD-ROM cards play in standard tray loading CD-ROM drives on Windows and Macintosh computers. The communication will automatically launch for maximum impact.

A communication can also be used as a user's home page. To execute this functionality, a user can click on the "My Websites" from inside the account to generate a website based on the communications that are chosen. Then, the Domain Name Service (DNS) settings are automatically set up with the system's servers, and the website is available by typing in any URL (i.e. www.mywebsite.com). This function is used as the core to use any communication created by the communication builder engine system as a dynamically created site for use with private web sites such as Google, Overture, eBay, Amazon and the like.



A communication can also be added to an existing web page by clicking on the "Show" from inside the account to generate HTML or the actionscript ("objectembed") code to directly embed the file into the page. This HTML can be placed anywhere on a web page.

In accordance with the above description, and as shown in FIGS. **2**-**5**, a communication method includes a number of steps for creating, storing and distributing multimedia communications. As shown in FIG. **2**, a method **200** for creating a template includes creating one or more communication templates, at **202**. The templates are typically created by designers and represent general structures and arrangements of multimedia communications that are suitable for distribution to a number of different recipients via a number of different transmission mechanisms. In a preferred embodiment, the templates are created in Flash™ actionscript using a proprietary application programming interface (API) for being loaded into the media repository.

At **204**, media assets are provided for general use by any user. The media assets include media components such as text, font type, audio clips, video clips, images or graphics, Flash™ animation files, etc. At **206**, media assets for private use are received by the communication builder engine and system. These private media assets can include proprietary logos, images, sound files, or the like. At **208**, the project template(s), general use media assets, and private use media assets are loaded and stored into the media repository, for future access by the user. Private media assets can be accessed only by the user (or authorized agent thereof) that provided them.

FIG. **3** illustrates a method **300** for template customization and media asset usage. At **302**, the communication builder engine interviews the user to determine the templates and/or media assets that will be appropriate for that user. For instance, a real estate agent user may indicate a need to utilize stock images of houses, as opposed to images of only people in social settings. Likewise, the type, profession, or characteristics of the user can be used to tailor the types of templates and/or media assets that will be available for access by that user, so as to not overburden the user with choices, but also to intelligently provide the user with the most pertinent and efficient communication creation system possible.

At **304**, the communication builder engine provides the appropriate templates and/or media assets to the user, as determined by the interview or by user input data, for being customized into a communication by the user. At **306**, the customized communication project(s) are received from the user and compiled into a format suitable for transmission. At **308**, the compiled communications are stored as projects in the media repository, for access by the distribution and sharing programs.

FIG. **4** illustrates a method **400** for distributing and tracking communications. At **402**, the communication builder engine receives a selection of completed communication projects that have been stored in the media repository. At **404**, the communication builder engine receives from the user a selection of distribution mechanisms by which the communications will be transmitted. The distribution mechanism include, without limitation, websites, e-mail systems, CD-ROM, DVD, or via an offline copy (i.e. hard-copy or print). At **406**, the selected communications are

distributed to the selected distribution mechanisms for transmission or sending to the selected recipients.

FIG. **5** illustrates sharing by users of media assets with other users that may be affiliated by employer, by contract or other arrangement. At **502**, the communication builder engine receives a selection of completed communication projects that can be shared among one or more other users. At **504**, the one or more other users are identified and received by the communication builder engine. At **506**, the sharing program of the communication builder engine processes the selections, and at **508** the processed selections and associated communication projects and/or media assets are made available to the selected one or more other users.

Embodiments of the invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of them. Embodiments of the invention can be implemented as one or more computer program products, i.e., one or more modules of computer program instructions encoded on a computer readable medium, e.g., a machine readable storage device, a machine readable storage medium, a memory device, or a machine-readable propagated signal, for execution by, or to control the operation of, data processing apparatus.

The term "data processing apparatus" encompasses all apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, or multiple processors or computers. The apparatus can include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, or a combination of them. A propagated signal is an artificially generated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus.

A computer program (also referred to as a program, software, an application, a software application, a script, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform functions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to, a communication interface to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks.

Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio player, a Global Positioning System (GPS) receiver, to name just a few. Information carriers suitable for embodying computer program instructions and data include all forms of non volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, embodiments of the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

Embodiments of the invention can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention, or any combination of such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), e.g., the Internet.

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other.

Certain features which, for clarity, are described in this specification in the context of separate embodiments, may also be provided in combination in a single embodiment. Conversely, various features which, for brevity, are described in the context of a single embodiment, may also be provided in multiple embodiments separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Particular embodiments of the invention have been described. Other embodiments are within the scope of the following claims. For example, the steps recited in the claims can be performed in a different order and still achieve desirable results. In addition, embodiments of the invention are not limited to database architectures that are relational; for example, the invention can be implemented to provide indexing and archiving methods and systems for databases built on models other than the relational model, e.g., navigational databases or object oriented databases, and for databases having records with complex attribute structures, e.g., object oriented programming objects or markup language documents. The processes described may be implemented by applications specifically performing archiving and retrieval functions or embedded within other applications.

What is claimed:

1. An online advertisement generation system for autonomously generating and broadcasting one or more communications, the one or more communications capable of being rendered, the online advertisement generation system comprising:

a communications system server capable of being coupled to a recipient device via an internet network connection, the recipient device having a graphical user interface being configured for receiving an input directed to a query, the query comprising data pertaining to one or more keywords, the communications system server further being coupled with a media repository for storing media rich communication content, the media rich communication content comprising a plurality of online advertisement templates and a plurality of media assets, the communications system server being configured for receiving the query from the recipient device via the internet network connection as well as for generating and broadcasting the one or more communications to the recipient device in response to the received query, the communications system server having an advertisement generation engine for autonomously generating the one or more communications, the one or more communications including a collection of slides comprising a grouping of design layers, design elements, and content containers, the advertisement generation engine comprising:

an advertisement builder, the advertisement builder for identifying and extracting the data pertaining to the one or more keywords from the query, and being configured for accessing the media repository and selecting, based on the data pertaining to one or more keywords, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets;

a compiler associated with the advertisement builder, the compiler for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the one or more communications capable of being rendered in a manner so as to be content specific to the data pertaining to the one or more keywords; and

a formatter associated with the compiler, the formatter for formatting the one or more communications, wherein once the one or more communications is generated and formatted, the communications system server autonomously broadcasts the one or more communications to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.



2. The online advertisement generation system in accordance with claim 1, wherein the compiler is configured for autonomously integrating the at least one selected media asset with the at least one selected online advertisement template to generate the one or more communications.

3. The online advertisement generation system in accordance with claim 1, further comprising a distribution program for targeted and autonomously broadcasting of the online advertisement over the Internet.

4. The online advertisement generation system in accordance with claim 3, wherein the distribution program uses keywords or other data for targeted broadcasting.

5. The online advertisement generation system in accordance with claim 4, wherein the formatter formats the online advertisement in one or more of a plurality of electronic distribution formats, the one or more of the plurality of electronic distribution formats comprising advertisements formatted for display on a web page and advertisements formatted for display on a mobile device; and

the distribution program is configured for distributing the online advertisement in at least one of the plurality of electronic distribution formats.

6. The online advertisement generation system in accordance with claim 5, wherein the electronic distribution format includes an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

7. The online advertisement generation system in accordance with claim 6, wherein the data pertaining to one or more keywords is from a social network, a geographical location determining system, or a web page.

8. The online advertisement generation system in accordance with claim 7, wherein the data pertaining to one or more keywords comprises data determining a look and feel of a website and the online advertisement is generated based on the look and feel.

9. An online advertisement generation system for autonomously generating and broadcasting one or more communications, the one or more communications capable of being rendered, the online advertisement generation system comprising:

a communications system server being configured to be coupled to a recipient device via an internet network connection, the recipient device having a graphical user interface, the graphical user interface being configured for receiving an input directed to a query, the query comprising data pertaining to one or more keywords, the communications system server being coupled with a media repository for storing media rich communication content, the media rich communication content comprising a plurality of online advertisement templates and a plurality of media assets, the communications system server further being configured for receiving the query from the recipient device via the internet network connection as well as for generating and broadcasting the one or more communications to the recipient device in response to the received query, the communications system server having an advertisement generation engine for automatically generating the one or more communications, the one or more communications including a collection of slides comprising a grouping of design layers, design elements, and content containers, the advertisement generation engine comprising:

a compiler associated with the communications system server, the compiler for automatically identifying

and extracting the data pertaining to the one or more keywords from the query, for accessing the media repository and selecting, based on the data pertaining to one or more keywords, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets, and for integrating the selected media asset with the selected online advertisement template, as well as for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the one or more communications capable of being rendered in a manner so as to be content specific to the data pertaining to the one or more keywords; and

a distribution program associated with the compiler, the distribution program for targeted and autonomously broadcasting of the one or more communications over the internet network connection to the recipient device so as the be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

**10**. The online advertisement generation system in accordance with claim **9**, further comprising a formatter associated with the compiler, the formatter for formatting the one or more communications.

**11**. The online advertisement generation system in accordance with claim **10**, wherein the formatter is configured for formatting the one or more communications in at least one of a plurality of distribution formats.

**12**. The online advertisement generation system in accordance with claim **11**, wherein the plurality of distribution formats comprise one or more of an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

**13**. The online advertisement generation system in accordance with claim **9**, wherein the distribution program uses data pertaining to one or more keywords or other data for the targeted and autonomous broadcasting.

**14**. The online advertisement generation system in accordance with claim **13**, wherein the data pertaining to one or more keywords is from a social network, a geographical location determining system, or a web page.

**15**. The online advertisement generation system in accordance with claim **14**, wherein the data pertaining to one or more keywords comprises data determining a look and feel of a website and the online advertisement is generated based on the look and feel.

**16**. The online advertisement generation system in accordance with claim **15**, wherein the extracted data comprises a keyword entered at the graphic user interface presented for display to the client or recipient computing device.

**17**. The online advertisement generation system in accordance with claim **9**, further comprising a project builder for assisting in the building of the online advertisement.

**18**. An online advertisement system, comprising:

a server-side media repository, the server-side media repository for storing one or more online advertisement templates and one or more media assets;

a server-side advertisement builder, the server-side advertisement builder configured for obtaining and extracting data from a data feed received by the server from a recipient computing device, the advertisement builder using the extracted data to access the server-side media repository, to select both an online advertisement template and a media asset from the media repository, and to generate one or more online advertisements based on the selected online advertisement template and the media asset, the one or more online advertisements including a collection of slides comprising a grouping of design layers, design elements, and content containers;

a server-side distribution program, the server side distribution program configured for accessing the one or more online advertisements from the server-side advertisement builder for targeted broadcasting of the one or more online advertisements over the Internet, in at least one of a plurality of electronic distribution formats, the distribution program using keywords for the targeted broadcasting, the targeted broadcasting being directed to the recipient computing device in a manner so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

**19**. The online advertisement system in accordance with claim **18**, wherein the extracted data comprises one or both of data pertaining to a keyword and other data received from one or more of the client or recipient computing device.

**20**. The online advertisement system in accordance with claim **19**, wherein the extracted data comprises data received from a social network, a geographical location determining system, or a web page.

**21**. The online advertisement system in accordance with claim **20**, wherein the extracted data comprises a keyword entered at the graphic user interface presented for display to one or more of the client or recipient computing device.

**22**. The online advertisement system in accordance with claim **18**, further comprising a server side compiler for assisting in the integrating of the selected media asset with the selected online advertisement template.

**23**. The online advertisement system in accordance with claim **18**, further comprising a formatter for formatting the online advertisement in the at least one of a plurality of electronic distribution formats.

**24**. An online advertisement generation system for autonomously building and broadcasting one or more communications to a graphical user interface of a recipient device, the one or more communications capable of being rendered, the online advertisement generation system comprising:

a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;

a communications system server being associated with the media repository and connectable to an internet network, the communication system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data;

an advertisement generation engine coupled to the media repository, the advertisement generation engine for autonomously generating the one or more communications and comprising:

an advertisement builder configured for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to build the one or more communications, the one or more communications including a collection of slides comprising a grouping of design layers, design elements, and content containers;

a compiler associated with one or more of the media repository and advertisement generation engine, the compiler for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design

elements, and content containers into the collection of slides so as to generate the one or more communications capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;

a formatter associated with the compiler, the formatter for formatting the one or more communications; and

a distributor, wherein once the one or more communications is built and formatted, the distributor autonomously broadcasts the one or more communications via the internet network to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

**25**. The online advertisement generation system in accordance with claim **24**, wherein the formatter is configured for formatting the one or more communications in at least one of a plurality of distribution formats.

**26**. The online advertisement generation system in accordance with claim **25**, wherein the plurality of distribution formats comprise one or more of an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

**27**. The online advertisement generation system in accordance with claim **24**, wherein the distributor uses one or more of the user data, keyword data, and geographic data for targeted broadcasting of the one or more communications to the recipient device.

**28**. The online advertisement generation system in accordance with claim **27**, wherein the user data, keyword data, and geographic data comprises data determining a look and feel of a website and the one or more communications is generated based on the look and feel.

**29**. The online advertisement generation system in accordance with claim **24**, wherein the user data, keyword data, and geographic data comprises data entered at a graphic user interface presented for display to the recipient computing device.

**30**. An online advertisement generation system for autonomously generating and broadcasting a communication to a graphical user interface of a recipient device, the communication capable of being rendered, the online advertisement generation system comprising:

a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;

a communications system server coupled to the media repository, the communications system server being connectable to an internet network, the communications system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data, and comprising:



an advertisement generation engine for autonomously generating the communication, the advertisement generation engine for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to generate the communication, the communication including a collection of slides comprising a grouping of design layers, design elements, and content containers;

a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;

a formatting engine for formatting the communication; and

a distribution engine wherein once the communication is generated and formatted, the communications system server autonomously broadcasts the one or more communications via the distribution engine to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

**31**. The online advertisement generation system in accordance with claim **30**, wherein the formatting engine is configured for formatting the communication in at least one of a plurality of distribution formats.

**32**. The online advertisement generation system in accordance with claim **31**, wherein the plurality of distribution formats comprise one or more of an electronic mail, a web page, an electronic brochure, and an animated file for display on a computer.

**33**. The online advertisement generation system in accordance with claim **30**, wherein the distribution engine uses one or more of the user data, keyword data, and geographic data for targeted broadcasting of the one or more communications to the recipient device.

**34**. The online advertisement generation system in accordance with claim **30**, wherein one or more of the user data, keyword data, and geographic data comprises data determining a look and feel of a website and the one or more communications is generated based on the look and feel.

**35**. The online advertisement generation system in accordance with claim **28**, wherein the user data, keyword data, and geographic data comprises data entered at the graphic user interface presented for display to the recipient computing device.

* * * * *