2022–2291

_____

# United States Court of Appeals for the Federal Circuit

_____

Impact Engine, Inc.,

*Plaintiff–Appellant*

v.

Google, LLC,

*Defendant–Appellee*

_____

Appeal from the United States District Court for the Southern District of California
in no. 3:19-cv-1301-CAB-DEB, Judge Cathy Ann Bencivengo

_____

## Response Brief of Appellee Google LLC

_____

Andrew T. Dufresne
Perkins Coie LLP
33 E. Main Street, Suite 201
Madison, Wisconsin 53703
Phone: (608) 663–7492
E-mail: ADufresne@perkinscoie.com

Jonathan I. Tietz
Perkins Coie LLP
700 13th Street, N.W, Suite 800
Washington, D.C. 20005
Phone: (202) 654–6200
E-mail: JTietz@perkinscoie.com

Dan L. Bagatell
Perkins Coie LLP
3 Weatherby Road
Hanover, New Hampshire 03755
Phone: (602) 351–8250
E-mail: DBagatell@perkinscoie.com

David A. Nelson
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Phone: (312) 705–7400
E-mail: davenelson@quinnemanuel.com

David A. Perlson
Antonio R. Sistos
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Phone: (415) 875–6600
E-mail: davidperlson@quinnemanuel.com
antoniosistos@quinnemanuel.com

Counsel for Google LLC

May 5, 2023

# REPRESENTATIVE PATENT CLAIMS

U.S. Patent No. 7,870,497

1. A multimedia communication system comprising:

a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and

a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assemble the communication.

9. A multimedia communication system in accordance with claim 1, further comprising a project viewer that renders an assembled communication and transmits the rendered communication via the network to the client computer for viewing in the graphical user interface.

U.S. Patent No. 10,565,618

14. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet based on recipient specific data received from a user of a recipient computing device, the system comprising:

a server having a connection to the Internet to communicate with a user of a recipient computing device via a graphical user interface displayed by the recipient computing device, the server comprising:

a recipient specific database for storing qualitative and/or quantitative data received from a user of the recipient computing device;

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder for accessing the recipient specific database as well as the media repository, and for selecting a media asset for integration with an advertisement template, the media asset being selected based on qualitative or quantitative data received from the recipient computing device;

a compiler associated with the project builder, the compiler for integrating the selected media asset with the online advertisement template to generate an online advertisement;

a formatter for selecting and formatting the online advertisement in an electronic distribution format; and

a distribution program for performing the targeted broadcasting of the online advertisement over the Internet to the recipient computing device.

## U.S. Patent No. 8,930,832

1. A multimedia communication system comprising:

a media repository storing communication project templates categorized according to a plurality of communication categories, the communication categories of the communication project templates being displayed on a graphical user interface of a client computer connected to the media repository via a network;

a project builder containing a communication project template from the media repository when a communication category associated with the communication project template is selected on the graphical user interface from the plurality of communication categories, the project builder generating a communication displaying data specified on the graphical user interface in accordance with the selected communication project template;

a distribution program ... formatting the communication according to an electronic distribution format specified on the graphical user interface ...; and

a project viewer connected to the project builder, the project viewer sending the communication according to the electronic distribution format via the network to the graphical user interface of the client computer.

30. An online advertisement generation system for autonomously generating and broadcasting a communication to a graphical user interface of a recipient device, the communication capable of being rendered, the online advertisement generation system comprising:

> a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;

> a communications system server coupled to the media repository, the communications system server being connectable to an internet network, the communications system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data, and comprising:

> an advertisement generation engine for autonomously generating the communication, the advertisement generation engine for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to generate the communication, the communication including a collection of slides comprising a grouping of design layers, design elements, and content containers;

> a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;

> a formatting engine for formatting the communication; and

> a distribution engine wherein once the communication is generated and formatted, the communications system server autonomously broadcasts the one or more communications via the distribution engine to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

# CERTIFICATE OF INTEREST

I certify that the information below is complete to the best of my knowledge.

Date: May 5, 2023      Signature:    /s/Dan L. Bagatell

                                  Name:      Dan L. Bagatell

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Google LLC | none | XXVI Holdings Inc.; Alphabet Inc. |

| 4. Other Legal Representatives | |
|---|---|
| from Quinn Emanuel Urquhart & Sullivan, LLP: | Jason C. Williams Robert B. Wilson |
| from Paul Hastings LLP: | Christopher H. McGrath Andrea Pallios Roberts |

| 5. Related Cases |
|---|
| none |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

## TABLE OF CONTENTS

Representative Patent Claims .................................inside cover and following pages

Certificate of Interest ...................................................................................i

Table of Authorities ....................................................................................iv

Table of Abbreviations and Conventions ............................................... viii

Statement of Related Cases.........................................................................ix

Introduction..................................................................................................1

Statement of Issues.......................................................................................1

Statement of the Case...................................................................................2

    I.    Impact Engine's purported invention and the asserted patents.................2

    II.    The accused product features ....................................................9

    III.    This litigation...........................................................................9

        A.    The district court's ruling on Google's Rule 12(b)(6) motion .........10

        B.    The district court's claim-construction orders and ruling on Google's initial Rule 12(c) motion....................................................11

        C.    The district court's order dismissing the '618 and '497 claims for patent-ineligibility .......................................................15

        D.    The district court's summary-judgment order and final judgment .......................................................................................16

Summary of Argument ...............................................................................21

Standards of Review ..................................................................................24

Argument.....................................................................................................25

    I.    The asserted claims are patent-ineligible under § 101 ............................25

        A.    The claims are directed to an abstract idea......................................25

1.    The focus of the claimed advance is abstract ............................25

2.    Impact Engine's step-one arguments fail.................................28

B.    The invalidated claims lack a saving inventive concept .................34

1.    The claimed components are generic, and so are the ways they are used.............................................................................34

2.    The "project viewer" limitations do not save the claims..........40

C.    The three claims not invalidated under § 101 are also abstract and patent-ineligible .........................................................................42

II.    Even if '497 claim 9 and '6,253 claim 1 are patent-eligible, the district court properly granted summary judgment of non-infringement...............................................................................................45

A.    The district court correctly construed the "project viewer" of these claims under § 112 ¶ 6.............................................................45

1.    Impact Engine forfeited its new-on-appeal constructions of "project viewer" ........................................................................45

2.    The district court correctly construed the "project viewer" terms it found not infringed ......................................................47

3.    Impact Engine's other criticisms are unfounded .....................51

B.    The district court correctly granted summary judgment of non-infringement under its construction of "project viewer" ..........55

III.   '898 claim 30 is invalid under § 112 ¶ 1 because the specification does not explain how a compiler would group design layers, design elements, and content containers into slides ...........................................57

Conclusion ..............................................................................................................64

Certificate of Compliance with Type–Volume Limitation.....................................65

**Cases**                                                              **Pages**

*ADASA Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ...........................................................31

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ........................................................26

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ...................................................25, 34, 36, 37

*Amgen Inc. v. Sandoz Inc.*,
923 F.3d 1023 (Fed. Cir. 2019),
*modified on other grounds*, 776 F. App'x 707 (Fed. Cir. 2019) ......................24

*Amgen, Inc. v. Chugai Pharm. Co.*,
927 F.2d 1200 (Fed. Cir. 1991) ........................................................62

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2011) (en banc) ................................58, 59

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ........................................................40

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ........................................................38

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) ........................................................33

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ........................................................36

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) .........................................................45

*ChromaDex, Inc. v. Elysium Health, Inc.*,
59 F.4th 1280 (Fed. Cir. 2023) ............................................24, 30, 35

*Comiskey, In re*,
554 F.3d 967 (Fed. Cir. 2009) .........................................................43

*Cooperative Ent., Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) .........................................................39

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed Cir. 2018) ...................................................29, 31

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) ....................................28, 29, 30, 40

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ............................................29, 30, 31

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......................................................39

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
830 F. App'x 634 (Fed. Cir. 2020) ..................................................33

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
619 F.3d 1329 (Fed. Cir. 2010) .......................................................60

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......................................................30

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .......................................................33

*Glaxo Grp. Ltd. v. TorPharm, Inc.*,
153 F.3d 1366 (Fed. Cir. 1998) .......................................................43

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ...........................................30, 36, 44

*IBM Corp. v. Zillow Grp., Inc.*
50 F.4th 1371 (Fed. Cir. 2022) ...........................................26, 28, 29

*Intell. Ventures I LLC v. Capital One Bank*,
792 F.3d 1363 (Fed. Cir. 2015) ...........................................26, 36, 40

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......................................................27

*Lockwood v. Am. Airlines*,
107 F.3d 1565 (Fed. Cir. 1997) .......................................................59

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......................................................33

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .......................................................24

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
  550 F.3d 778 (9th Cir. 2008) ................................................24

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ..........................................62

*People.ai, Inc. v. Clari Inc.*,
  No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) ......................28, 34

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008) ..............................................25, 61

*Purdue Pharma L.P. v. Faulding Inc.*,
  230 F.3d 1320 (Fed. Cir. 2000) ..........................................40

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
  827 F.3d 1042 (Fed. Cir. 2016) ............................................31, 36

*Riggs Tech. Holdings, LLC v. Cengage Learning, Inc.*,
  No. 2022-1468, 2023 WL 193162 (Fed. Cir. Jan. 17, 2023) ............................38

*Rudy, In re*,
  956 F.3d 1379 (Fed. Cir. 2020) ..........................................40

*Salwan, In re*,
  681 F. App'x 938 (Fed. Cir. 2017) ....................................38

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ..........................................27

*Simio LLC v. FlexSim Software Prods., Inc.*,
  983 F.3d 1353 (Fed. Cir. 2020) ........................25, 27, 29, 31, 35

*Solvay S.A. v. Honeywell Int'l Inc.*,
  742 F.3d 998 (Fed. Cir. 2014) ..........................................45

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ............................................42

*Stratoflex, Inc. v. Aeroquip Corp.*,
  713 F.2d 1530 (Fed. Cir. 1983) ..........................................51

*Syngenta Seeds, Inc. v. Monsanto Co.*,
  231 F. App'x 954 (Fed. Cir. 2007) ....................................50

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ..........................................33

*TLI Commc'ns LLC Pat. Litig.*, *In re*,
  823 F.3d 607 (Fed. Cir. 2016) ...............................................37, 38, 40

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
  675 F. App'x 1001 (Fed. Cir. 2017) ....................................29

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
  896 F.3d 1357 (Fed. Cir. 2018) ..........................................63

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) ............................................55

*Wands*, *In re*,
  858 F.2d 731 (Fed. Cir. 1988) .......................................62, 63

*Wyeth & Cordis Corp. v. Abbott Lab'ys*,
  720 F.3d 1380 (Fed. Cir. 2013) ..........................................24

*Zuili v. Google LLC*,
  722 F. App'x 1027 (Fed. Cir. 2018) ...................................38

## Statutes and Rules

35 U.S.C. § 101 .................................................................*passim*

35 U.S.C. § 112 ¶ 1 (pre-AIA) .......................................*passim*

35 U.S.C. § 112 ¶ 6 (pre-AIA) .......................................*passim*

Fed. R. Civ. P. 12(b)(6) ...................................................10

Fed. R. Civ. P. 12(c) ..............................................11, 14, 15, 24

Fed. R. Civ. P. 56(a) ........................................................24

S.D. Cal. Patent L.R. 1.3 .................................................60

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Appx___ | appendix page___ |
| Google | defendant–appellee Google LLC |
| GUI | graphical user interface |
| Impact Engine | plaintiff–appellant Impact Engine, Inc. |
| POSA | person of ordinary skill in the art |
| '###(*xx:yy-zz*) | column *xx*, lines *yy-zz* of the '### patent |
| '497 patent | U.S. Patent No. 7,870,497 |
| '6,253 patent | U.S. Patent No. 8,356,253 |
| '832 patent | U.S. Patent No. 8,930,832 |
| '632 patent | U.S. Patent No. 9,361,632 |
| '8,253 patent | U.S. Patent No. 10,068,253 |
| '618 patent | U.S. Patent No. 10,565,618 |
| '898 patent | U.S. Patent No. 10,572,898 |

"§" references refer to sections of U.S.C. Title 35

## STATEMENT OF RELATED CASES

No other appeal involving this case has been before this Court or any other appellate court. Google's counsel are not aware of any other case that may directly affect or be directly affected by the Court's decision in this appeal.

## INTRODUCTION

Impact Engine tried to have things both ways in this case. To enhance its infringement position, it argued that vague, coined claim terms such as "project builder" and "project viewer" were broad, generic, known constructs. Yet to avoid patent-ineligibility under § 101, it simultaneously asserted that those same limitations were inventive concepts. The district court recognized the inconsistency and ultimately held that all the asserted claims were either invalid or not infringed.

Impact Engine now takes potshots at the district court's rulings, but it cannot escape the fundamental problem that its claims are invalid if read broadly and functionally, and not infringed if the coined terms are construed under pre-AIA § 112 ¶ 6 and limited to the corresponding structure described in the specification. The judgment for Google should be affirmed.

## STATEMENT OF ISSUES

1. Impact Engine's patent claims are directed to the abstract idea of generating customized communications based on user-provided information, and they contain no inventive concept because they use ordinary computer hardware and software to automate processes for creating advertisements and other communications that had long been performed manually. Are the claims invalid under § 101?

2. The district court construed the "project viewer" limitations of two claims as means-plus-function terms governed by § 112 ¶ 6, and it identified the correspond-

ing structure in the patents' common specification. Impact Engine presented no evidence that Google's accused products satisfied the district court's construction. Impact Engine also never raised below the alternative construction it now proposes on appeal, and the new construction contradicts the specification in any event. Should the judgment of non-infringement of these claims be affirmed?

3. One asserted claim recites a "compiling engine" (construed to mean a conventional software compiler) that generates advertisements from certain components. The specification neither describes a "compiling engine" performing that function nor explains how a conventional compiler could do so. Did the district court correctly invalidate this claim under § 112 ¶ 1?

## STATEMENT OF THE CASE

## I. Impact Engine's purported invention and the asserted patents

Impact Engine's asserted patents are all entitled "Multimedia Communication System and Method," and all share the same named inventors, written description, and asserted 2005 priority date. Appx29-215. The patents describe the invention as replacing tasks "usually contracted out to a professional graphic designer" at an advertising agency by "automat[ing] the process of creating and distributing professional quality, media-rich communications" such as advertisements. Appx47 ('497(1:12-26)). The patents emphasize that this automated substitute for the traditional ad-development process may be achieved using almost any combination of

software, firmware, and hardware. Appx52-53 ('497(12:38-14:9)). The resulting "communication" may be in any of many existing formats. Appx47 ('497(1:36-52)).

The specification generally describes the components of the claimed system at a functional level, and the figures depict them as black boxes with no specific structure. Figure 1 shows a "client user interface" interacting with a "communication builder engine" over a network. Appx31. The "communication builder engine," in turn, includes six components: a "project builder," a "project viewer," a "compiler," a "media repository," a "distribution program," and a "sharing program."



The "project builder" provides a graphical user interface (GUI) that enables a user to select templates and "media assets" (e.g., artwork and graphics) from the "media repository" and assemble ads by answering questions in an "interview." *See* Appx53 ('497 claim 1), Appx36-46 (Figs. 6-16). The "project viewer" enables users to view and assemble the components by "rendering" ("serializing") project "slides" and content. Appx48-51 ('497(4:27-9:19)). The "compiler" integrates the information into a format suitable for transmission. Appx52 ('497(12:9-11)). The "distribution program" distributes completed projects to selected recipients. Appx48 ('497(3:17-21)). The "sharing program" prompts users to provide distribution parameters and can report on transmission results or responses. *Id.* ('497(3:22-29)).

The asserted claims focus on different aspects of the system, but all recite coined terms such as a "project builder" or "project viewer" performing functions without reciting particular hardware or software-algorithm structures for doing so.

For example, claim 1 of the '497 patent recites a "multimedia communication system" comprising a "media repository" that stores templates and media assets and a "project builder" with a GUI that uses an "interactive interview" to receive user input about which templates and media assets to use. The claim does not recite how the communication is assembled, just the general approach of obtaining user input from a GUI-based questionnaire akin to the drop-down web-forms and "wizards" that were common in the 1990s and early 2000s:

1. A multimedia communication system comprising:

a media repository storing communication project templates and media assets of a number of content types, the project templates and media assets being accessible by a graphical user interface on a client computer via a network; and

a project builder providing the graphical user interface for the client computer via the network for local display of the graphical user interface on the client computer, the graphical user interface comprising controls to receive user input for selecting at least one communication project template from the media repository and one or more media assets, and assembling a communication based on the at least one communication project template, the project builder further including an interactive interview for display on the graphical user interface, the interactive interview providing a plurality of questions to a user for eliciting a user response pertaining to user preferences, and further receiving the user preferences about the at least one communication project template and one or more media assets to assemble the communication.

Appx53.

Claim 9 further requires a "project viewer" that renders the communication and transmits it for viewing by the user, without specifying how that is done:

9. A multimedia communication system in accordance with claim 1, further comprising a project viewer that renders an assembled communication and transmits the rendered communication via the network to the client computer for viewing in the graphical user interface.

Appx54.

Claim 1 of the '6,253 patent likewise recites a "project builder" with a GUI for selecting a template and media assets and a "project viewer" for rendering slides comprising the communication. Appx78-79.

Claim 14 of the '618 patent recites various elements including a "media repository," "project builder," "compiler," and "distribution program," but it omits the "project viewer." The elements are again recited in generic, functional terms:

14. A multimedia communication system for generating an online advertisement in an electronic distribution format to accommodate targeted broadcasting over an Internet based on recipient specific data received from a user of a recipient computing device, the system comprising:

a server having a connection to the Internet to communicate with a user of a recipient computing device via a graphical user interface displayed by the recipient computing device, the server comprising:

a recipient specific database for storing qualitative and/or quantitative data received from a user of the recipient computing device;

a media repository for storing a plurality of online advertisement templates and a plurality of media assets;

a project builder for accessing the recipient specific database as well as the media repository, and for selecting a media asset for integration with an advertisement template, the media asset being selected based on qualitative or quantitative data received from the recipient computing device;

a compiler associated with the project builder, the compiler for integrating the selected media asset with the online advertisement template to generate an online advertisement;

a formatter for selecting and formatting the online advertisement in an electronic distribution format; and

a distribution program for performing the targeted broadcasting of the online advertisement over the Internet to the recipient computing device.

Appx186-187. '618 claim 22 is similar but omits the "project builder." Appx187. Claims 16 and 23 add minor limitations regarding data sources and formatting. *Id.*

Claim 1 of the '832 patent is similar but identifies the "project *builder*" as the component generating the communication, while the "project *viewer*" simply sends formatted communications for display:

> 1. A multimedia communication system comprising:
>
> a media repository storing communication project templates categorized according to a plurality of communication categories, the communication categories of the communication project templates being displayed on a graphical user interface of a client computer connected to the media repository via a network;
>
> a project builder containing a communication project template from the media repository when a communication category associated with the communication project template is selected on the graphical user interface from the plurality of communication categories, the project builder generating a communication displaying data specified on the graphical user interface in accordance with the selected communication project template;
>
> a distribution program ... formatting the communication according to an electronic distribution format specified on the graphical user interface ...; and
>
> a project viewer connected to the project builder, the project viewer sending the communication according to the electronic distribution format via the network to the graphical user interface of the client computer.

Appx104-105. '632 claim 1 and '8,253 claim 12 similarly recast the roles of the "project builder" and "project viewer." Appx131-132; Appx159.

Finally, claim 30 of the '898 patent also contains generic, functional language but uses different terminology, e.g., "advertisement generation engine," "compiling

engine," "formatting engine," and "distribution engine." In addition, the function of claim 30's "compiling engine" is not only integrating media assets and templates, but also grouping design layers, design elements, and content containers into renderable slides—a function of the "project viewer" in other claims:

> 30. An online advertisement generation system for autonomously generating and broadcasting a communication to a graphical user interface of a recipient device, the communication capable of being rendered, the online advertisement generation system comprising:
>
> > a media repository for storing media content comprising a plurality of online advertisement templates and a plurality of media assets;
> >
> > a communications system server coupled to the media repository, the communications system server being connectable to an internet network, the communications system server being configured for receiving, via the internet network, one or more of user data, keyword data, and geographic data, and comprising:
> >
> > an advertisement generation engine for autonomously generating the communication, the advertisement generation engine for accessing the media repository and selecting, based on one or more of the user data, keyword data, and geographic data, at least one of the plurality of online advertisement templates and at least one of the plurality of media assets to generate the communication, the communication including a collection of slides comprising a grouping of design layers, design elements, and content containers;
> >
> > a compiling engine for integrating the at least one selected media asset with the at least one selected online advertisement template, and for grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data;
> >
> > a formatting engine for formatting the communication; and

a distribution engine wherein once the communication is generated and formatted, the communications system server autonomously broadcasts the one or more communications via the distribution engine to the recipient device so as to be rendered at the graphical user interface thereof, the slides being displayable in an auto-play on or an auto-play off format.

Appx215.

## II. The accused product features

This lawsuit targeted the Ad Canvas tool in Google's Display & Video 360 ad-campaign-management software, the YouTube Video Builder tool, and the Display Ad Builder, Responsive Display Ads, and Lightbox Ads tools in Google Ads. Because the operational details of those features are immaterial here, Google will simply note that extensive expert reports supported its non-infringement and invalidity defenses.

Impact Engine's allegations of copying (BlueBr13-15) are also irrelevant here—and baseless. Impact Engine was just one of many potential third-party partners for Google's aborted AdSense for TV and Ad Creation Marketplace projects (neither of which are at issue here), and the limited communications between the parties ended years before Impact Engine's patents issued.

## III. This litigation

This case began in 2019 when Impact Engine alleged infringement of six patents. Appx280-307. It expanded in 2020 after two additional patents issued.

Appx1250-1280. It ended in 2022 after the district court held most of the asserted claims invalid and two not infringed. Appx1; Appx8-28.

## A.    The district court's ruling on Google's Rule 12(b)(6) motion

Google responded to Impact Engine's original complaint by moving to dismiss for, among other things, patent-ineligibility. Google contended that '497 claim 1 was representative, that the claims were directed to the abstract idea of automatically creating customized communications based on user input, and that the claims lacked any inventive concept because they invoked generic computer capabilities and recited no inventive way of performing the claimed steps. Appx12001-12028; Appx12033-12048.

The district court denied the motion, concluding that Google had not established that '497 claim 1 was representative and that Impact Engine had made a "plausible assertion that the claim sets forth technical elements functioning in a non-conventional or non-routine manner." Appx11472-11474. The court cautioned, however, that its ruling was without prejudice and did "not preclude [Google] from asserting a patent eligibility challenge to one or more of the asserted claims if claim construction or further evidence beyond the pleadings support such a challenge at some future point." Appx11473. In particular, the court was willing to revisit patent-eligibility if, as Google predicted, Impact Engine later contended that the "project

builder" should be broadly construed rather than limited to its description in the specification. Appx12081-12083.

### B. The district court's claim-construction orders and ruling on Google's initial Rule 12(c) motion

The case proceeded to claim construction. Google contended that the "project builder" limitations were in means-plus-function format and limited to the algorithms recited in the specification for performing the functions attributed to that component in the claims. Appx12134-12139 (citing '247(5:18-8:59)). Although Impact Engine had argued that the "project builder" was *not* a routine or conventional component for § 101 purposes, it sought a broad "plain and ordinary meaning" construction on grounds that a "project builder" was "a known program construct that would be familiar to one of skill in the art." Appx12179-12182. According to Impact Engine, the "project builder" could be any hardware/software combination that "builds the communication or advertisement based on input from the user." Appx12180. Impact Engine specifically contended that the "project builder" terms were *not* subject to § 112 ¶ 6. Appx12181-12182; Appx12194-12196.

The district court agreed with Impact Engine that the "project builder" terms were not in means-plus-function format, reasoning that software applications for performing the claimed functions of interviewing clients and selecting templates and media applications were known to skilled artisans at the claimed invention date. Appx11481-11483. The Court rejected Google's contention that the "project build-

er" was responsible for generating communications, concluding that the (as-yet-unconstrued) "project viewer" performed the necessary "rendering." Appx11483. Although the court did not adopt Impact Engine's "plain and ordinary meaning" proposal, it broadly construed "project builder" as "server-side software and hardware that obtains user information, selects appropriate template(s) and asset(s) and obtains user formatting and transmission information," and added that "[s]uch program constructs … would be tools familiar to one of skill." Appx11483.

The district court also agreed with Impact Engine that the "distribution program" component and the "formatting engine" of '898 claim 30 were not means-plus-function terms. It instead held that "programs for the distribution of a communication in the various formats disclosed existed at the time of filing of the application and would be familiar to one of skill in the art without further structural description," and that "the distribution program disclosed in the patent that formats a communication for distribution existed at the time of filing of the application and would be familiar to one of skill in the art and recognized as the 'formatting engine' limitation without further structural description." Appx11480.

The district court also construed "compiler"/"compiling engine." The parties agreed that "compiler" had a commonly understood meaning as a program that translates source code into machine language or object code, and the court accordingly construed these terms as referring to "back-end processing of source code into

machine or object code." Appx11480-11481. The court rejected Impact Engine's proposal of "plain and ordinary meaning" "including a [known] programming construct that integrates media assets into a finished communication," *see* Appx12182-12184.

Given the broad, generic constructions of "project builder," "distribution program," "formatting engine," "compiler," and "media repository" and Impact Engine's assertions that the "project viewer" and "sharing program" were conventional tools, Google moved for judgment on the pleadings, asserting invalidity under § 101. Appx12315-12346. Google argued that '6,253 claims 1-3 and 5 were representative, that those claims are directed to the abstract idea of automating known processes for creating customized computer communications based on user input, and that the claims lacked an inventive concept. *Id.*; Appx12405-12420.

Google concurrently requested construction of additional terms including the "project viewer" component, which the court had concluded performed the "rendering" function that Google originally attributed to the "project builder." Appx12348-12351. The court ordered briefing. Appx12352-12353. Google contended that the "project viewer" terms were in means-plus-function format and limited to corresponding algorithms in the specification. Appx7395-7402; Appx12429-12433. Impact Engine again proposed a "plain and ordinary meaning" construction, contending that a "project viewer" was "a known program construct that would be

familiar to one of skill in the art." Appx7561-7564. Impact Engine so argued even though it maintained in simultaneous patent-eligibility briefing that the "project viewer" was an inventive concept. Appx12379-12380.

Although the district court had previously ruled that the "project builder" and other terms were *not* governed by § 112 ¶ 6, it concluded that the "project viewer" terms *were* means-plus-function elements. The court agreed with Impact Engine that skilled artisans were familiar with viewers that displayed items created by other applications. Appx6. But it noted that the claimed "project viewer" also had to render/serialize communication-project slides and perform other functions, and it concluded that known viewers had not performed those functions. Appx6-7. The court thus rejected Impact Engine's construction as "too generic" and not "sufficiently structural." Appx7. Turning to the specification, it concluded that the structures for performing the claimed functions of the "project viewer" were described at '497(4:27-9:19). Appx7.

Because Google's pending Rule 12(c) motion assumed Impact Engine's construction of "project viewer," the court summarily denied that motion. Appx11485-11486. It did not, however, suggest that Google's challenges were meritless. Indeed, it observed that the claims would have a § 101 problem if the "project viewer" were a known, generic construct as Impact Engine contended. Appx7829-7833.

**C.** **The district court's order dismissing the '618 and '497 claims for patent-ineligibility**

Google then filed another Rule 12(c) motion, asserting ineligibility of the claims that did *not* recite a "project viewer." Appx12564-12596; Appx12629-12644. Google again contended that the claims were directed to the abstract idea of automatically creating computer communications based on user input. Google further observed that the court had held or Impact Engine had conceded that the non-"project viewer" components were generic, conventional tools. This time, the district court granted Google's motion as to all challenged claims except '898 claim 30. Appx8-20.

The court concluded that the asserted '497 and '618 claims are directed to an abstract idea and lack any transformative inventive concept. It agreed with Google that the '618 claims are directed to "the abstract idea of a system for generating customized or tailored computer communications based on user information." Appx14. It noted that the patents describe the system as automating tasks traditionally performed by advertising agencies and that the recited elements of these claims are "well-known program constructs defined by their functions ... [and] familiar to one of skill in the art at the relevant time." Appx15. It further observed that "[n]o advancement or improvement to any of these elements is disclosed or claimed" and concluded that locating them on a server "d[id] not impart a meaningful improvement or advance" because the server just "house[s] the generic components."

Appx15-16. The court observed that the specification says little about how the generic components interact and identifies no novel way of compiling, formatting, and distributing materials over the internet. Appx16. It thus concluded that the '618 claims call for "[a]utomating conventional technology," which "d[id] not amount to [an] inventive concept." Appx16-17. The same analysis doomed '497 claim 1. Appx17-18.

The court reached a different result for '898 claim 30, however. It agreed with Google that claim 30 focuses on the same abstract idea despite using different terminology (e.g., "advertisement generation engine" instead of "project builder"). But it concluded that claim 30 includes an inventive concept by requiring "a grouping of design layers, design elements and content containers" whose creation, management, and population are "disclosed in great detail in the specification." Appx18-19 (citing '497(4:1-9:10)).

### D.    The district court's summary-judgment order and final judgment

After fact and expert discovery, Google moved for summary judgment of non-infringement of all remaining claims and invalidity of '898 claim 30. Appx9218-9248; Appx12645-12660.

Google contended there was no evidence that any accused product contained the structure required by the construction of "project viewer." Rather than mapping the accused products to the court's construction, Impact Engine's expert, Dr. Wick-

er, mapped them to his own taxonomy. He unilaterally lumped the required structure into nine high-level categories. For example, he reduced four columns included in the court's corresponding structure to "project object structure defining layout (*e.g.*, positioning of content, asset width and height) and content (*e.g.*, asset paths or data fees), including embodiments made up of flash and xml files." Appx9300. He then opined that each claim required only a subset of those categories and that *no* claims required most of the structure identified by the court, including his layout/content category. *E.g.*, Appx9301-9302, Appx9333-9334, Appx9349-9350, Appx9370-9371, Appx9373, Appx9401-9403, Appx9414, Appx9416-9419, Appx9443-9444, Appx9454-9455, Appx9457-9459.

Google further contended that '898 claim 30 was invalid under § 112 ¶ 1. That claim requires a "compiling engine" to integrate the media asset with a template and group the design layers, design elements, and content containers into slides to generate a renderable communication.

At the supplemental-claim-construction hearing, the district court observed that the specification describes the "project viewer" performing that function rather than the compiler or "compiling engine," posing a § 112 problem for claim 30 because it recites a "compiling engine" and no "project viewer." Appx7819-7822. Echoing that observation, Google contended that the "compiling engine"/compiler is distinct from the "project viewer" and that the specification neither describes nor

enables a "compiling engine" that performs the recited function. Appx9246-9247; Appx12659.

At the summary-judgment hearing, the district court shared those concerns— and others. The court expressed annoyance that Impact Engine had consistently touted the novelty and creativity of various claim elements, yet at claim construction it had argued that those same elements were well-known and should be given broad "plain and ordinary meaning" constructions not limited by § 112 ¶ 6. Appx11346-11347. The court had taken a middle path, construing several terms as generic constructs but interpreting "project viewer" as a means-plus-function limitation limited by the specification. Appx11347. Yet Impact Engine's expert had "danced around the issue" and "created his own sort of generic labels for these things" without applying the court's construction. Appx11348.

The district court also observed that it had construed the "project *viewer*" as the component that generates communications, yet the '832 and '632 claims required the "project *builder*" to perform that function instead. *Id.* Because those claims generically recited generating a communication based on user preferences, the court asked why those claims were not ineligible under the logic of its previous ruling. Appx11349. The court further identified a § 112 problem with those claims because the specification does not describe having the "project builder" generate the

communication. Appx11374-11379. To give Impact Engine a full opportunity to respond, the court invited supplemental briefing on these issues. *Id.*; Appx11406.

After receiving the supplemental briefing, Appx11408-11422; Appx12661-12676; Appx11436-11450, the district court granted summary judgment to Google on the remaining claims. Appx21-28. Its order addressed three sets of issues.

The court first granted summary judgment of non-infringement of the claims that require the "project *viewer*" to render the communication ('497 claim 9 and '6,253 claim 1) because Impact Engine's expert had failed to apply the court's construction of that term. Appx24-25. Impact Engine asserted that the construction "did not 'set forth any required structure' and left it to the parties to determine the structures necessary to perform the claimed functions." Appx24. But the court disagreed and held that merely pointing to evidence that the accused "project viewer" receives "project object" information needed for rendering did not show the presence of the structure necessary to perform the rendering. Appx25.

The court next invalidated the claims identifying the "project *builder*" as the generator of the communications ('8,253 claim 12, '832 claim 1, and '632 claim 1) under § 101. Appx25-26. In these claims, the court observed, the "project viewer" "operate[s] in its known and familiar capacity—to display a file in the same way as the application that created the file, and not to render the communication." Appx26. The court thus concluded that these claims, like those it had invalidated previously,

are directed to "an abstract idea of generating customized communications based on user preferences using unspecified, generic computer applications in their known capabilities to automate functions previously performed by [humans]," and do not recite any inventive methods of generating, compiling, formatting, or distributing communications. *Id.*

Finally, the court invalidated '898 claim 30 under § 112. Appx27. It observed that the specification mentions a compiler only briefly and only as a component that compiles a customized project into a transmission-suitable format. It also noted that it had construed "compiler"/"compiling engine" according to its ordinary meaning as a program that translates source code into machine or object code. *Id.* Because the specification nowhere explains how such a compiler or "compiling engine" would group design layers, design elements, and content containers into a collection of slides to generate communications, the "compiling engine" limitation was neither adequately described nor sufficiently enabled. *Id.*

The court accordingly entered final judgment for Google. Appx1. Impact Engine now appeals. Appx11468-11470.[1]

---

[1] Because Google raised invalidity grounds only as defenses to infringement, Appx12115-12116, the judgment is final even though the district court did not resolve the validity of the two non-infringed claims. Google maintains that all the asserted claims are invalid, but it could not and did not cross-appeal because it obtained the dismissal it sought.

## Summary of Argument

### 1. The asserted claims are invalid under § 101.

The asserted claims are directed to the abstract idea of generating customized communications based on user preferences. The specification itself says the invention automates steps traditionally contracted out to graphic designers, and the concept of using design templates and user preferences to tailor communications is abstract. The claims do not focus on any improvement to computer technology. Impact Engine argues that the claims are directed to an improved user interface, but the claims do not focus on any technical aspects of the GUI.

The claims also do not recite an inventive concept. The recited software and hardware are generic, and computerizing an abstract idea is not an inventive concept. Impact Engine primarily points to the "project builder" and its use of a GUI to select templates and assets, but Impact Engine itself convinced the district court that "project builders" were a familiar construct. Impact Engine also touts its server-client architecture, but that was old hat by 2005.

Impact Engine's reliance on the "project viewer" limitations is unavailing. Impact Engine points to the district court's means-plus-function construction for rendering communications, but the "project viewer" claims that were held patent-ineligible do not require that component to render communications, only to perform the conventional function of transmitting assembled communications for display.

Impact Engine has concocted a new means-plus-function construction of "project viewer" on appeal, but it contended below that the "project viewer" was a well-known construct. This Court should not consider Impact Engine's belated new construction, but even the new construction identifies only generic, functional specification language that recites no inventive concept.

The three claims not invalidated under § 101 are equally ineligible, at least under Impact Engine's new construction of "project viewer." Two ('497 claim 9 and '6,253 claim 1) recite a "project viewer" that renders an assembled communication and transmits it for viewing. But the corresponding structure in the means-plus-function construction that Impact Engine now proposes is again functional, generic, and lacking in any inventive concept. The district court found an inventive concept in the third claim ('898 claim 30), but that ruling was mistaken because an abstract idea cannot supply an inventive concept, and the generic requirement that slides contain "design layers, design elements, and content containers" is abstract.

### 2. '497 claim 9 and '6,253 claim 1 were not infringed.

The district court correctly construed the "project viewer" of these claims and correctly held that Impact Engine failed to present a triable infringement case.

This Court can and should affirm the district court's construction on forfeiture grounds because Impact Engine has jettisoned the broad, plain-meaning/known-structure construction it asserted below and now urges a new set of means-plus-

function constructions. In any event, the district court's construction was correct. The "project viewer" recited in these claims must render/serialize communications and transmit them for presentation to users. The court properly identified the corresponding structure for those functions, and Impact Engine's belated counterproposal is inadequate because it cites only a high-level, introductory description of the rendering *function* that is devoid of algorithmic *structure*. Whether the district court properly identified corresponding structure for other "project viewer" limitations in other claims is irrelevant to the non-infringement judgment.

Summary judgment followed from the district court's construction. Impact Engine's expert disregarded the construction and tried to rewrite it to fit Impact Engine's infringement theories. The district court correctly rejected that gambit.

### 3. '898 claim 30 is invalid under § 112 ¶ 1.

Claim 30 requires the "compiling engine" to group various design components into renderable communications. Impact Engine has not appealed the district court's construction that the "compiling engine" is a traditional compiler that converts source code into machine language or object code. And the specification nowhere explains how such a compiler would perform the additional grouping function of claim 30. Impact Engine says skilled artisans would have known how to relocate this function from the "project viewer," but that is an enablement argument, not a written-description argument. The Court need not reach enablement, but the

non-enablement ruling was nevertheless correct because Impact Engine's expert did not explain how a traditional compiler could be rejiggered to perform the very different function claimed here. Impact Engine's complaint about Google's invalidity contentions is misplaced because the district court itself raised these flaws and Impact Engine had a full opportunity to respond.

## STANDARDS OF REVIEW

Under Ninth-Circuit law, judgments on the pleadings and summary judgments are reviewed *de novo*. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1027 (Fed. Cir. 2019), *modified on other grounds*, 776 F. App'x 707 (Fed. Cir. 2019). This Court thus assesses whether there is any genuine issue of material fact and whether judgment as a matter of law is proper. Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 56(a). The Court may affirm on "any basis supported by the record." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 782 (9th Cir. 2008) (citation omitted).

Patent-eligibility "may involve questions of fact but is, ultimately, a question of law." *ChromaDex, Inc. v. Elysium Health, Inc.*, 59 F.4th 1280, 1282 (Fed. Cir. 2023). Claim construction is reviewed *de novo*, but subsidiary findings of fact are reviewed only for clear error. *Amgen*, 923 F.3d at 1027. Infringement is a factual issue. *Id.* Enablement is a legal issue that may involve subsidiary facts. *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). Written-

description is a factual issue. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

**ARGUMENT**

## I.   The asserted claims are patent-ineligible under § 101

Impact Engine's claims fail the two-step eligibility test of *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), because they are directed to an abstract idea and merely computerize tasks previously performed manually without adding an inventive concept.

### A.   The claims are directed to an abstract idea

At *Alice* step one, the district court correctly concluded that Impact Engine's claims are directed to the abstract idea of generating customized or tailored computer communications based on user-provided information. Appx14-17; Appx25-26.[2]

#### 1.   The focus of the claimed advance is abstract

Step one considers the claims' "character as a whole" and the "focus of the claimed advance over the prior art." *Simio LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (citations omitted). In the patentees' words, the purported invention "automate[d] the process of creating and distributing profes-

---

[2] This discussion of step one applies to all asserted claims. Although Impact Engine disputed below that any claims were representative, on appeal it treats them collectively. For good reason: although the details vary, the basic concept of all the claims is the same, as reflected in the later six patents' terminal disclaimers.

sional quality, media-rich communications," replacing steps "usually contracted out to a professional graphic designer." Appx47 ('497(1:22-36)). The user indicates preferences and selects media and templates, and the claimed hardware and software assemble ads from those ingredients. Appx31-35 ('497(Figs. 1-5)), Appx47-48 ('497(2:65-3:29)), Appx52('497(11:36-12:37)); Appx11476. Impact Engine itself contended that the elements in Figure 1 were well-known, Appx12179-12190; Appx7561-7564, and the specification confirms that they were conventional, Appx47 ('497(1:44-51)), Appx52-53 ('497(12:38-13:12, 12:58-14:3)).

The concept of using templates and user preferences to tailor communications is a classic abstract idea. *See Intell. Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1369-70 (Fed. Cir. 2015) ("information tailoring" was abstract); *IBM Corp. v. Zillow Grp., Inc.* 50 F.4th 1371, 1380-82 (Fed. Cir. 2022) ("organizing and display-ing information" using user preferences was abstract); *see also Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1267-69 (Fed. Cir. 2016) (claims to "communicat[ing] targeted information" from content library to mobile devices were directed to abstract idea of "delivering user-selected media content to portable devices"). Impact Engine argues that the claims' focus is more specific, BlueBr33-34, but the limitations it cites are either abstract concepts ("interactive interview," "user preferences"), admittedly conventional components ("project builder," GUI), or both ("media assets," "project template," "communication," "slides," "layers").

The focus of the advance claimed here is *not* an improvement in computer technology. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) (focus not "improved computer" where "off-the-shelf computer technology" was used). Other than "generic computer-implemented steps," "nothing in the claims ... foreclose[s] them from being performed by a human" such as a professional graphic designer. *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016); *see* Appx12580-12581.

*Simio* is analogous. The patents there concerned computer simulations. Like Impact Engine's communications, Simio's "objects" could be "created with simple graphical process flows that require[d] no programming." 983 F.3d at 1356. Like Impact Engine's claims, Simio's claims contained generic limitations such as "simulation models," "graphical processes," and "base objects" in which new objects were "implemented in a 3-tier structure." *Id.* at 1357. Like Impact Engine's purported invention, Simio's "key advance" was "using graphics instead of programming to create object-oriented simulations" so that lay users could achieve results previously requiring expertise. *Id.* at 1359. Simio's claims were ineligible because the claimed invention did not "improve[ ] a computer's functionality," just a user's ability to build simulation models faster. *Id.* at 1361. That was not a technological improvement but instead a benefit "inherent [in] applying the abstract idea on a computer." *Id.* (citation omitted).

The same is true here. *See also Zillow*, 50 F.4th at 1381 (using computer to put information into visual layers solved problem "not specific to a computing environment"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1361-64 (Fed. Cir. 2020) (server and cable box "deliver[ing] targeted advertising to a user" with improved speed/efficiency not an improvement in how computers function); *People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at *8 (Fed. Cir. Apr. 7, 2023) (benefits of automating manual process of record-updating were inherent in automation and insufficient).

## 2. Impact Engine's step-one arguments fail

*a.* Impact Engine contends that its claims recite an improved user interface, namely a "specific, structured [GUI] paired with a prescribed functionality." BlueBr34, BlueBr37-38. But the claims do not focus on particulars of the interface, and Impact Engine identifies no inventive features of the claimed interface. It cites the "project builder," but it argued below that that component was a known, conventional construct. Appx12179-12180. The district court agreed and observed that GUIs were among the "tools familiar to one skilled in the art." Appx11483. Impact Engine cannot change its tune now. Impact Engine suggests that the GUI made "user interaction with a computer system much easier and more efficient," BlueBr37, but the cited excerpts from the specification barely mention the GUI, and the cited testimony, Appx11333-11334, did not tie such benefits to the GUI.

Even if the GUI were the focus of the claims, it was not a *technological* improvement. The claims recite it functionally: it "display[s]" items, includes an "interview," and lets users "select" things with "controls." *E.g.*, Appx53 ('497 claim 1). The cited testimony says nothing about the GUI other than that the invention uses "easily understood pre-built components" and "templates" and has a "thin" interface (whatever that means). Appx11333-11334 (emphasis omitted). Impact Engine also cites Figures 6-16, but they merely show a computerized version of a graphic designer's intake interview, and the claims require no such specific steps anyway.

Even assuming the claimed GUI "improv[es] a user's experience," that is insufficient at step one. *Zillow*, 50 F.4th at 1377 (quoting *Customedia*, 951 F.3d at1365); *Simio*, 983 F.3d at 1361. The patent-eligible interfaces in Impact Engine's favored cases differed because they claimed *specific* structured displays providing technological improvements. In *Trading Technologies International, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1004 (Fed. Cir. 2017), the claims recited the GUI's features and layout, and that particular structure "[was] addressed to and resolve[d] a specifically identified problem" with prior devices. In *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1003-04, 1008-09 (Fed. Cir. 2018), the invention imbued three-dimensional spreadsheets with a notebook-tabbed interface that purportedly enhanced computer functionality and improved prior GUIs. In *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1359-60 (Fed Cir. 2018),

the invention was a GUI with specialized navigational elements and menu-access rules that purportedly improved the usefulness of small-screen devices. In each case, the claimed interface was specifically structured to provide a technological benefit over prior interfaces. The claimed invention here uses a generic user interface that provides no technological benefit.

*b.* Impact Engine asserts that the invention improved computer functionality. But its analysis is untethered to claimed features, which step one "must focus on," *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (citation omitted). Impact Engine says its claims involve "media-rich, non-static advertisements that use less internet bandwidth," BlueBr32-33, and make "high-quality" advertisements and "layered ads that require less internet bandwidth," BlueBr39. But the claims recite no such limitations, and such results are not inherent. *See ChromaDex*, 59 F.4th at 1285 (refusing to consider unclaimed features).

Improvements to how computers work may be patent-eligible, but using computers to automate previously manual processes is not. *Customedia*, 951 F.3d at 1364. The inventions in Impact Engine's favored cases fell in the former category; the claims here fall in the latter.

The unconventional self-referential database in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338-39 (Fed. Cir. 2016), altered how data were structured and how computers handled memory. The invention in *Data Engine* altered how

three-dimensional spreadsheets were structured. 906 F.3d at 1007-08. The interface in *Core Wireless* improved the utility of small-screen devices. 880 F.3d at 1359-63. The invention in *ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908-09 (Fed. Cir. 2022), involved encoding RFID tags with a specific data structure that enabled on-demand tag-commissioning without reconnection to a database. And the invention in *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016), improved hepatocytes' resistance to cold temperatures.

By contrast, the supposed improvements here are "inherent [in] applying the abstract idea on a computer." *Simio*, 983 F.3d at 1361 (cleaned up). They arise from using familiar, abstract concepts such as templates, libraries, layered designs, and user interviews on a generic computer platform. Interacting via a GUI may be easier than programming, but merely "improving a user's experience while using a computer application" does not constitute improving "the *computer's* functionality." *Id.* at 1360-61 (citation omitted).

*c.* Impact Engine argues that the claims recite "specific steps … that accomplish the desired result" in a "concrete" way, require "particular information" and "specific data structures," and recite a "sufficiently specific implementation" for "improv[ing] the function of the overall technological process." BlueBr34-35 (citations omitted). But apart from the "project viewer" limitations as construed by the district court, the claims do not require "particular information," "specific data

structures," or "specific steps." They require some sort of "template," some sort of "media asset," and some sort of "user preference" information as inputs, and the recited steps are generic, functional implementations of the abstract idea. The claims recite soliciting input and producing communications, but they do not specify how the claimed results must be achieved.

The "project builder," for instance, "assembl[es] a communication based on" a "template" (generically construed as "pre-existing general structures and arrangements of a multimedia communication," Appx2-3), provides an "interactive interview" with "questions" to "elicit[ ] a user response" pertaining to "user preferences" (of some sort), and uses those "preferences" to "assemble the communication" (in some way). Appx53 ('497 claim 1); *see also* Appx131-132 ('632 claim 1). The "project builder" also "generat[es] a communication displaying data … in accordance with" a "template." Appx104-105 ('832 claim 1). The "distribution program" is equally generic: it "format[s] the communication according to an electronic distribution format" and "dynamically match[es]" the user's "location" with "content." *Id.* The "formatter" "select[s] and format[s] the online advertisement in an electronic distribution format based on" some generalized "data." Appx159 ('8,253 claim 1); *see also* Appx186-187 ('618 claim 14) ("media asset" "selected based on qualitative or quantitative data").

The claims lack the necessary technological specificity because they use generic language without articulating concrete steps. Impact Engine's cases highlight the specificity missing here. The claims in *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1305-06 (Fed. Cir. 2018), recited a novel behavior-based malware-protection method that required specific steps, not just a desired result. The invention in *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-96 (Fed. Cir. 2020), required a specific approach to multi-level encryption including an "object-oriented key manager," a "label," and encryption for access management. The claims in *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1307-08, 1313-15 (Fed. Cir. 2016), required "a combined order of specific rules" recited in detail. The communication-creation steps here use broad, non-specific language like "based on" and "in accordance with" rather than specific rules, and they do not specify the content of the "questions," "preferences," templates," and "assets."

*d.* Impact Engine denies that the claims merely automate known techniques. BlueBr40. But this case is not like *McRO*, where the invention required new, specific rules to animate speech, or *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370-71 (Fed. Cir. 2020), where the claims focused on a specific way of improving cardiac-monitoring technology. Nor is it like *EcoServices, LLC v. Certified Aviation Services, LLC*, 830 F. App'x 634, 642-43 (Fed. Cir. 2020), where the claims were held patent-eligible because they improved jet-engine-washing technology and did

not simply automate old methods. The patentees here expressly directed their invention to automating previously manual tasks, Appx47 ('497(1:22-36)), and the supposed benefits Impact Engine touts, BlueBr40-41, are not claim limitations or necessary results. For "[a]utomation of a manual process" to be patent-eligible, the automated process must not only "differ from the manual process," but also provide a "specific means or method that improves the relevant technology." *People.ai*, 2023 WL 2820794, at *8 (citation omitted). These claims do not.

## B. The invalidated claims lack a saving inventive concept

At *Alice* step two, the district court correctly determined that most of the asserted claims lack a saving inventive concept. Appx15-18; Appx25-26.

### 1. The claimed components are generic, and so are the ways they are used

The claims use generic components, and those components operate in their conventional manner. Appx15-18; Appx25-26. The specification confirms as much, Appx47, Appx52-53 ('497(1:41-52, 12:38-43, 12:51-54, 12:63-13:2, 13:21-24)), and Impact Engine repeatedly contended that the components and their functions were well known.

Apart from the "project viewer" limitation (addressed in the next section), Impact Engine identifies two allegedly inventive concepts. Neither saves the claims.

***Templated GUI.*** Impact Engine first argues that creating "media-rich online advertisements" using an "intuitive graphical interface," "project templates," and

"media assets" in a network-connected media repository was "unprecedented."
BlueBr42-43. This theory recasts Impact Engine's previous assertions that combining a server-side "project builder" with other components was an inventive concept. *See* Appx12621-12623. And it fares no better.

Impact Engine itself convinced the district court that "project builders" were a familiar construct. Appx12179-12180; Appx11481-11483. And its expert admitted that performing project-building functions on a server was familiar. Appx12698; Appx12208-12209. Impact Engine never purported to have invented the GUI, templates, or collections of images or other "media assets." In any event, novelty does not overcome "the problem of abstractness." *Simio*, 983 F.3d at 1364 (citation omitted). The concept of using templates and an image repository to create a graphic rather than making one from scratch is an abstract idea. And the concept of picking particular templates and media assets based on user input is equally abstract.

Impact Engine touts its "combination" and argues "significant" benefits over prior-art methods. BlueBr42-43. But those arguments go well past what Impact Engine argued below, Appx12622-12624 (emphasizing creation "without programming assistance"), and they improperly rely on unclaimed, non-inherent features*, see ChromaDex*, 59 F.4th at 1285. Nothing in the claims requires an "intuitive" interface. The claims likewise require no particular "media-rich"-ness or any special "templates" or "media assets." Impact Engine suggests its "unconventional combin-

ation" lets users sidestep "professional artists," "high-end design software," and use "their own media assets," BlueBr42, but those purported advantages are not limitations or inherent results and just recapitulate the abstract idea.

Impact Engine cites *CellzDirect* and *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019), BlueBr42-43, but it fails to explain how the combination here provided an inventive concept that transformed the underlying abstract idea into substantially more, as *Alice* requires. *CellzDirect* entailed repeated freezing of hepatocyte cells that was "far from routine," and "prior art taught away from" that process in an "art well-known for its unpredictability." 827 F.3d at 1051 (citations omitted). Impact Engine points to no such teaching away or unpredictability. *Cellspin* involved unconventional "separat[ion of] the steps of capturing and publishing data" in a specific "two-step, two-device structure," and the patent explained the *technological* benefits of doing so. 927 F.3d at 1316-17. Impact Engine's claims recite no such specific innovative technology, and any benefits are inherent in computerizing the abstract idea. *See Capital One*, 792 F.3d at 1367. The claims use "generic functional language" and under Impact Engine's adopted constructions they merely require "conventional computer and network components operating according to their ordinary functions" to achieve the asserted benefits. *Hawk*, 60 F.4th at 1358 (citation omitted).

Impact Engine asserts that several claims "add further improvements." BlueBr43. But the first alleged "improvement," the "project builder," was a known construct according to Impact Engine itself. Appx12179-12180; *see* Appx11483. Having it combine "templates" and "assets" merely implemented an abstract idea using a computer and cannot save the claims at step two. *Alice*, 573 U.S. at 223-26. The other alleged "improvement," automatic selection of media using user-provided criteria, BlueBr43, simply automates an abstract idea.

***Server-side positioning.*** Impact Engine stresses that the claims locate the "project builder" and "other components" on a server. BlueBr43-47. But using a server was not inventive. Appx12698. The specification admits that "software as a service" was a known model. Appx47 ('497(2:49-52)). And during claim-construction, the district court found that "server-side" positioning of the "project builder" was "familiar to one of skill." Appx11483; Appx12641. The court similarly found that "provid[ing] a [GUI] over a network" and "select[ing] appropriate templates and assets from the system repository based on the user's responses" were familiar. Appx11483. Familiar concepts are not inventive by definition.

Moreover, a server is a generic type of computer, *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613-14 (Fed. Cir. 2016), and "limiting the use of an abstract idea to a particular technological environment" is not enough, *Alice*, 573 U.S. at 223 (cleaned up). Relocating some functions to a generic server was not inventive—this

Court regularly holds that using a server does not supply an inventive concept. *E.g.*, *TLI*, 823 F.3d at 613-14 (no inventive concept in claims reciting "telephone unit," "server," "image analysis unit," and "control unit"); *Zuili v. Google LLC*, 722 F. App'x 1027, 1031 (Fed. Cir. 2018) (no inventive concept in claims reciting "client side" and "server side" components); *In re Salwan*, 681 F. App'x 938, 941 (Fed. Cir. 2017) (no inventive concept in claims reciting "central server" and "server for processing and transferring"); *Riggs Tech. Holdings, LLC v. Cengage Learning, Inc.*, No. 2022-1468, 2023 WL 193162, at *3-4 (Fed. Cir. Jan. 17, 2023) (no inventive concept in claims reciting "handheld device and server").

Impact Engine repeats its refrain that the claims "improve a technological process" through an "unconventional combination." BlueBr44-45. But it never explains how combining these elements yields substantially more than their sum. Citing *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), it argues that its invention "combine[s] conventional components in an atypical manner." BlueBr45. But BASCOM's claims included a "non-conventional and non-generic arrangement" including a "filtering tool" that was installed at an unconventional remote location and yielded "hybrid" technological benefits, such that the "particular arrangement" was "a technical improvement." *Id.* at 1350 (further observing that merely filtering internet content with generic components was *not* an inventive concept). Impact Engine offers only conclusory

allegations that server-side architecture was unconventional in this application. BlueBr43-44. And the "significant benefits" it asserts either result inherently from using servers (saving bandwidth) or are untethered to the server-side location ("easily making custom ads").

Impact Engine cites *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), and *Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*, 50 F.4th 127 (Fed. Cir. 2022), BlueBr45-46, but they too are inapposite. The claimed webpage mashup in *DDR* was "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks": how URLs routed webpage visitors. 773 F.3d at 1257-58. Impact Engine's use of a generic server to serve "templates" and "assets" (both well-known concepts) was not a solution "necessarily rooted in computer technology" because it solved no "problem specifically arising in the realm of computer[s]." *Id.* at 1257. The claimed improvement in *Cooperative Entertainment* was a technological "segmenting" of dynamic-network process that was undisputedly inventive. 50 F.4th at 133, 135. The dispute there was whether the claims required such a process. *Id.* That is not the dispute here.

At bottom, Impact Engine identifies no benefit to its generic server-side model other than what would inherently result from a client-server model. "[T]he recited physical components behave exactly as expected according to their ordinary use,"

*TLI*, 823 F.3d at 615, and Impact Engine relies on efficiency improvements inherent in servers, *Capital One*, 792 F.3d at 1367; *Customedia*, 951 F.3d at 1365.

Impact Engine's argument that the claims "do not preempt all ways of achieving these results," BlueBr46, is doubly flawed. Preemption *is* significant because Impact Engine obtained broad constructions of numerous functional claim elements. And although preemption supports ineligibility, its absence does not establish eligibility. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

Finally, Impact Engine observes that the PTO deemed the claims patent-eligible. BlueBr46-47. But the PTO's eligibility standards are not binding, *In re Rudy*, 956 F.3d 1379, 1382-83 (Fed. Cir. 2020); judicial deference simply "takes the form of the presumption of validity," *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1329 (Fed. Cir. 2000). Impact Engine also ignores that the PTO's allowances preceded the broad constructions issued by the district court at Impact Engine's behest.

### 2. The "project viewer" limitations do not save the claims

Impact Engine separately argues that the "project viewer" limitations of the '8,253, '832, and '632 patents supply an inventive concept. BlueBr47-49. But those limitations do not save the claims, however construed.

Impact Engine first argues that the adopted means-plus-function construction narrowed the claims so much that they cannot be abstract. BlueBr48-49. Not so. Means-plus-function claiming may save claims from invalidity under § 112 ¶ 1, but it is not a get-out-of-§ 101-free card. Impact Engine accuses the district court of ignoring its construction, but it is Impact Engine that ignores the key distinction the court made in its summary-judgment order. In that order, the court recognized that the "project viewer" functions differ by claim, and it invalidated under § 101 the claims where the "project viewer" simply sends files to the user's computer for display. Appx25-26. In those claims, the court observed, the "project viewer" operates "in its known and familiar capacity—to display a file in the same way as the application that created the file." Appx26.

Impact Engine alternatively argues that the "project viewer" supplies an inventive concept under its proposed construction. BlueBr49-50. But Impact Engine contended below that the "project viewer" was a "known programming construct" for viewing assembled communications and that the patents "describe and claim the project viewer using known structures." Appx7563-7564. Under that construction, the "project viewer" was indisputably uninventive.

On appeal, Impact Engine has pivoted, conceded that the "project viewer" limitations are in means-plus-function format, and identified four functions with different corresponding structures. BlueBr59. As discussed later in this brief, Impact

Engine forfeited that new construction by not raising it below. But even if this Court adopts it, Impact Engine still identifies no inventive concept. Impact Engine describes the relevant function as "sending the advertisement to a client computer," BlueBr49, and contends that the corresponding structure appears at '497(8:60-9:29), BlueBr59. But the portion of that passage that addresses sending files for user review uses generic functional language and describes sending completed communication files in "a variety of third party formats such as .swf, .pdf, xml, html, txt, or any other format." Appx51 ('497(9:5-9)); *see also* Appx7609-7611 (Impact Engine's expert describing function of "project viewer" as "consistent with a known program construct," including prior viewers). There was nothing inventive in using conventional techniques and formats to send files from a server to a client.

### C. The three claims not invalidated under § 101 are also abstract and patent-ineligible

The district court held that Google did not infringe '497 claim 9 and '6,253 claim 1 and that '898 claim 30 is invalid under § 112 ¶ 1. Appx24-25, Appx27. Those rulings were correct for reasons discussed later in this brief, but the no-liability judgment for those claims can also be affirmed on the alternative ground that they do not satisfy § 101.

This Court "may affirm on any basis supported by the record, whether or not relied upon by the district court." *Somers v. Apple, Inc.*, 729 F.3d 953, 960 (9th Cir. 2013) (citation omitted). Because Google asserted invalidity only as an affirmative

defense, reaching ineligibility would not expand the scope of the judgment. Because ineligibility is a legal issue briefed below, this Court may properly consider it even though the district court did not finally resolve these claims' patentability. *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1373-74 (Fed. Cir. 1998); *In re Comiskey*, 554 F.3d 967, 973-75 (Fed. Cir. 2009).

'497 claim 9 recites a "project viewer" that both renders an assembled communication and transmits it for client viewing. Below, Impact Engine contended that the "project viewer" in all claims was a known construct and not subject to § 112 ¶ 6. Appx7562-7564. On appeal, Impact Engine switches positions, argues that the "project viewer" limitations *are* governed by § 112 ¶ 6, and, for the first time, identifies '497(4:27-42) as structure corresponding to the "rendering" function. BlueBr59. But even if this Court considers that tardy construction, that passage describes no inventive step. Using functional language, it simply says that the "project viewer" serializes the project slides and content by representing the slides in an array and determining a load sequence for the content. Appx48 (4:34-38). It does not explain *how* to do so—that explanation comes in later portions of the specification that the district court included in the corresponding structure but Impact Engine omits.

If the corresponding structure is limited to '497(4:27-42), as Impact Engine now contends, there is no inventive concept and '497 claim 9 is ineligible. If the

corresponding structure includes the detail in the following columns, Impact Engine presented insufficient proof of infringement. Either way, Impact Engine loses.

The same is true for '6,253 claim 1. The sole function of the "project viewer" there is rendering the communication in the GUI. Impact Engine again treats '497(4:27-42) as the corresponding structure, and that passage supplies no inventive concept. If the corresponding structure includes the following columns, Impact Engine failed to prove infringement.

'898 claim 30 is also patent-ineligible. The district court recognized that claim 30 is equally directed to an abstract idea despite using different terminology. Appx18-19. The court also agreed that the claimed components do not improve computer functioning, that the claimed generation and distribution of communications rely on known program constructs, and that the specification did not disclose any advance in autonomous generation or broadcasting. Appx19. Nevertheless, the court noted that claim 30 requires "slides comprising a grouping of design layers, design elements and containers" and concluded, from the description of creating, managing, and populating such slides at '497(4:1-9:10), that this "particular format" provided an inventive concept. Appx18-19. That holding was mistaken, however, because the generic requirement of "design layers, design elements and content containers" is abstract—no *specific* format is required. *See Hawk*, 60 F.4th at 1358-59 (no inventive concept where claims included "parameters" that "concern abstract data manipu-

lation" and were implemented conventionally); *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019) (abstract ideas "cannot supply the inventive concept" (citation omitted)). The court relied on unclaimed slide-layering details in the specification, Appx19, but "the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint*, 920 F.3d at 769.

## II. Even if '497 claim 9 and '6,253 claim 1 are patent-eligible, the district court properly granted summary judgment of non-infringement

In contesting the summary judgment of non-infringement of '497 claim 9 and '6,253 claim 1, Impact Engine relies on new constructions of "project viewer" that are both forfeited and misguided on the merits. And it made nowhere close to a sufficient showing to avoid summary judgment under the district court's construction.

### A. The district court correctly construed the "project viewer" of these claims under § 112 ¶ 6

#### 1. Impact Engine forfeited its new-on-appeal constructions of "project viewer"

Impact Engine's new means-plus-function constructions of "project viewer" should be disregarded because they were not raised below.

Appellate courts ordinarily "do[ ] not give consideration to issues not raised below," and that principle has been applied "to preclude a party from adopting a new claim construction position on appeal." *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1003 (Fed. Cir. 2014) (citations omitted). A party raises a new position if it

"changes the scope of the claim construction" it previously asserted rather than "clarifying or defending the original scope of its claim construction or supporting its existing claim construction position with new citations to the specification." *Id.* (cleaned up).

Here, Impact Engine argued to the district court that § 112 ¶ 6 did *not* apply to "project viewer." *See* Appx7561-7564; Appx12533-12535. Specifically, Impact Engine asserted that "project viewer" was *not* a nonce term and had "known structure" that skilled artisans would have recognized "according to its plain meaning." Appx7563; *see also* Appx12534; Appx7829-7830, Appx7833-7834. Even after Google proposed a means-plus-function construction, Impact Engine never offered an affirmative construction under § 112 ¶ 6 identifying the claimed structure and inventorying the entire corresponding structure. Instead, it suggested that if § 112 ¶ 6 applied, the term would encompass "additional structures" beyond what Google identified. Appx7564; Appx12535 n.4.

Impact Engine pivots radically here. It no longer disputes that the "project viewer" limitations are means-plus-function terms, BlueBr51, and it proposes a specific set of functions and corresponding structures, BlueBr59. That is all new, and the constructions it belatedly proposes bear little resemblance to its assertions below. The Court should deem them forfeited.

## 2. The district court correctly construed the "project viewer" terms it found not infringed

Even if Impact Engine could change positions on appeal, the only "project viewer" constructions that matter here involve '497 claim 9 and '6,253 claim 1, and those constructions were correct. Understanding why that is so and why Impact Engine's criticisms are misplaced requires context that Impact Engine ignores.

Before embarking on claim construction, the district court addressed Google's original patent-eligibility motion. In opposing that motion, Impact Engine asserted that the "project builder" and "project viewer" supplied inventive concepts rather than routine functionality. Appx985 (citing Appx294-295), Appx992. The court declined to dismiss at that point, citing Impact Engine's "plausible assertion" that the claims contained "technical elements functioning in a non-conventional or non-routine manner." Appx11473. In its subsequent claim-construction order, the court—at Impact Engine's behest—interpreted "project builder" and other terms as known structures that would have been "familiar to one of skill." Appx11483 ("project builder"); Appx11480 ("distribution program" and "compiler"); *see also* Appx2592 (Impact Engine describing "sharing program" as a "known program construct that would be familiar to one of skill in the art"). Those rulings left the "project viewer" as the sole allegedly inventive concept that had not been construed as a well-known structure in the art.

The "project viewer" limitations thus became critical, and Google requested supplemental construction. Appx12350-12351. Google proposed applying § 112 ¶ 6, while Impact Engine asserted a "plain and ordinary meaning" that it characterized as "a known program construct that would be familiar to one of skill in the art." Appx7561; Appx12533. In support, Impact Engine cited expert testimony discussing skilled artisans' familiarity with software viewers that allowed a user to *view* content. Appx12534 (citing Appx12396; Appx12463; Appx12554-12556). Yet in simultaneous § 101 briefing, Impact Engine portrayed the "project viewer" as an inventive concept based on that construct's additional ability to *render* selected slides and design layers into a communication as recited in '6,253 claim 1. Appx12379-12380.

The district court recognized the incongruity of Impact Engine's positions. At the *Markman* hearing, it observed that the "project viewer"

> is not simply a software program that runs on the server that allows the client to view the choices they're making and edit them. It actually is creating the collection of slides with all of this interactive function, and that is the function of the rendering, which is a function of the viewer. And I have yet to hear that that was a known function of software in the art at the time to do all of that.

Appx7862-7863; *see also* Appx7826-7827, Appx7841-7842, Appx7858, Appx7865. The court added that a "project viewer" with the additional, allegedly inventive rendering function in '497 claim 9 and '6,253 claim 1 could not be equated

with known structure (viewers presenting content for display to a user) to escape § 112 ¶ 6 without "walking right back into the 101 problem." Appx7829-7830. The court thus rejected Impact Engine's efforts to read "project viewer" broadly as known software for viewing content, concluding that its construction needed to address the rendering function. *E.g.*, Appx7828-7829.

The district court accordingly invoked § 112 ¶ 6 in construing a "project viewer" capable of *rendering/serializing* a communication. Appx3-7. It focused on the project viewer as "an application that renders or serializes the communication project slides and provides them with functionality," Appx4 (quoting Appx48 ('497(4:27-30))), and held that § 112 ¶ 6 applied because there were no known "'viewer' applications to render or serialize the communication project slides" as described by the patents, Appx6-7.

Thus, although the court's analysis mentioned the presentation functions as well as the rendering function, its construction centered on the rendering function. Appx7. That is apparent from both the corresponding structure it selected and its later statements. As corresponding structure, the court identified nearly the same descriptions of rendering algorithms in the specification that Google had identified. Appx7; Appx7395; *see also* Appx7826, Appx7833. The court later confirmed that its construction of "project viewer" was directed to the function of *rendering* the communications. For example, when discussing the claims that "specifically say[ ]

they are going to render the communications," the court reiterated that it had "ruled that is a means-plus-function [element], that rendering by the Project Viewer." Appx11371-11372; *see also* Appx11347-11348 (describing the § 112 ¶ 6 ruling as "the Court's claim construction as to how the Project Viewer limitation renders"), Appx11358-11359; Appx11485-11486.

Any ambiguity was cleared up in the judgment. *See Syngenta Seeds, Inc. v. Monsanto Co.*, 231 F. App'x 954, 960 (Fed. Cir. 2007) (judgment made construction clear "[t]o the extent that the original claim construction order [was] ambiguous"). The court held only two claims not infringed for lack of structure corresponding to "project viewer" limitations. Those were '497 claim 9 and '6,253 claim 1, the two claims reciting a "project viewer" that renders communications. Appx24-25. Rather than holding '8,253 claims 1 and 12, '832 claims 14 and 18, and '632 claims 4, 21, and 25 not infringed, the court held those claims invalid under § 101 because the "project viewer" in those claims "operate[d] in its known and familiar capacity—to display a file in the same way as the application that created the file, and not to render the communication." Appx26. Conversely, '497 claim 9 and '6,253 claim 1 were not invalidated under § 101, on grounds that reciting an unconventional project viewer with rendering functionality provided an inventive concept. *See* Appx16 n.6 ("*Without that limitation*, these claims broadly encompass collecting user preference information and making an advertisement to be distributed on the Internet using

known conventional computer software and hardware." (emphasis added)). Ultimately, this Court "sit[s] to review judgments, not opinions." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983). And the judgment here confirms that the court ultimately applied its means-plus-function construction only to the two claims that recited a "project viewer" with rendering functionality.

The district court thus did not do what Impact Engine accuses it of doing in its summary-judgment order. It did not "ignore[] the disparate functions of the 'project viewer' recited in each individual asserted claim"; nor did it "conclud[e] that the claimed 'project viewer' must possess *all* the structures in the entire universe of identified structures corresponding to *any* 'project viewer' function." BlueBr53. It was *Impact Engine* that ignored any distinction between project-viewer functions during claim-construction and even criticized Google for addressing different functions recited in different claims. Appx7564 n.7. The district court properly construed "project viewer" as a means-plus-function term in the claims that require a "project viewer" capable of rendering communications, and it properly identified the disclosed structure corresponding to the rendering function in the specification.

### 3. Impact Engine's other criticisms are unfounded

Impact Engine's additional criticisms of the district court's construction are equally unavailing.

Impact Engine first complains that the construction of "project viewer" in '497 claim 9 and '6,253 claim 1 included structures unnecessary to the claimed function. BlueBr56-58. In particular, Impact Engine accuses the district court of including extraneous algorithms for loading content for playback, exchanging information and commands between layers, and defining the layout and content of communications. BlueBr57 (citing Appx48-50 ('497(4:43-48, 4:59-5:6, 5:7-8:49))). But Impact Engine raised no such objections when Google proposed corresponding structure for the rendering function that included each of those passages. Appx7395. Instead, Impact Engine criticized Google's proposal as *under*inclusive. Appx7564; *see also* Appx12466-12467 (expert agreeing that the structures cited by Google performed functions of the project viewer). Notably, the sole support Impact Engine offers for its current recharacterization of those passages is an expert report from November 2021, six months *after* "project viewer" was construed. BlueBr57 (citing Appx8352-8354, Appx8392-8395); Appx8208, Appx8936.

In any event, Impact Engine's attempt to isolate those passages from the rendering function is incorrect: content must be loaded to render it (*see* BlueBr59 (discussing "loading and interpreting the project object")), relationships between layers must be accounted for when rendering the whole advertisement, and the disclosures Impact Engine dismisses as "exemplary design files" are the detailed

algorithms for rendering identified by the inventors. The district court properly incorporated those disclosures as structure corresponding to the rendering function.

Impact Engine's meager counterproposal for structure that corresponds to the rendering function is inadequate and indefinite. Impact Engine identifies '497 column 4, lines 27-42 as "algorithms implemented in software." BlueBr59. But as discussed above, those sixteen lines contain no specific algorithm, just a high-level description of the rendering *function* as an introduction to the detailed algorithmic structure in the following columns. As the district court recognized, the data structure for the "project object" and the algorithms for how to load and render such content appear later in the specification.

Citing an early joint claim-construction chart, Impact Engine suggests that "[n]ot even Google" thought all the structure identified by the district court was required. BlueBr60 (citing Appx2552-2553). But Google has consistently maintained that any non-abstract invention here requires the disclosed rendering algorithms. The same chart Impact Engine now cites shows that Google originally proposed construing the "project builder" as the software component implementing those algorithms. Google specifically proposed a means-plus-function construction for "project builder" that incorporated the disclosed algorithms as corresponding structure. Appx2347-2348 (identifying structure including '497(5:18-9:9)). Impact Engine responded that the "project *builder*" was a known interface for accepting user

selections, whereas the "project *viewer*" rendered the resulting communications. Appx12303-12304. The court agreed with Impact Engine that "[a]lthough the claims recite the project builder assembling or generating the communication," the specification described passing user selections "to the project viewer component for rendering or serializing into slides." Appx11482-11483. The court thus explained that the structure for rendering a communication that Google had originally attributed to the "project builder" was instead associated with the "project viewer." Appx11483 (citing "Col. 4:27 to 8:59").

That was no "off-handed[ ]" remark. *Contra* BlueBr61. It explained the intermediate construction the court had adopted for "project builder" after struggling with Impact Engine's contradictory assertions that that component was both well-known and inventive. *See*, *e.g.*, Appx12306-12309; Appx11482-11483. Google accepted the court's ruling and requested construction of "project viewer" consistent with the court's conclusion that the "project viewer," not the "project builder," assembled communications using algorithms disclosed in the specification. Appx7400 (quoting Appx11483). Google had no "change of heart," BlueBr61, and there was no mystery about why that structure was included within the rendering function of the "project viewer."

Impact Engine's complaints about other "project viewer" functions, BlueBr63-66, are red herrings. As shown above, the means-plus-function construc-

tion at issue here was specific to one recited function: the "rendering" in '497 claim 9 and '6,253 claim 1. Appx11371-11372. Nothing more was needed to resolve infringement of those claims, and disputed terms must be construed "only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

## B. The district court correctly granted summary judgment of non-infringement under its construction of "project viewer"

Summary judgment of non-infringement of '497 claim 9 and '6,253 claim 1 followed from the district court's construction. In opposing, Impact Engine refused to acknowledge that construction, contending that the court "did not set forth any 'required structure.'" Appx9855. Its expert thus never mapped the corresponding structure specified in the court's construction onto the accused products. Instead, he unilaterally broke up that structure into nine parts and concluded that only a fraction of what the court identified was required. Appx8352-8354; Appx9856-9858. Then, when purporting to compare the claims with the accused products, he applied his own shorthand characterizations of the structures in each of his own artificial categories rather than addressing the algorithms recited in the specification.

For example, Impact Engine dumped the vast majority of the corresponding structure from district court's construction into a self-styled category 7, "embodiments of the project object structure defining layout ... and content ...." *E.g.*, Appx8352 (citing Appx49-50 ('497(5:7-8:49))); Appx9860. At columns 5:7-8:49,

the specification describes numerous files and components, e.g., "background.fla," "intro.fla," "slideTypen.fla," "nav.fla," an "Image Component," a "Video Component," and a "Text Component," with details about their native properties. Yet when assessing infringement, Impact Engine's expert devoted only a single paragraph per product-group to all of category 7, with just two sentences of generalized, functional assertions buried in a mass of cursory string citations. *See* Appx8390-8391 ¶287, Appx8667-8668 ¶520, Appx8890 ¶754. In particular, when addressing "Google Ads," he asserted that (1) "the preview rendering pipeline utilizes one or more data structures for the project object that defines layout (*e.g.*, positioning of content, asset width and height) and content (*e.g.*, asset paths or data feeds)"; and (2) "the data structures representing the project include project layer information." Appx8390 ¶287. He presented no evidence that any accused product contained the *specific* files and components described at '497 columns 5:7-8:49, or equivalents thereof.

The district court correctly rejected Impact Engine's attempts to evade its construction. It rebuffed Impact Engine's suggestion that the "construction did not 'set forth any required structure'" and confirmed that it had "identified a significant portion of the specification that describes how the project viewer renders a communication." Appx24. And it correctly observed that Impact Engine's expert had "danced around the issue, creat[ing] his own sort of generic labels for these things." Appx11348.

Impact Engine insists that its expert's opinions "were not cursory," but, like its expert, it relies on generalized assertions and unexplained string citations. *See* BlueBr73-74. Impact Engine failed to conduct a proper infringement analysis identifying where the structure required under the district court's construction appears in each accused product. The district court correctly granted summary judgment of non-infringement because Impact Engine did not even attempt that analysis. Appx24-25.

The non-infringement judgment should therefore be affirmed. If, however, the Court disagrees with the district court's construction of "project viewer" as recited in '497 claim 9 and '6,253 claim 1 and does not invalidate those claims under § 101, it should remand for the district court to consider in the first instance how any revised construction affects non-infringement and invalidity of those claims. *See* Appx16 n.6. This Court should decline Impact Engine's invitation to dig through the record and resolve factual issues neither presented nor decided below.

## III. '898 claim 30 is invalid under § 112 ¶ 1 because the specification does not explain how a compiler would group design layers, design elements, and content containers into slides

Claim 30 of the '898 patent requires a "compiling engine" for both "integrating the at least one selected media asset with the at least one selected online advertisement template" and "grouping the design layers, design elements, and content containers into the collection of slides so as to generate the communication

capable of being rendered in a manner so as to be content specific to the user data, keyword data, and geographic data." Appx215 ('898(20:11-17)).

The district court construed "compiling engine" and "compiler" according to the ordinary meaning of "compiler," as a program that translates source code into machine or object code. Appx11480-11481. Impact Engine has not appealed that construction. Impact Engine *has* appealed the court's holding that the specification did not describe and enable the claimed compiler as required by § 112 ¶ 1, but that ruling was correct because the specification does not explain how a compiler "would group the claimed design layers, design elements and content containers into a collection of slides to generate a communication." Appx27. The specification discusses how a "*project viewer*" would perform those tasks, but not how a conventional *compiler* or a "*compiling engine*" would. *Id.*

Under the written-description requirement, the specification must disclose every claim element in a manner sufficient to show that the inventors "possessed" the claimed invention at the effective filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2011) (en banc). "[T]he specification must describe an invention understandable to [a] skilled artisan and show that the inventor[s] actually invented the invention claimed." *Id.* Importantly, "it is the specification itself that must demonstrate possession"; extrinsic evidence does not suffice. *Id.* at 1352. And "a written description that merely renders the invention

obvious does not satisfy the requirement." *Id.* (citing *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997)).

Here, nothing in the specification describes a traditional compiler (a program for converting source code into machine language or object code) that groups design layers, design elements, and content containers into slides. The specification describes a "project viewer" that does so, Appx48-51 ('497(4:27-9:29)), but not a "compiling engine" or "compiler." The specification never mentions a "compiling engine," and it mentions a "compiler" only once, as black box 116 in Figure 1. Appx31. Step 306 of Figure 3 calls for "receiv[ing] and compil[ing]" a "customized communication project," Appx33, but the specification never explains how a compiler program would build a set of slides from design elements, as opposed to receiving slides from a user and compiling them into usable format. *See* Appx52 ('497(12:9-11) ("At 306, the customized communication project(s) are received from the user and compiled into a format suitable for transmission.")). Notably, claim 30 treats integrating media assets with a template to generate communications—which '497 claim 2 recites and which traditional source-code compilers conceivably could do—differently from the distinct task of grouping design layers, design elements, and content containers into slides, which the specification describes as a task for the "project viewer."

Impact Engine primarily argues that Google forfeited any § 112 arguments by not including them in invalidity contentions. BlueBr75. But Impact Engine ignores that the district court *itself* raised the issue at the supplemental claim-construction hearing, explaining that "[t]here is zero information in this patent to explain how a compiler does any of those steps." Appx7820; *see also* Appx7821, Appx7863. Google's summary-judgment motion echoed that point. Appx9246-9247. Impact Engine was thus on notice of the issue during discovery, and it had a full opportunity to respond in Dr. Wicker's report, Appx10491-10495, and summary-judgment briefing, Appx9877-9878. Exclusion requires prejudice, and Impact Engine was not prejudiced. *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1345 (Fed. Cir. 2010) (no abuse of discretion allowing trial of written-description theory not included in contentions where patentee had sufficient notice).

Moreover, invalidity contentions are a creature of local rules, and this district's rules expressly provide that "[t]he Court may ... eliminate[ ] or modify the obligations ... set forth in these Patent Local Rules based on ... the circumstances of any particular case ...." S.D. Cal. Patent L.R. 1.3. Although the district court did not expressly address Impact Engine's forfeiture argument in its order, the discussion at the hearing made clear that the court intended to reach the merits. Appx11349, Appx11379, Appx11385-11387. Any error of omission was harmless, and a remand

to explain why would be pointless when the court had the discretion to eliminate or modify the contention requirements.

On the merits, Impact Engine points to nothing in the specification that describes a *compiler* that groups design layers, design elements, and content containers into slides. Figures 1 and 3 say no such thing, and neither do the cited portions of columns 3, 4, and 12. Dr. Wicker testified that a POSA "would have understood how to implement this functionality in software." Appx10494-10495. But the written-description question is not whether a *skilled artisan* would have found it *obvious* to implement the claimed functionality in software. *PowerOasis*, 522 F.3d at 1310. It is whether the original specification itself showed that *these inventors* invented and claimed use of a traditional *compiler* to group design layers, design elements, and content containers into slides. The specification makes clear that they used the "project viewer," not the compiler, for that purpose.

Apparently recognizing this, Impact Engine argues that skilled artisans would have understood that the distinction between the component modules was "somewhat arbitrary" and that they could move functionality from the "project viewer" to the "compiling engine." BlueBr78-79 (citing Appx10493-10494). But that is at most an *enablement* argument, not an argument that the specification contains a *written description* of a compiler or "compiling engine" performing these functions. The specification treats the "project viewer" and compiler as separate components, *e.g.*,

Appx31 ('497 Fig. 1), Appx48-52 ('497(3:9-29, 4:27-9:29, 12:6-11)), and claim 30 itself recites the "advertisement generation engine" and "compiling engine" separately. Impact Engine's criticisms of Google's expert, Dr. Jansen, are irrelevant, as neither Google's motion, Appx9246-9247, nor the district court's order, Appx27, relied on his report.

Because the specification did not describe the extraordinary compiler/"compiling engine" of claim 30, this Court need not reach enablement. But that ruling was correct too. The *Wands* factors are "not mandatory," *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991), and the district court did not need to analyze them because undue experimentation was not the primary problem. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318-19 (Fed. Cir. 2007) (affirming summary judgment of non-enablement without discussing undue experimentation). As the statutory language makes clear, a patent's written description is what must enable skilled artisans to make and use the claimed invention. Here, nothing in the written description describes using a *compiler* to group design layers, design elements, and content containers into slides. Whether the necessary experimentation was undue might have been relevant if the specification had taught to use a traditional compiler to perform that function. But it did not; it taught to use a "project viewer" to do so.

Furthermore, all Impact Engine offered on undue experimentation was its expert's conclusory assertion that functionality could be moved from one software module to another. Dr. Wicker did not explain how a traditional compiler that converts source code into machine language or object code could be harnessed to perform the vastly different "project viewer" task of grouping design components into slides. Impact Engine thus did not raise a triable question of fact regardless of whether *Wands* applied. *See Trs. of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362-64 (Fed. Cir. 2018) (finding non-enablement as a matter of law and reversing jury, without mentioning *Wands*, due to lack of a "basic enabling disclosure" and only "conclusory or unsupportive expert testimony").

Finally, Impact Engine complains about the concluding footnote in the district court's opinion expressing frustration that Impact Engine and its experts had "treated various claim terms representing separate component parts of the patented system as interchangeable and advocated for interpretations that broadly substitute individual parts of the system for each other in ways not supported by the teaching of the specification." Appx27-28 n.8 (also noting that "new claim terms appear[ed] over the course of the issuance of continuation patents in this family tree that ha[d] no reference whatsoever in the specification"). The court's concern was spot-on. Impact Engine's specification was poorly and vaguely drafted, and its ever-evolving claim terminology and arguments made the case more complicated and far lengthier than

it should have been. In the end, the court properly invalidated claim 30 under § 112 ¶ 1, and it could have invalidated other claims for similar reasons had it not invalidated them under § 101.

## CONCLUSION

Although this case followed a circuitous path, the district court ultimately recognized that Impact Engine could not have its cake and eat it too, and that the claims are invalid if broadly construed and not infringed if their coined terms are narrowly construed according to the specification. Regardless of whether this Court agrees with the precise split between invalidity and non-infringement, the district court's judgment was correct and should be affirmed.

Respectfully submitted,

PERKINS COIE LLP
QUINN EMANUEL URQUHART & SULLIVAN, LLP

by /s/Dan L. Bagatell

    Dan L. Bagatell

Counsel for Google LLC

**CERTIFICATE OF COMPLIANCE WITH TYPE–VOLUME LIMITATION**

1.     This brief complies with the type–volume limitation of Federal Circuit Rule 32(b). The brief contains 13,999 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word software and 14-point Times New Roman type.

Dated: May 5, 2023                                    /s/Dan L. Bagatell

                                                          Dan L. Bagatell